**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MUD KING PRODUCTS, INC. | § | CASE NO.  13-32101-H5-11 |
| | § | |
| | § | (Chapter 11) |

**MOTION TO ESTIMATE CLAIM OF NATIONAL OILWELL VARCO
FOR PURPOSES OF ALLOWANCE, DISTRIBUTION AND VOTING
PURSUANT TO 11 U.S.C. SECTION 502(C)**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT
YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY
CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.   IF
YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE
A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU
MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE
DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE
WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT
FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED
WITHOUT FURTHER NOTICE TO YOU.   IF YOU OPPOSE THE
MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST
ATTEND THE HEARING.   UNLESS THE PARTIES AGREE
OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE
HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR
ATTORNEYS.**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Debtor, MUD KING PRODUCTS, INC. ("Debtor" or "Mud King"), hereby moves

this Court pursuant to 11 U.S.C. § 502(c) for an order estimating the claim of National Oilwell

Varco ("NOV") at zero for purposes of allowance, distribution, and voting with respect to the

Debtor's Chapter 11 Plan.  The grounds for this Motion are as follows:[1]

---

[1] This summary is provided to assist the Court and does not waive any arguments set forth herein in the detailed briefing below.

- The NOV litigation threatens to exceed the net worth of Mud King in a manner that is disproportionate to the merits of any claim alleged therein.

- NOV has identified 3 categories of drawings in support of its claims:
  (1) "**Hundreds" of Drawings Provided to Mud King by NOV Employee:** Plaintiff's Complaint, 4; Complete Listing attached to TI.[2]

  (2) **23 Mud King Drawing Revisions Based on NOV Drawings:**  NOV alleges that Mud King only used 23 such drawings to revise its own drawings that were sent to a Chinese manufacturer.  See chart, Plaintiff's Complaint, 5-6.[3]

  (3) **2 Drawings Provided to Mud King by Larry Murray (an NOV Vendor)**

- All of the identified drawings are of mud pump parts which are manufactured by NOV and entities acquired by NOV, as well as by non-NOV manufacturers.

- Mud King sold and distributed such parts for years prior to this litigation, along with many other distributors and manufacturers, as such parts are not complex and have been widely replicated.

- NOV has asserted the following claims, all of which focus on NOV's assertion that the drawings were **trade secrets** and that NOV has been damaged as a result of Mud King's **use** of the **23 drawings**:  misappropriation of trade secrets, conversion, Computer Fraud and Abuse Act (CFAA), Texas Theft Liability Act (TTLA), civil conspiracy, aiding and abetting, and unjust enrichment.

- NOV cannot meet its burden of proving that the drawings are protectable trade secrets as required by the Texas law.  *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (enumerating six factor test for trade secret protection).

- Likewise, NOV cannot meet the requirements for proof of its claims under the CFAA, TTLA, or conversion.

- Absent a viable legal theory for protection of decades-old drawings of mud pump parts that had been replicated widely, NOV's claim should be estimated at zero.

- In the alternative, NOV's interests may be adequately protected through injunctive relief similar to the existing Temporary Injunction.  *See* Plaintiff's Complaint, Exhibit C.

---

[2] As outlined above, the TI outlines a process for adding documents; thus, it can be presumed absent a request to include additional documents, that the TI listing is substantially complete.

[3] Although these are characterized as "just a sampling" by NOV in its Third Amended Complaint, this list has been produced after full access to all of the drawings in Mud King's possession and ample time to review all email correspondence pursuant to NOV's unfettered electronic access.

- But even assuming that NOV could establish liability on any one (or all) of its overlapping legal theories, its total damages on all claims is limited, at best, to the amount of profit Mud King made on sales of parts that correspond to the 23 drawings that were revised -- $131,094.16. (Exhibit 1 to this Motion).

# I.    Summary of Motion and Relief Requested

On September 21, 2012, NOV filed suit against Mud King and various other parties for misappropriation of trade secrets, corporate espionage and related causes of action, alleging that employees of Mud King stole hundreds, if not thousands, of NOV engineering designs for use in Mud Kings products.  NOV has aggressively litigated this case and is seeking to recover damages based on multiple legal theories. While no damages sought have been adequately quantified or supported by NOV, the combination of damages claimed and legal expenses incurred by Mud King in connection with such claims threaten to exceed the company's net worth.  Prior to the bankruptcy filing, discovery was ongoing and not expected to be completed before February 2014.  A trial in this case is not expected before second half of 2014.  Mud King vigorously disputes this claim and it is currently unliquidated.

Mud King is in the process of preparing a plan which will provide for payment in full of all secured and unsecured creditors provided NOV's claim is valued at zero. Hence, Mud King is seeking an order estimating NOV's claim at zero for purposes of allowance, distribution and voting under the terms of his plan, or in the alternative, a hearing lasting a maximum of 2 days.

As set forth in more detail in the Support for Request section, NOV's multiple legal theories center on a single issue regarding the validity of NOV's claim that certain drawings of old parts that have been widely manufactured by companies other than NOV for many years are protectable trade secrets.  Mud King disputes the validity of NOV's claims against it in their entirety, but may assume certain facts as true in this motion for the purposes of demonstrating that NOV's damages, if any, are minimal.

## II.      Jurisdiction and Venue

1.      This Court has jurisdiction by virtue of 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1), (b)(2)(B).  The statutory predicates for the relief requested are 11 U.S.C. § 502(c) and Bankruptcy Rule 3018.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1408(1) because the Debtor has resided in this district for more than 180 days preceding the filing of these bankruptcy cases.

## III.      Background of Request

3.      On April 5, 2013, (the "Petition Date") the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code, 11 U.S.C. §§101 et sq. (the "Bankruptcy Code").  The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee or Committee has been appointed.

4.      Mud King Products, Inc. is a Texas corporation that is a global supplier of quality oilfield replacement parts with its primary offices located at 15211Woodham Dr., Houston, Texas.  Mud King currently has approximately 30 employees.

5.      On or about September 21, 2012, litigation was initiated in Harris County District Court against the Mud King Products, Inc. and various other defendants for misappropriation of trade secret and related actions.  On or about October 19, 2012, this litigation was subsequently removed to the Federal District court in Houston, where it remains pending, in the case styled as *National Oilwell Varco v. Mud Ling Products, L.L.C. et al,* Case No. 4:12-cv-03120, in the United States District Court for the Southern District of Texas, Houston Division ("Litigation"). Debtor has denied the allegations in the Litigation.  The Litigation remains pending and has been stayed due to the bankruptcy filing.

6.     Since the Litigation was filed, the Debtor has spent in excess of $413,000 in legal fees and related expenses.  Due to the complex nature of the Litigation, the case is expected to continue for at least three more years and attorneys' fees and expenses for the Debtor will continue to average $60,000 per month, or an additional $2 million.

7.     The pending Litigation has also negatively impacted Debtor's sales.  Since the Litigation was initiated, Debtor's sales have decreased by an average of $728,000 per month. This significant decline in sales, coupled with the astronomical legal fees and expense, are the primary reasons for this bankruptcy filing.  The Debtor intends to utilize this case to determine any liability owed to National Oilwell Varco with respect to the Litigation and treat the claim, if any, in a Chapter 11 plan of reorganization.  Absent Chapter 11 restructuring, the company is likely to continue suffer from deteriorating sales, huge legal fees and expenses, and potentially close.

8.     For the reasons below, the Debtor requests the claim to be estimated at zero.  In the alternative, Debtor will demonstrate that even assuming NOV could prevail in establishing liability against Mud King on any theory, it has not suffered any damages as a result of the conduct complained of and any risk of future harm has been prevented under the terms of the Temporary Injunction initially entered in state court and later reaffirmed in federal court by Judge Atlas.  Further, and in the alternative, even assuming that NOV is able to establish liability and damages as to any theory, the total amount of damage should be limited as discussed in more detail below.

## IV.    Support for Request

### A.  Parties and Claims

9.     Mud King is a Houston, Texas based oilfield services company. Mud King's core business is selling replacement pump parts for mud pumps. A mud pump is a large reciprocating

pump used to circulate drilling fluid, also known as mud, on a drilling rig. Mud King's pump parts are <u>not</u> high-tech. They are based on old designs, some of which are over thirty years old. Mud King distributes many products that are manufactured in China.  Mud King operates in a competitive marketplace. There are several dozens of manufacturers and dealers who have been selling the same parts as Mud King for many years.  Mud King has been in business since 2000, and employs approximately 35 people.

10.     NOV is a multinational corporation that has grown through a series of more than 300 acquisitions in the last 15 years, including the acquisition of manufacturers of certain parts at issue in the lawsuit filed by NOV against Mud King.   NOV manufactures land-based and offshore oil drilling rigs as well as all the major mechanical components for such rigs. The company also performs a number of services for the oil industry such as well and pipeline inspections and is one of the market leaders in supply chain management. NOV designs, manufactures and sells equipment and components used in oil and gas drilling, including mud pumps and replacement pump parts. NOV has manufactured many of its products in China.

11.     The replacement mud pump parts at issue in this case correspond to various original equipment manufacturer ("OEM") pumps originally manufactured by NOV.  NOV does not allege that any of these pumps or pump parts are protected by any registered patent or trademark.   Nor do they constitute secret or new technology. In fact, most of the pumps were designed decades ago.

12.     There is nothing illegal or wrong about selling aftermarket, OEM-equivalent parts. Numerous companies (including at least one eventually purchased by NOV[4]) sell aftermarket, NOV-equivalent pump parts across Texas, the United States, and abroad. Mud King

---

[4] Plaintiff states in its Amended Complaint that it purchased PEP, Inc. in 1997. Prior to the purchase, PEP, Inc. was in the business of selling aftermarket pump parts for Plaintiff's pumps.

is one such company, and it legally sold the NOV-equivalent pump parts at issue for many years prior to any alleged wrongdoing.

13.     NOV alleges that it learned in August 2012 that one of its employees was providing NOV drawings of mud pump component parts to a Mud King employee.  Plaintiff's Third Amended Complaint ("Plaintiff's Complaint").  Because Mud King had already been selling these same parts for over a decade and such parts had been widely produced by manufacturers other than NOV, it is not clear whether any benefit could be derived from such drawings.  NOV's employee was allegedly paid $900 for the drawings.  NOV filed suit in Harris County District court in September 2012 seeking, among other things, a temporary restraining order. Mud King attended a mediation with NOV which resulted in an Unopposed Temporary Injunction Order (the "TI").  Plaintiff's Complaint, Exhibit C.

14.     The TI provides that Mud King will not use NOV's drawings.  Importantly, the temporary injunction fully protects NOV's interests, and provides for an automatic enlargement if NOV has a good faith basis to believe they should be added:

> To the extent that NOV determines that Mud King possesses or possessed other NOV blueprints and used them to make or modify rig or mud pump components or to make or modify other blueprints, either directly or indirectly, prior to January 31, 2011, NOV may add the part numbers for those components to the list in paragraph (a). Further, Mud King would be prohibited from selling or attempting to sell, directly or through third parties, any such rig or mud pump components.
>
> NOV may only add such part numbers to the list in paragraph (a) if it has a good faith basis to believe that NOV blueprints were used to make or modify those components or blueprints prior to January 31, 2011.

TI (Plaintiff's Complaint, Exhibit C at p.13, subsection (c)).

15.     On October 19, 2012, Mud King removed this case to federal court.     Judge Nancy Atlas adopted the TI, which continues in full force and effect.  Importantly, the TI as entered by the state court and by Judge Atlas focuses on Mud King's **use of the drawings** and does not prohibit Mud King from continuing its established business with regard to the mud pump parts.  Judge Atlas recognized that Mud King had sold and distributed such parts for years, along with other distributors and manufacturers.  Thus, preserving NOV's *status quo* prior to the time the drawings were obtained by Mud King does NOT necessitate a blanket prohibition on the sale or manufacture of such common parts.

16.     The state court permitted NOV full, unlimited access to all computers on Mud King's premises.  NOV obtained a full and complete forensic image of all of Mud King's computers, including access to all drawings and to all financial books and records (as well as other business records) as they are kept in the ordinary course of business.   In the course of the litigation, NOV has identified the following **3 categories of drawings** that are at issue in the case against Mud King:

    a.   "**Hundreds" of Drawings Provided to Mud King by NOV Employee:**  "Hundreds" of drawings were allegedly distributed to Mud King by NOV's employee, Lilliana Arredondo, who accessed the drawings "outside the scope of her job responsibilities while employed by NOV and provided them to Freddy Rubiano, an employee of Mud King.  Plaintiff's Complaint, 4; *see also*, Complete Listing attached to TI.[5]

    b.   **23 Mud King Drawing Revisions Based on NOV Drawings:**  From the hundreds of drawings identified by NOV as belonging to them, NOV alleges that Mud King only used 23 such drawings to revise its own drawings that were sent to a Chinese manufacturer.  See chart, Plaintiff's Complaint, 5-6.[6]

---

[5] As outlined above, the TI outlines a process for adding documents; thus, it can be presumed absent a request to include additional documents, that the TI listing is substantially complete.

[6] Although these are characterized as "just a sampling" by NOV in its Third Amended Complaint, this list has been produced after full access to all of the drawings in Mud King's possession and ample time to review all email

     c.      **2 Drawings Provided to Mud King by Larry Murray:** Defendant Larry Murray of SMC, Inc., an NOV vendor, allegedly provided Mud King President Nigel Brassington with 2 drawings from companies acquired by NOV, including 1 drawing of an Emsco F-1000 crosshead dated January 12, 1979 and 1 drawing of an Ideco threaded plug retainer dated April 9, 1975.  Murray Depo. Tr. 109-10, 117-18 and Dep. Exhs. 5 and 7.

17.    NOV also makes allegations against Don Humiston, a former Mud King employee and the alleged "whistleblower" who notified NOV through an anonymous letter that an NOV employee was sharing NOV drawings with a Mud King employee.  Plaintiff's Complaint, 7 (¶15) and Exhibit A (the anonymous letter).  Specifically, NOV challenges whether Humiston, who began working for a competitor of Mud King before the letter was sent, was really a whistleblower.  *Id.*  NOV further alleges that Humiston has "turned over a portable hard drive to NOV that contains several NOV blueprints, as well as blueprints of other companies, including Mud King" and that "Humiston's professed reasons for having these blueprints on a portable hard drive are dubious."  *Id.*

18.    In connection with the **3 categories of drawings related to Mud King**, NOV alleges the following causes of action against Mud King:

      (i)      Misappropriation of trade secrets;

      (ii)     Conversion;

      (iii)    Computer Fraud and Abuse Act;

      (iv)    Texas Theft Liability Act;

      (v)     Civil conspiracy;

      (vi)    Aiding and abetting; and

---

correspondence pursuant to NOV's unfettered electronic access.

(vii)    Unjust enrichment.

19.    As set forth in more detail below, NOV came into this lawsuit following years where the industry status quo included multiple other manufacturers and distributors of the parts for which NOV now seeks protection.  NOV does not assert, nor could it, that the parts are subject to any trademark or patent protection.  Rather, NOV attempts to argue that the drawings themselves offer some sort of protectable "secret" of value to NOV.  Far from being secret, the parts at issue are commonplace and the designs are so easily ascertained that **it is not necessary to have access to the NOV drawings at issue in order to replicate the part.**

20.    **As a threshold matter, the burden is on NOV to prove that the information in the drawings were in fact "trade <u>secrets</u>" and that the information was "not readily ascertainable."**  *Stewart & Stevenson Servs., Inc. v. Serv-Tech.,* 879 S.W.2d 89, 99 (Tex. App.--Houston [14th Dist.] 1994, writ denied).   The burden of proving secrecy status falls on the party claiming secrecy status.  *Id.*   NOV cannot meet this threshold burden.    To the contrary, the pervasive manufacture of such parts lends itself to one of two conclusions:  Either the design of the parts was readily ascertainable and thus replicated absent the drawings at issue or the drawings (assuming *arguendo* they are needed at all to reproduce the parts) have not been protected adequately by NOV, thus losing any protection they might have possessed many years ago at the time the original part was designed.

21.    **NOV's damages are limited, at best.**  Even assuming that the drawings are protectable trade secrets, only those that were "used" in some manner can give rise to the recovery of damages under any theory raised. Thus, only the drawings identified by NOV as being revised and utilized, the 23 Mud King Drawings Revised Based on NOV Drawings, are relevant to the calculation of damages under any theory.  Given the facts of this case, and as

outlined in more detail below, arguments exist for a finding that NOV was not damaged by the conduct.  Assuming solely for the sake of argument that the Court decides to award damages, such damages should be limited to recoverable damages in connection to those 23 drawings.

### B.  No Protectable Trade Secret Exists in Old Parts Manufactured by Multiple Different Companies for Decades Domestically and Abroad

22.     To state a claim for trade secret misappropriation under Texas law, the burden is on NOV to (1) establish that a trade secret existed; (2) demonstrate that the trade secret was acquired by the defendant through a breach of a confidential relationship or discovered by improper means; and (3) show that the defendant used the trade secret without authorization from the plaintiff." *Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 149-50 (5th Cir. 2004).*

23.     By definition, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business and *presents an opportunity to obtain an advantage over competitors who do not know or use* it."  *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting *Computer Assocs. Intern. V. Altai*, 918 S.W.2d 453, 455 (Tex. 1994))(emphasis added).

24.     In keeping with the leading case from the Texas Supreme Court, *In re Bass*, Texas courts evaluate a plaintiff's claim to trade secret protection based on the following **six factor test** from the Restatement of Torts:

> **Factor 1:**  the extent to which the information is known outside of his business;
>
> **Factor 2:**  the extent to which it is known by employees and others involved in his business;
>
> **Factor 3:**  the extent of the measures taken by him to guard the secrecy of the information;
> **Factor 4:**  the value of the information to him and to his competitors;
>
> **Factor 5:**  the amount of effort or money expended by him in developing the information;

**Factor 6:** the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d at 739 (citing RESTATEMENT OF TORTS § 757 cmt. b. (1939); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 reporter's n. cmt. d). In *Bass*, the question was whether certain geological seismic information qualified as a trade secret. While the Court stated that a party claiming trade secret status is not required to satisfy all six factors and that the courts should weigh to factors in the context of the surrounding circumstances to determine if the information at issue qualifies as a trade secret, the Court in *Bass* concluded that *all but one factor* weighed in favor of trade secret status. *In re Bass*, 113 S.W.3d at 140. In contrast, NOV's mud pump part case, as demonstrated below, fails to satisfy the six factor test mandated by *Bass*.

25. **Factor 1: the extent to which the information is known outside of his business.** Stated another way, **a trade secret must be a secret.** The burden of proving secrecy status falls on the party claiming secrecy status. *Stewart & Stevenson Servs., Inc. v. Serv-Tech.,* 879 S.W.2d 89, 99 (Tex. App.--Houston [14th Dist.] 1994, writ denied). In *Bass*, the company seeking trade secret protection showed that other than the entity who conducted the geological survey, **the company had not provided any outside access to the data**. *In re Bass*, 113 S.W.3d at 15-16. Further, the company seeking trade secret protection in *Bass* established that it would be **impossible for others to obtain this information** without paying a substantial sum for a license or right to view the existing data or paying an even larger amount to conduct another seismic survey. *Id.* In contrast, NOV has not demonstrated control over the data, much less secrecy, through the decades the drawings have been in existence, including drawings dated from the 1960s. To complicate matters, NOV has not established that the data was secret at the time of its acquisition of some of the manufacturers who owned the drawings. Most importantly, the circumstances in which NOV finds itself, as only one of a number of long-standing

manufacturers of the same replacement parts answers the question posed by Factor 1 -- **the information on how to manufacture such parts is widely known outside of NOV's business.**

26.     **Factor 1 requires a threshold finding of secrecy:**  Since widespread production by other manufacturers presents a fatal obstacle to a trade secret case, NOV seeks to "skip a step" by pointing to the alleged misconduct of its own employee, Lilliana Arredondo, and the alleged misconduct of its former employee, Freddy Rubiano.  However, such misconduct does not permit NOV to skip over the definitive requirement of proving secrecy.  Courts following the *Bass* decision have made it clear that there can be no cause of action for misappropriation of information that is not either secret, or at least substantially secret. *SP Midtown, Ltd. v. Urban Storage, L.P.,* No. 14-07-00717-CV, 2008 Tex. App. LEXIS 3364, 2008 WL 1991747, at *5 n. 5 (Tex. App.--Houston [14th Dist.] May 8, 2008, *pet. denied*) (mem. op.) (*citing* Stewart & Stevenson Servs., Inc., 879 S.W.2d at 99).   Regardless of NOV's characterizations of the conduct of any defendant, they cannot create a protectable trade secret if the information is not confidential.  *See also Luccous v. J.C. Kinley Co*., 376 S.W.2d 336, 338 (Tex. 1964) ("It is self-evident that the subject matter of a trade secret must be kept secret."); *Astoria Indus. of Iowa, Inc. v. SNF, Inc*., 223 S.W.3d 616, 634 (Tex. App.--Fort Worth 2007, pet. denied) ("Before information can be termed a trade secret, there  must be a substantial element of secrecy."); *Gonzales v. Zamora*, 791 S.W.2d 258, 264 (Tex. App.--Corpus Christi 1990, no writ) ("[T]he key part of the definition of trade secret is secrecy.").

27.     **Factor 2:  the extent to which it is known by employees and others involved in his business.**   In Bass, **only four people within the company had even seen the data, and their jobs included analyzing the information**. *In re Bass*, 113 S.W.3d at 16-17.  In contrast, NOV alleges, that Arredondo, a fairly low level, hourly-paid NOV employee with no

engineering, drafting, or technical responsibilities, was able to access "hundreds" of the drawings at issue, send them electronically, and copy them.   NOV further alleges that Arredondo's conduct was not detected by any NOV internal system and thus went on unchecked until the time that NOV received an anonymous letter in August 2012.   NOV has not proven, nor can they prove, that they restricted access to the drawings in question within their organization or in their business dealings during their ownership of the entities that originally produced the drawings. With regard to any of the drawings from companies that NOV acquired, the measures taken to protect the drawings prior to NOV's acquisition of the companies is merely speculative.

28.    **Factor 3:  the extent of the measures taken by him to guard the secrecy of the information.**   In contrast with the low level of vigilance demonstrated by NOV in permitting access and distribution by Arredondo, the company in *Bass* guarded the secrecy of valuable seismic data by **keeping the data in a secured, climate regulated vault that was accessible only to those who knew the combination**. *In re Bass*, 113 S.W.3d at 17.   Cases addressing this factor emphasize that **vigilance in guarding the trade secret is required because, once the information is publically revealed through the owner's lack of vigilance, it is no longer a trade secret; the element of secrecy is gone**. *See Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 457 (Tex. 1996) ("Vigilance in the area of trade secrets is required, particularly because once a trade secret is made public all ownership is lost."); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.--Houston [1st Dist.] 1998, pet. dism'd) ("Courts have refused to give trade secret protection when the material or procedure sought to be protected has been publicly disclosed."); *see also Interox America v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984) (concluding that one who voluntarily discloses

information or fails to take reasonable precautions to insure its secrecy cannot claim that information constituted trade secret).

29.     **Factor 3 is not satisfied where information has been released to third parties without adequate controls.**  In addition to Mud King, NOV has sued SMC, a former NOV vendor, and Larry Murray, one of SMC's current owners.  *See* Plaintiff's Complaint at 32-33. NOV alleged that SMC and Murray had entered into a confidentiality agreement ("the Secrecy Agreement") that covered the two drawings that Murray forwarded to Mud King.  *Id.* at 24 and Complaint Exh. R.  However, sworn testimony by Murray revealed, among other things, that the confidentiality agreement in question had not been renewed when the company changed hands and that NOV had never followed up on its obligation to request the return of any information. Exhibit 2 - Murray Depo. Tr. at 185-86 and Dep. Exh. 10.   In circumstances such as these where the information that NOV seeks to protect has been disclosed to third parties without vigilance in maintaining confidentiality, any asserted trade-secret protection is lost. *See, e.g., Numed, Inc. v. McNutt*, 724 S.W.2d 432, 435 (Tex. App.--Fort Worth 1987, no writ) (concluding that data not trade secret because owner had previously disclosed it in contracts to its customers); *Interox America*, 736 F.2d at 202 (considering owner's past conduct of voluntarily giving third-party contractors manuals containing technical information to support conclusion that information not entitled to trade secret protection); *Furr's Inc. v. United Specialty Advertising Co*., 385 S.W.2d 456, 459 (Tex. Civ. App.--El Paso 1964, writ ref'd n.r.e.) ("The owner of the secret must do something to protect himself. He will lose his secret by its disclosure unless it is done in some manner by which he creates a duty and places it on the other party not to further disclose or use it in violation of that duty.").

30.     **Factor 4:   the value of the information to him and to his competitors**.  The "market value" of the NOV information, if any, is questionable.  In *Bass*, the information was highly valuable to the company's competitors, describing the seismic information as a "vital commodity" upon which all interpretation of the land's value is based.  Unlike  the seismic data in *Bass*, which analyzes structures that by their nature are not visible to the naked eye upon inspection, the NOV drawings portray the dimensions of a mud pump part that are readily ascertainable on inspection and that may be duplicated based on general engineering knowledge. Exhibit 2 – Murray Depo. Tr. at 199-209.  *H. E. Butt Grocery Co. v. Moody's Quality Meats*, 951 S.W.2d 33 (Tex. App. Corpus Christi 1997)(process was not a trade secret because it was commonly known in the industry and widely utilized by others). NOV has not alleged, nor can they prove, that the drawings at issue have a particular market value, deliver a market advantage to the holder, or that Mud King's short term possession of the drawings will detract from NOV's value in any way.   Per an affidavit produced by NOV, Arredondo (the NOV employee) was allegedly paid $900 for the drawings.

31.     **Factor 5:  the amount of effort or money expended by him in developing the information.**   In *Bass*, the company alleged that it spent substantial time, expense, and inconvenience, in developing the data.  *In re Bass*, 113 S.W.3d at 18.   However, in the absence of testimony as to a specific amount, the Court declined to attribute any weight to such allegations.   *Id.*  NOV has not produced any information regarding specific costs associated with the production of the drawings at issue, which go back years and, in some cases, were from other entities prior that were later acquired by NOV.  Thus, the cost, and in some cases the source, of the drawings is speculative.

32.     **Factor 6:     the ease or difficulty with which the information could be properly acquired or duplicated by others.**     In the *Bass* case, the Court found that a competitor would have substantial difficulty obtaining the data because it would have to spend a tremendous amount to conduct another shoot, which would require current owner's permission, or, alternatively, it would have to pay the current owner a substantial license fee to use the data. *Id.* at 740-742.  This final factor was determined to weigh heavily in favor of trade secret status. *Id.* at 742.  In contrast, the parts at issue in the NOV case have been widely duplicated with the knowledge of NOV for years prior to the filing of the instant case.  In truth, NOV's case has been mischaracterized as one concerning trade secrets when it should more properly be characterized as a case about employee conduct.  NOV's anger at the conduct of its own employee, Arredondo, and an employee of Mud King who was formerly employed by NOV, Freddy Arredondo, does not make the drawings secret.  The drawings and the parts were not secret before NOV encountered this employee issue and they cannot be made secret now.  *See, e.g. Zoecon Indus. v. American Stockman Tag*, 713 F.2d 1174, 1179 (5th Cir. 1983) (to qualify as a trade information must not be generally known by others in the same business nor *readily ascertainable* by an independent investigation) *Id.*; *see also Bluebonnet Petroleum, Inc. v. Kolkhorst Petroleum Co.*, 2008 Tex. App. LEXIS 7724, 25-26 (Tex. App. Houston 14th Dist. Oct. 9, 2008, *pet denied*)(customer list that could be gleaned from publicly available data not protectable as a trade secret); *Johnson Controls, Inc. v. Guidry*, 724 F. Supp.2d 612, 630 (W.D. La. 2010) (refusing to issue injunction when the facts showed that the employee returned, destroyed, and did not use the information from his former employer that was in his possession after his employment ended).

**C. NOV Cannot Demonstrate the Element of Commercial Use with Regard to the Majority of Drawings**

33.     The current case includes a multitude of drawings that were not utilized at all and had no negative impact on NOV.  In order to satisfy the "use" requirement, the Fifth Circuit and Texas intermediate courts have required that plaintiffs demonstrate "use" of a trade secret through proof of "**commercial use** by which a person seeks to profit from the use of the secret.'" *Devon Energy Corporation v. Westacott,* 2011 U.S. Dist. LEXIS 30786 (S.D. Tex. 2011)(J. Rosenthal)(deleting data did not satisfy the "use" element of trade secret misappropriation).

34.     Mere possession cannot satisfy the "use" element of trade secret misappropriation. *Gen. Universal Sys. v. HAL Inc.*, 500 F.3d 444, 451 (5th Cir. Tex. 2007).  In the *General Universal Systems* case, the Fifth Circuit specifically disapproved of the magistrate judge's definition of "use" as "'[a]ny misappropriation of trade secrets, followed by an exercise of control and dominion [sic], is considered  a commercial use,'" noting that this definition has never been approved by the Texas Supreme Court, is not widely used in Texas courts, and unnecessarily confuses the standard used to define conversion.  *Id., citing Green Int'l v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997)(conversion is defined as the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his right).  Thus, since merely possessing the drawings but taking no action to utilize them commercially cannot constitute a "use" as a matter of law, only the 23 drawings that NOV contends were revised should even be considered in assessing damages.  Even as to those 23, there is an argument that no commercial use existed as to those drawings that were not used to manufacture a part and as to those 23 drawings for which no parts were sold in the relevant time period.  *Id.*

**D. NOV's Damages are Limited, at Best, and Future Harm is Prevented by Injunction**

35.    In a claim for trade secret misappropriation, a plaintiff's actual damages are recoverable in the form of lost profits.  *See Univ. Computing,* 504 F.2d at 535-36; *Carbo Ceramics, Inc. v. Keefe,* 166 F. App'x 714, 722 (5th Cir. 2006)(unpublished); *Elcor Chem. Corp. v. Agri-Sul, Inc.,* 494 S.W.2d 204, 214 (Tex. App.—Dallas 1973, writ ref'd n.r.e.).   In order to recover actual damages, NOV is required to show that Mud King's use of NOV's trade secrets proximately caused NOV to suffer a specific injury. Proximate cause consists of two elements: (1) foreseeability, and (2) cause in fact. *McClure v. Allied Stores of Tex., Inc.,* 608 S.W.2d 901, 903 (Tex. 1980). Both elements must be present. *Id.* Foreseeability is satisfied by showing that the actor should have anticipated damage to others by his wrongful act. *Id.* To establish cause in fact, a party must show "that the act or omission was a substantial factor in bringing about the injury and without which no harm would have occurred." *Id.* "Proximate cause cannot be established by mere guess or conjecture, but rather must be proved by evidence of probative force." *Id.* "There need not, however, be direct and positive proof, as the [fact finder] may infer proximate cause 'from the circumstances surrounding the event.'" *Mosley v. Excel Corp.,* 109 F.3d 1006, 1009 (5th Cir. 1997) (quoting *B. M. & R. Interests v. Snyder,* 453 S.W.2d 360, 363 (Tex. Civ. App.—Tyler 1970, writ ref'd n.r.e.)).

36.    To recover lost profits, a party must introduce "objective facts, figures, or data from which the amount of lost profits can be ascertained." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). "Although the uncertainty of damages is not fatal to recovery once the fact of damage is established, it is nevertheless a reasonable degree of certainty with which the extent of damages must be shown." *A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc.*, 798 S.W.2d 606, 615 (Tex. App.—Dallas 1990, writ denied). "There can be no recovery for damages which are speculative or conjectural." *Id.* Rather, damages must be ascertainable "by

reference to some fairly definite standard, established experience, or direct inference from known facts." *Id.*

37.     Recognizing the difficulty in proving lost profits and the wide variation that exists factually between cases, the Fifth Circuit has permitted courts to utilize a "flexible" approach to calculating damages in misappropriation cases based on the facts of the individual case, including: the value of plaintiff's lost profits, the defendant's actual profits from the use of the secret, the value that a reasonably prudent investor would have paid for the trade secret, the development costs the defendant avoided incurring through misappropriation, or a "reasonable royalty" where appropriate. This variety of approaches demonstrates the used to calculate damages for claims of misappropriation of trade secrets. See *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. Tex. 2012), *citing Univ. Computing*, 504 F.2d at 535.

38.     Given the publicly available data regarding NOV's profits and the already widespread replication of the parts at issue far in advance of this litigation, NOV cannot prove that it has lost any profit based on Mud King's alleged conduct.   Assuming for the sake of argument that NOV possessed a "trade secret" as defined by Texas law and that NOV can prove that commercial use occurred with regard to all of the parts at issue, NOV's measure of damages might arguably be ascertained through the defendant's profits from the sale of the parts at issue. Without admitting any liability, it is easy to ascertain that of the 23 drawings that NOV claims that Mud King revised, only a small number of parts corresponding to such drawings[7] were sold by Mud King.   See chart attached as Exhibit1 identifying the sales for the parts corresponding to the 23 drawing in controversy during the relevant time period.[8]   **Over the relevant time period**

---

[7] Mud King does not admit that the parts that correspond to the identified drawings were actually made based on the NOV drawings, but argues instead that even if you assume that as fact, NOV's damages are limited.
[8] The chart is based on the time period from the date that former NOV employee Freddy Rubiano was hired until the

at issue in this lawsuit, Mud King's books reflect that it had no sales for 8 of the 23 drawings and only $131,094.16 in gross profit attributable to the remaining 15 drawings in controversy.

### E. Texas Theft Liability Act Claim and Conversion Damages are Limited, at Best

39.     The Texas Theft Liability Act ("TTLA") provides a civil cause of action for damages against a party who commits theft by any method defined under the Texas Penal Code. *See* TEX. CIV. PRAC. & REM. CODE §§ 134.001-.005 (Vernon 2011). With respect to theft of trade secrets, a plaintiff may establish a claim by showing: (1) without the plaintiff's consent; (2) the defendant knowingly steals the plaintiff's trade secret, makes a copy of an article representing the trade secret, or communicates or transmits a trade secret; and (3) the plaintiff sustains damages as a result of the theft. *See* TEX. PENAL CODE § 31.05 (Vernon 2011) (providing the first two elements); *TEX. CIV. PRAC. & REM. CODE § 134.005(a)* (providing the third element).  In Texas, conversion has four elements: (1) the plaintiff's legal possession of the property or was entitlement to it; (2) the defendant's wrongfully exercise of dominion and control over the property, excluding the plaintiff; (3) the plaintiff's demand of the property's return; and (4) the defendant's refusal. *Arthur W. Tifford PA v. Tandem Energy Corp., 562 F.3d 699, 705 (5th Cir. 2009)* (citing *Small v. Small, 216 S.W.3d 872, 877 (Tex. App.--Beaumont 2007, pet. denied)).*

40.     Assuming for the sake of argument that NOV possessed a "trade secret" as defined by Texas law and that NOV can satisfy the first two elements of a claim under the TTLA (despite the disclosure of information by its own employee), NOV cannot prove that it has sustained damages as required for liability under the TTLA.  Under the TTLA, a person who commits theft is civilly liable for the damages resulting from the theft. TEX. CIV. PRAC. & REM.

_____

date of the original injunction proceeding.

CODE § 134.003(a) (Vernon 2011). A person who has sustained damages resulting from theft may recover the amount of actual damages found by the trier of fact plus an additional amount not to exceed $1,000. Id. § 134.005(a). The TTLA does not further define actual damages, but Texas courts have interpreted actual damages to mean those recoverable at common law. Beaumont v. Basham, 205 S.W.3d 608, 619 (Tex. App.--Waco 2006, pet. denied). Under the common law theory of conversion, damages are generally the market value of the property at the time of the conversion. Soto v. Sea-Road Int'l, Inc., 942 S.W.2d 67, 74 (Tex. App.--Corpus Christi 1997, writ denied). Additionally, damages may include "other losses or expenses necessary to compensate the plaintiff for all the actual losses or injuries sustained, not merely the reasonable market value of the property, as a natural and proximate result of the defendant's wrong." Id. Proof of damages for reasonable market value, however, must be based on a definite standard and established with a reasonable degree of certainty. A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc., 798 S.W.2d 606, 615 (Tex. App.--Dallas 1990, writ denied). There can be no recovery when damages are speculative or conjectural. Id.

41.     NOV has not alleged that there is any commercial market for the sale of the drawings as a basis for its recovery under its TTLA claim or its common law conversion claim. The only "market value" demonstrated by the facts of this case is the single sales transaction that allegedly occurred when NOV's employee delivered "hundreds" of drawings to Mud King's employee for a sum of $900.[9]

42.     In the event that the Court finds liability exists under TTLA and/or a common law claim for conversion, the damages must be limited to either the actual value allegedly exchanged (as a measure of commercial value) or, at most, the profits that Mud King made as to 15 of the

---

[9] NOV produced an affidavit from its employee, Lillian Arredondo, attesting that she had been paid $900.

23 parts for which drawings were allegedly revised.  As discussed above, **Mud King's books reflect that it had no sales for 8 of the 23 drawings and only $131,094.16 in gross profit attributable to the remaining 15 drawings in controversy.**

### F.  NOV Cannot Prevail on the Computer Fraud and Abuse Act Claim

43.    **There is a split among the circuits as to whether the CFAA even applies to cases like NOV's** because the information from the computer was distributed by an employee with authorized access.  The 9th Circuit and other courts view the CFAA as a statute designed to target actual outside "hacking" by an unauthorized user rather than an employee with authorized use who misappropriates data or exceeds the scope of her authorized access. *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012)(en banc); but see *United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010); *United States v. John*, 597 F.3d 263 (5th Cir. 2010); *Int'l Airport Ctrs., LLC v. Citrin*, 440 F.3d 418 (7th Cir. 2006).

44.    In *Nosal*, the government prosecutors alleged that a former employee aided and abetted his former coworkers in "exceeding their authorized access" to their employer's computers, with intent to defraud.  *Id.*  Similarly, in this case, NOV alleges broadly that the Mud King defendants aided and abetted NOV employee Arredondo in exceeding her authorized access.  Plaintiff's Complaint, 31.  NOV goes even further, alleging that defendants Mud King, Brassington, and Rubiano "accessed or caused access to NOV's computers and servers without authorization, or in excess of their authorized access, and by means of such conduct damages the integrity of NOV's data . . . ."  Plaintiff's Complaint, 27.  In *Nosal*, the court held that, "the phrase 'exceeds authorized access' in the CFAA does not extend to violations of use restrictions." *Id.* at 863. Rather, the court concluded that "the plain language of the CFAA targets the unauthorized procurement or alteration of information, not its misuse or misappropriation." *Id.*

(citation and internal punctuation omitted).  Thus, the Court of Appeals for the Ninth Circuit concluded that the CFAA does not address the situation raised by NOV where an employee "has unrestricted physical access to a computer, but is limited in the use to which he can put the information." *Nosal*, 676 F.3d at 857; *see also Orbit One Communications, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373, 385 (S.D.N.Y. 2010) ("The plain language of the CFAA supports a narrow reading. The CFAA expressly prohibits improper 'access' of computer information. It does not prohibit misuse or misappropriation. . . . [T]he statute as a whole indicates Congress's intent to prohibit access of a computer without authorization, not an employee's misuse of information that he or she was entitled to access or obtain."); *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1343 (N.D. Ga. 2007) ("[A] violation for 'exceeding authorized access' occurs where initial access is permitted but the access of certain information is not permitted."); *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Matsuda*, 390 F. Supp. 2d 479, 499 (D. Md. 2005) ("[T]he CFAA, however, do[es] not prohibit the unauthorized disclosure or use of information, but rather unauthorized access.").

45.     **Even if the CFAA applies, NOV cannot prove all of the elements because no "damage" was done to NOV's computers.**  As Judge Rosenthal has observed, the  CFAA should be narrowly construed in a civil case because of the threat of criminal liability.  *Devon Energy Corporation v. Westacott,* 2011 U.S. Dist. LEXIS 30786 (S.D. Tex. 2011)(J. Rosenthal). In order to show a violation under the CFAA, a plaintiff must prove: (1) the knowing transmission of a program, information, code, or command; (2) to a protected computer; and (3) that the transmission causes intentional **damage** without authorization. *Id., citing* 18 U.S.C. § 1030 (a)(5)(A) (requiring "intentionally caus[ing] damage"), *(e)(8)* (defining "damage"); *Kalow & Springnut, LLP v. Commence Corp., Civ. A. No. 07-3442(FLW),* 2008 U.S. Dist. LEXIS

48036, 2008 WL 2557506, at *3 *(D. N.J. June 23, 2008)* (dismissing a complaint under *Rule 12(b)(6)* that failed to allege intent to damage); *Oracle Corp. v. SAP AG,* 734 F. Supp. 2d 956 (N.D. Cal. 2010)(plaintiff has the burden to prove that defendant intentionally caused damage to the computer system).

46.     Assuming, *arguendo*, that the CFAA applies and that NOV can meet all of its elements, NOV has not demonstrated any additional or different damage that was allegedly suffered in connection with its CFAA claim. Thus, the limited damages demonstrated above applies with equal force to this claim.

**G. Conspiracy / Aiding and Abetting**

47.     To establish civil conspiracy, a plaintiff must demonstrate that the defendants had a meeting of the minds on an object or course of action, and that one of the members committed an unlawful, overt act in furtherance of the object or course of action. *Chon Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005).   Absent evidence of either a meeting of the minds or of any unlawful act by a defendant no liability exists for civil conspiracy.  *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968); SP Midtown, Ltd., 2008 Tex. App. LEXIS 3364, 2008 WL 1991747, at *9; *Bluebonnet Petroleum, Inc. v. Kolkhorst Petroleum Co.*, 2008 Tex. App. LEXIS 7724, 25-26 (Tex. App. Houston 14th Dist. Oct. 9, 2008, *pet denied*)(granting summary judgment on conspiracy claim in trade secret case where information did not qualify as a trade secret and communications between defendants did not show any meeting of the minds).

48.     As set forth above, NOV has challenging of proof on each of its claims regarding the allegedly unlawful activity.  Absent proof of an unlawful act and a meeting of the minds, NOV's claims for civil conspiracy (and aiding and abetting) must likewise fail.  But in the event that the Court finds merit as to NOV's conspiracy or aiding and abetting claim, the same

limitations exist with regard to damages, as noted above. Further, NOV has no distinct, different, or additional damages in connection with its claims for conspiracy or aiding and abetting.

### H. Unjust Enrichment

49.     No independent legal cause of action exists under Texas law for unjust enrichment.  *See, e.g.*, *Janvey v. Alguire*, 846 F. Supp. 2d 662, 674 (N.D. Tex. 2011) ("some Texas authorities hold that plaintiffs cannot state a claim for unjust enrichment"); *Casstevens v. Smith*, 269 S.W.3d 222, 229 (Tex. App.—Texarkana 2008, pet. denied) ("Unjust enrichment, itself, is not an independent cause of action . . . ."); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000)(no independent claim for unjust enrichment exists in a dispute concerning a written contract).

50.     Texas courts have applied unjust enrichment as "an equitable principle holding that one who benefits unjustly should make restitution for those benefits." *Villarreal v. Grant Geophysical, Inc., 136 S.W.3d 265, 270 (Tex. App.--San Antonio 2004, pet. denied)*. Like other equitable claims and defenses, **the existence of an adequate legal remedy renders equitable claims of unjust enrichment unavailable.** *See, e.g., BMG Direct Mktg., Inc. v. Peake, 178 S.W.3d 763, 770 (Tex. 2005)*; *see also Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 683-84 (Tex. 2000)* (holding unjust enrichment inapplicable when parties have express contract covering subject matter of dispute). Thus, in the event that NOV secures an award of damages on its claim for trade secret misappropriation or conversion, the existence of an adequate legal remedy would preclude NOV's claim for unjust enrichment because the same conduct forms the basis of both claims.

## V.   Conclusion

51.     No misappropriation of trade secrets has occurred.  For that reason alone, the claim should be estimated at zero.  Further, the drawings that NOV alleges were provided to

Mud King would have provided no benefit as Mud King had already been selling these same parts for over a decade, and many other companies sell these same parts. Moreover, none of the parts are patented and there is no legal impediment to selling them. Drawings for these parts are widely disseminated in the industry and NOV routinely provides them to third-parties for various uses. For each of those reasons, the claim should be estimated at zero

## VI.   Relief Requested

52.     Mud King seeks the entry of an order estimating the NOV claim at zero ($0.00) for purposes allowance, distribution, and voting.

53.     Estimation under section 502(c) is permitted, which provides that "[t]there shall be estimated for purposes of allowance under this section - (1) any contingent or unliquidated claim, the fixing of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c). Several courts have expressly relied on section 502(c) of the Code to estimate claims for purposes of distribution. In re Trident Shipworks, Inc., 247 B.R. 513, 514 (Bankr. M.D. Fla. 2000) (stating that a bankruptcy court "has discretion to determine the appropriate method of estimation, especially the purpose of the estimation," and stating that it is "well established that the estimation proceeding may be used … to determine the allowed amount for distribution purposes"); In re Poole Funeral Chapel, Inc., 63 B.R. 527, 532 (Bankr. N.D. Ala. 1986), later proceeding, approving settlement of claims 79 B.R. 37 (Bankr. N.D. Ala. 1987)) . Another court stated that "[a] section 502(c) estimation is often employed for purposes other than adjudicating the merits of claim, such as to establish voting rights or determine a plan's feasibility.  In some cases courts have estimated the value of a claim for all purposes, including distribution." In re C.F. Smith & Assoc., 235 B.R. 153, 159 (Bankr. D. Mass. 1999) (citations omitted). The Fifth Circuit has described the purposes and intentions underlying section 502(c) of the Code:

> We note that section 502(c)(1) is intended to permit estimation of claims the fixing of which might unduly delay the closing of the estate. This section of the Code serves at least two purposes. First, it is designed to avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions. By so doing, the trustee can more rapidly determine the payout to each creditor who, in the meantime, receives no interest on its claim. Second, section 502(c)(1) is designed to promote a fair distribution to creditors through a realistic assessment of uncertain claims.

In re Ford, 967 F.2d 1047, 1053 (5th Cir. 1992) (emphasis added).  Mud King is faced with exactly the same issues which were presented in the *Ford* case – the need to estimate for allowance, distribution and voting purposes.  Based on this Fifth Circuit case, the Court should not allow the NOV claim to impede confirmation of the Plan.

54.     Estimation of NOV's claim is highly appropriate in this case and meets all of the elements of Section 502(c).  First, the claim is certainly unliquidated.  Second, trial of the claim is currently set for no sooner than 2014.  The plan must be confirmed quickly so that business operations may continue absent the taint of Chapter 11.   The Debtor believes that it is likely to take years for this complex litigation to be finally resolved.   Absent the bankruptcy filing, discovery is not slated to be completed before February 2014. Hence, absent estimation, administration of the case and the payments to creditors is likely to be severely and unduly delayed.

55.     "In estimating a claim, the bankruptcy court should use whatever method is best suited to the circumstances. A bankruptcy court's estimation of the value of an unliquidated claim, the liquidation of which would unduly delay the proceedings, may be disturbed on appellate review only in the event of an abuse of discretion."   In re Brints Cotton Marketing, Inc., 737 F.2d 1338 (5th Cir. 1984).

56.     Hence, it is not necessary for the Court to have a full evidentiary trial according to all of the rules of procedure and evidence.  In fact, conducting such a trial would defeat the purpose of the Code section.  Rather, the court has the discretion to tailor the estimation proceeding to fit the particular circumstances of the case.  Here, Mud King submits that the estimation should be conducted on the basis of affidavits, expert reports and oral argument. Mud King submits that the court should grant each side two hours to put on its entire case including oral argument.

57.     A similar result was reached in In re Eagle Bus Manufacturing, 158 B.R. 421 (S.D. Tex. 1993).  There, in a much more complicated case which could have taken 200 days to try, the bankruptcy court set up an estimation process where "each side was permitted seven hours to present evidence and testimony by affidavit of live witnesses and expert testimony. Each side was permitted time to cross examine the witnesses of the opposing side. Both sides were permitted to introduce into evidence documents, charts, summaries and other visual aids. On appeal, the district court held that these procedures were both thorough and just and as such did not constitute an abuse of discretion.  Mud King submits that the subject case is much less complicated and that the estimation hearing can be conducted in a much more abbreviated fashion.

WHEREFORE, Mud King prays that the court estimate NOV's claim at zero for distribution and voting purposes and grant such other and further relief as is just and proper.

DATED:        May 31, 2013

Respectfully submitted,

HOOVER SLOVACEK LLP.

*/s/ Edward L. Rothberg*

By:_____

         EDWARD L. ROTHBERG
         State Bar No. 17313990
         MELISSA A. HASELDEN
         State Bar No. 00794778
         5847 San Felipe Suite 2200
         Houston, Texas 77057
         Telephone: (713) 977-8686
         Facsimile: (713) 735-4135

PROPOSED ATTORNEYS FOR DEBTOR

OF COUNSEL
Suzanne Lehman Johnson
MUSKAT, MARTINEZ & MAHONY, LLP
1201 Louisiana, Suite 850
Houston, TX 77002
Phone: 713-495-2323
Fax: 713-987-7854

## CERTIFICATE OF SERVICE

      I hereby certify that on May 31, 2013, true and correct copies of the foregoing MOTION TO ESTIMATE CLAIM OF NATIONAL OILWELL VARCO FOR PURPOSES OF ALLOWANCE, DISTRIBUTION AND VOTING PURSUANT TO 11 U.S.C. SECTION 502(C) document, and the proposed Order have been served by electronic mail to the parties listed below through the Court's ECF system and by U.S. first class mail, postage prepaid, to the parties on the attached service list.

*/s/ Edward L. Rothberg*

_____

EDWARD L. ROTHBERG

**MUD KING PRODUCTS, INC., DEBTOR**
**CASE NO. 13-32101-H5-11**
**MASTER SERVICE LIST**

Mud King Products, Inc.
15211 Woodham Dr.
Houston, TX 77073

Office of the U.S. Trustee
515 Rusk , Room 3516
Houston, TX 77002

Security and Exchange Commission
Attn: Angela Dodd
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604-2908

**TAXING AUTHORITIES:**

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Internal Revenue Service
Insolvency Section
1919 Smith MAIL STOP HOU 5022
Houston, TX 77002

Harris County MUD #36
312 Spring Hill Drive, Suite 100
Spring, TX 77386

Harris County, et al.
c/o John P. Dillman
Linebarger Goggan Blair & Sampson
P.O. Box 3064
Houston, TX 77253-3503

Texas Comptroller of Public Accounts
Revenue Accounting Div – Bankruptcy Section
P.O. Box 13528
Austin, TX 78711-3528

Texas Workforce Commission
Bankruptcy Section
P O Box 149080
Austin, TX 78714-9080

**SECURED CREDITORS:**

Ford Motor Credit Company LLC
Drawer 55-953
P O Box 55000
Detroit, MI 48255

**20 LARGEST UNSECURED CREDITORS:**

American Oiltools
20810 FM 2920
Hockley, TX 77447

Carton Design & Sales, Inc
8200 Blankenship Drive
Houston, TX 77055

Core International
10540 Bissonnet St., Suite 100
Houston, TX 77099

Cougar Pallet
13417 Aldine Westfield Rd
Houston, TX 77039

Dezhou L&A Petroleum Machinery Co, Ltd
2nd Road, East Expressway
DeZhou Economic Development Zone
Shandong, China Postal Code 200335

Drillers Machine Company, Inc.
P.O. Box 752234
Houston, TX 77275-2234

GPM International
5607 Campbell Road
Houston, TX 77041

Great Southwest Paper Company, Inc.
P.O. Box 15618
Houston, TX 77220-5618

JMP
P.O. Box 60827
Midland, TX 79711-0827

OBI
P.O. Box 203325
Dallas, TX 75320

Oilman Group Co., Ltd.
a/k/a Oilman Group Ltd.
Oilman Building
ZB-MOHO 1020, 999# Wangqiao Road
Rudong New Area, Shanghai, China

Polymer Products
2613 Aviation Parkway
Grand Prairie, TX 75052

RK Pipe & Supply
4115 S. Lewis St
New Iberia, LA 70560

Rotary Components Int., Inc.
P.O. Box  60429
Houston, TX 77205


Sjobrand, Inc.
P.O. Box  8198
Ennis, TX 75120

TC Die
1014  Courtesy Road
Houston, TX 77032

Tejas Machine, Inc
2115 Riley Fuzzel Rd
P.O. Box 1325
Spring, TX 77383


Tex Thread Inc
c/o Michael Avant, Chief Financial Officer
Apex Heritage Group
4133 Southerland
Houston, Texas 77092

Toombs Trust
717 N. Getty
Uvalde, TX 78801

Xpress Business Products, Inc.
P.O. Box 430906
Houston, TX 77243


Federico Andino Reynal
917 Franklin, Suite 600
Houston, TX 77002

D. John Nees, Jr.
Hawash Meade Gaston Neese & Cicack LLP
1221 McKinney Street, Suite 3150
Houston, TX 77010

John Zavitsanos
Ahmad, Zavitsanos, Anaipakos,
Alavi & Mensing P.C.
1221 McKinney, Suite 3460
Houston, TX 77010-2009


**PARTIES REQUESTING NOTICE:**

R. Christopher Naylor
Devlin, Naylor & Turbyfill, PLLC
4801 Woodway, Suite 420 West
Houston, TX 77056-1805

National Oilwell Varco, L.P.
c/o John Zavitsanos
Ahmad, Zavitsanos, Anaipakos, Alavi &
Mensing, P.C.
1221 McKinney, Suite 3460
Houston, TX 77010


National Oilwell Varco, L.P.
c/o Timothy C. Shelby
Ahmad, Zavitsanos, Anaipakos, Alavi &
Mensing, P.C.
1221 McKinney, Suite 3460
Houston, TX 77010

National Oilwell Varco, L.P.
c/o Ariadne S. Montare
Ahmad, Zavitsanos, Anaipakos, Alavi &
Mensing, P.C.
1221 McKinney, Suite 3460
Houston, TX 77010

Spring I.S.D. and Harris County MUD #36
c/o Yolanda M. Humphrey
Perdue, Brandon, Fielder, Collins & Mott, LLP
1235 N. Loop W., Suite 600
Houston, TX 77008


Spring I.S.D. and Harris County MUD #36
c/o Owen M. Sonik
Perdue, Brandon, Fielder, Collins & Mott, LLP
1235 N. Loop W., Suite 600
Houston, TX 77008

Spring I.S.D. and Harris County MUD #36
c/o Carl O. Sandin
Perdue, Brandon, Fielder, Collins & Mott, LLP
1235 N. Loop W., Suite 600
Houston, TX 77008

Tex Thread, Inc.
c/o Michael Avant, CFO
Apex Heritage Group
4133 Southerland
Houston, TX 77092


National Oilwell Varco, L.P.
c/o Monica Uddin
Ahmad, Zavitsanos, Anaipakos, Alavi &
Mensing, P.C.
1221 McKinney, Suite 3460
Houston, TX 77010