

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
07/17/2014

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MUD KING PRODUCTS, INC. | § | CASE NO. 13-32101-H5-11 |
| | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Debtor's Motion to Estimate Claim of National Oilwell

Varco, L.P. ("NOV") for Purposes of Allowance, Distribution and Voting Pursuant

to 11 U.S.C. § 502(c) and Debtor's Objection to Claim #14 Filed by National Oilwell

Varco, L.P.

NOV filed a proof of claim in debtor's bankruptcy listing the amount as

"unknown."[1] On September 21, 2012, NOV filed a petition in state court, styled

*National Oilwell Varco, LP vs. Mud King Products, Inc., Nigel Brassington, and*

*Freddy Rubiano,* cause no. 2012-55427, in the 165th District Court of Harris County,

Texas. NOV's state court petition sought a restraining order against Mud King, Nigel

Brassington, and Freddy Rubiano seeking to prohibit their use of NOV drawings of

mud pump parts. NOV also seeks monetary damages from defendants for various

causes of action allegedly due to debtor's acquisition and use of certain drawings

---

[1]See case number 13-32101, claims register, proof of claim no. 14.

1

from NOV's database that NOV contends are trade secrets.

After debtor filed bankruptcy on April 1, 2013, NOV's lawsuit was removed from state court and is currently pending in the United States District Court for the Southern District of Texas, Houston Division (Atlas, J.), styled, *National Oilwell Varco, LP v. Mud King Products, Inc., Nigel Brassington, Freddy Rubiano, Donald R. Humiston, Oilman Group Co., Ltd. a/k/a Oilman Group Ltd., Wellhead Solutions, Inc., Dezhou L & A Petroleum Machinery, Co., Ltd., Gary Clayton, Sean Cougot, Martin Rodriguez, SMC, Inc., and Larry D. Murray*, civil action no. 4:12-CV-03120. NOV's 3rd amended complaint filed in civil action no. 4:12-CV-03120 asserts causes of action against Mud King and other defendants for trade-secret misappropriation, conversion, conspiracy, and for violations of the Texas Theft Liability Act and the Computer Fraud and Abuse Act. NOV seeks damages including disgorgement of debtor's alleged profits of $283,859.96, avoided development costs of $4,001,546.90, and exemplary damages of $2,554,739.64, plus attorneys' fees, costs and prejudgment interest.

Mud King contends its gross profits made in connection with the NOV drawings was $131,094.28. However, Mud King seeks to estimate NOV's claim at zero dollars.

This Court has jurisdiction over these contested matters under 28 U.S.C. § 157

2

and § 1334. These are core proceedings under 28 U.S.C. § 157 (b)(2).

After review of all exhibits and considering the testimony of witnesses, this Court concludes that as to some of the 202 drawings at issue, NOV has failed to prove, as a basis for estimation of its claim, its causes of action for conversion, for unjust enrichment, and for violations of the Computer Fraud and Abuse Act (CFAA) NOV has failed to prove entitlement to exemplary damages. However, as a basis for its claim, NOV has borne its burden to prove Mud King misappropriated some trade secrets and violated the Texas Theft Liability Act (TTLA), for the following reasons:

## I. FINDINGS OF FACT

### a. The parties

NOV is a manufacturer and distributor of equipment and parts used in the oil and gas industry.[2] NOV has approximately 65,000 employees and locations world wide including 90 locations in the Houston area alone. (MK Ex. 46; Doc. 213[3] pp. 141-143) Among NOV's divisions is Rig Solutions, through which NOV sells drilling equipment and parts, including mud pumps and mud pump replacement parts. (Doc. 213 pp. 4-5) NOV's Rig Solutions sells "billions of dollars of equipment."

---

[2] Parties have agreed to the admission of all exhibits.

[3] Transcript references are to In Re Mud King Products Inc. case no. 13-32101 by docket entry number.

(Doc. 213, pp. 5-7) NOV controls roughly 70% of the market share of the mud pump replacement parts industry. ( Doc. 214 p. 38) NOV's customers include some of the largest Fortune 100 and Fortune 500 operators in the oil and gas industry. (Doc. 213 p.145)

In addition to complete mud pumps, NOV sells replacement parts for mud pump components. NOV also sells OEM[4] replacement parts for the brands that it owns. NOV's Mission division also sells fluid end replacement parts for mud pump brands that NOV does not own. Mission manufactures these aftermarket parts by reverse engineering an already manufactured OEM part to create an engineering blueprint that can be used to duplicate as closely as possible the specifications and tolerances of the original OEM part.[5] After market mud pump parts are designed to be compatible with OEM mud pumps. (Doc. 202 pp. 57-58, 132-133)

Mud King is a small, Houston-based manufacturer and distributer of aftermarket mud pump parts. Its only location is in Houston, Texas and it has approximately 30 employees. Mud King has been in business selling aftermarket replacement mud pump parts since 2000 and is one of numerous suppliers of

---

[4] Original equipment manufacturer-parts made by the original manufacturer of the part or according to the drawings used by the original equipment manufacturer.

[5] Replacement parts that are not manufactured by the original equipment manufacturer are referred to as "aftermarket" parts.

aftermarket mud pump replacement parts that comprise the remaining 30% of the mud pump replacement part market share. (Doc. 202 pp.172-173; NOV Ex.145) Aftermarket mud pump parts are less costly than OEM parts, but usually compatible with OEM parts. (Doc. 213 pp.146-147)

## b. Mud King's acquisition of NOV drawings

Freddy Rubiano is a quality manager for Mud King and a former NOV employee. (Doc. 202 pp.4-6; NOV Ex.145) Liliana Arredondo is Rubiano's sister in-law. During the time period pertinent to this proceeding, Arredondo was employed by NOV as a buyer planner whose duties included maintaining sufficient levels of NOV's parts inventory. (Doc. 214 pp.98-101; NOV Ex.101) To perform her duties Arredondo kept in frequent contact with NOV's outside parts vendors authorized to manufacture NOV's OEM parts pursuant to NOV's specifications. Arredondo accessed NOV's mud pump drawings stored in NOV's engineering database multiple times each day in order to communicate with and to send electronic copies of drawings to NOV's authorized vendors concerning NOV's parts manufacturing specifications. When buyer planners, such as Arredondo, sent parts drawings to outside vendors, the original data remained unaffected and available to NOV in its data base.

In 2011, Rubiano asked Arredondo to give him copies of certain NOV

blueprints. (Doc. 214 pp. 93-94) Although she resisted at first, eventually, Arredondo gave Rubiano the copies he requested.

At first, Arredondo emailed the requested drawings to Rubiano. Later, Arredondo left paper copies on Rubiano's kitchen table. (Doc. 214 pp.91-92) Rubiano gave Arredondo approximately $1,000 cash in exchange for the drawings.[6]

## c. An anonymous tip and Arredondo's confession

In August 2012, NOV's in-house attorneys received an anonymous letter in the mail purportedly authored by a Mud King employee. The letter states that Rubiano was "currently paying someone with your company to make copies of prints for use at our company." (NOV Ex.7) The letter names Mud King COO Nigel Brassington as providing the funds. The letter is signed "Concerned Employee." Enclosed with the letter were two NOV engineering drawings.

NOV's in-house counsel requested Brad Ortego, NOV's Investigations Manager, open an investigation of the matter to determine whether the allegations were true. Ortega began his investigation by verifying on the internet that Mud King existed. Then he contacted NOV's human resources department to see whether Rubiano was a former NOV employee and where he had worked. At that point, Ortego contacted Kimmons Investigative Service for assistance in the investigation

---

[6] The exact sum of money paid Arredondo is unclear from the evidence.

6

to try to identify people who might be sending drawings out.

Ortego asked NOV's IT department to search for email traffic to or from Mud King. Ortgeo testified that when he got the email results from the IT department, he reviewed the list to see whether any of the emails had attachments that could have been NOV's drawings, but found none. Ortego then asked NOV's human resources department to research who had worked at the same facility at the same time as Rubiano to determine whether any of the same people continued to work for NOV. Ortego then tried to discover who had access to both of the drawings included with the letter but was unable to identify anyone.

Next, Ortego asked NOV's IT department to research Rubiano's personal email address to see whether any NOV email traffic went to that email address. That research lead to discovery of emails between Rubiano and Arredondo. In one of those emails, Rubiano asked Arredondo to proof read his English. The email also discussed drawings. The email indicated to Ortego that Rubiano and Arredondo had a close personal relationship. From the email, Ortego knew that Arredondo worked for RigSolutions. He contacted a manager of Arredondo to see whether she had access to drawings and to obtain a report of all drawings she had accessed. Ortgeo determined from access log reports that Arredondo had accessed both of the drawings included with the letter. One log shows that Arredondo accessed 170 drawings from

7

April 28, 2011, to October 28, 2011. Another log shows that Arredondo accessed 477 drawings from November 4, 2011 to September 10, 2012.

At that point Ortego arranged to interview Arredondo at her work site. The following day, September 20, 2012, Ortego, along with the Kimmons investigators, met Arredondo at NOV's facility on Bammel. During the meeting, Arredondo admitted that Rubiano was her brother-in-law, that she had given him NOV's drawings for which he had paid her cash in increments of $300.00. Ortego had Arredondo sign an affidavit. Although Arredondo confessed to giving drawings to Rubiano, Ortego found no emails or other documents showing that Arredondo had sent drawings to Rubiano. When the meeting concluded, Ortego spoke with the human resource manager and told him that Arredondo had confessed to stealing drawings and selling them to a competitor.

Next, Ortego spoke with his boss, Scott Duff, vice president of Internal Audit, and explained the result of his meeting with Arredondo. Immediately thereafter, Ortego received a call from an in-house NOV attorney who told him that NOV was hiring AZA. AZA is Ahmed, Zavitsanos, Anaipakos, Alavi & Mensing, P.C., NOV's attorneys throughout this litigation. AZA was having Timothy Shelby come to the Bammel facility right away to meet Ortego and speak with Arredondo himself.

Having been fired from her employment at NOV, Arredondo was not

comfortable staying at the Bammel facility to wait for the AZA attorney, but she agreed to meet them at her home. Shelby and Ortego met Arredondo at her home a couple of hours later. (Doc. 201 pp. 54-79)

During the meeting, the three discussed Arredondo's cell phone because Arredondo explained Rubiano had sent text messages to her requesting drawings he wanted her to print. Ortego and Shelby asked Arredondo for her cell phone, stating it would be replaced. Although Arredondo said she had already deleted the text messages, she gave Ortego and Shelby her cell phone on the condition that they replace it. Twenty minutes later at a local AT&T store, Ortego and Shelby bought her a new cell phone. The last time Ortego saw Arredondo was at the AT&T store. (Doc. 201 p.82)

Ortego testified, "My active involvement in the investigation ended for the most part the day of Ms. Arredondo's interviews. The only other work I did on it, beyond that point, was to participate in the interview of Sara Clugy. So for all intents and purposes, the day of the Arredondo's interview, when we hired AZA, they took over the investigation from that point and I had no involvement except the Clugy interview." (Doc. 201 p. 98)[7]

---

[7] Ortego testified that the only other person he met with in the course of his investigation was Sara Clugy, a former account manager for Mud King. Ortego contacted Clugy based on Clugy's information on LinkedIn showing she had worked at Mud King. Ortego, Jim Dunbar and Mike Rainey met with Clugy and Clugy signed a statement. (Doc. 201 pp. 82-82; NOV Ex. 128)

According to Ortego, Arredondo had authority to download NOV drawings. However, Ortego also testified Arredondo exceeded her authority by downloading the two drawings included with the allegations letter because she had no purchase orders or inquiries corresponding to the dates she accessed those drawings. (Doc. 201 pp. 85-87)

In the course of Ortego's investigation he did not discover, was not told about, and never saw any reports indicating there was any damage to NOV's computer systems as a result of Arredondo's conduct. (Doc. 201 p. 86)  To his knowledge, NOV hired no technicians or forensic computer companies to repair NOV's computers as a result of Arredondo's conduct. (Doc. 201 p. 86) Similarly, NOV paid no money to repair any facet of its computer system as a result of Arredondo's conduct. (Doc. 201 p. 87)

Ortego discovered no evidence that anyone at Mud King ever accessed NOV's computer system. (Id.) Arredondo was the only person who accessed NOV's computer system. (Id.) In his investigation Ortego found that no more than 254 drawings were sent to Rubiano by Arredondo. (Doc. 201 p.98)

**d. Temporary Restraining Order**

In addition to filing its state court petition against debtor and others, NOV notified the FBI. On November 16, 2012, Brassington received a target letter from the

Department of Justice alerting him that a federal grand jury had been impaneled to investigate him.

NOV and Mud King agreed on a procedure for forensic testing of Mud King's computers. As a result of the state court temporary restraining order, NOV was permitted to image all of Mud King's computers. NOV discovered hundreds of drawings from NOV's data base. NOV alleges Mud King's profits from these drawings were $283,859.59.

On October 3, 2012, the state district court entered Unopposed Temporary Restraining Order which enjoined Mud King and other defendants' "access, use, or sale" of a list of 401 blue prints and technical drawings for NOV mud pumps and component parts. (NOV Ex. 36) This TRO prevented Mud King from selling any part related to a Mud King blue print or technical drawing which came into Mud King's possession after January 31, 2011 and before September 24, 2012 and which corresponded to any NOV part on that list. This TRO also established a procedure to allow NOV to add drawings of parts to the list if NOV discovered further NOV drawings in the possession of Mud King. The federal district court issued a similar order. (NOV Ex. 59) NOV never sought to amend this list.

NOV alleges 204 drawings in the possession of Mud King were its trade secrets. The drawings include parts designs for four distinct NOV owned OEM

brands known as National, Oilwell, IDECO, and EMSCO. National merged with Oilwell in 1986. (MK Ex. 45, & 119-125)  NOV acquired IDECO and EMSCO in 2000. (MK Ex. 45 p. 001287) All drawings at issue from IDECO, EMSCO, National, and Oilwell were developed in the late 1960s.

In addition to the computer imaging, Mud King turned over to NOV more than 400 paper copies of NOV drawings, many of which were duplicates. Numerous copies show highlighting and writing.  NOV's drawings do not show these changes. In addition, Arredondo's name has been covered with white out or black marker.

All named individual defendants who are or were Mud King employees have taken the Fifth Amendment and refused to testify. However, Mud King admits that it used 23 NOV drawings to make 81 parts which it sold in 2011 and 2012. Mud King's evidence shows that Mud King received gross sales for the 81 parts of 131,094.00 and net profits of $64,323.00 from January 1, 2012 to September 21, 2012. (MK Ex. 50)

### e. PEP drawings

In 1997, NOV bought a company known as PEP in order to acquire PEP's patents.  In addition to PEP's patents, as a result of the acquisition, NOV became owner of PEP's mud pump parts drawings. NOV's forensic investigation of Mud King's computers showed that Mud King acquired some PEP drawings in 2004 or

2005, approximately six years before the events concerning Arredondo and Rubiano.

## f. Mud King's bankruptcy

On April 1, 2013, Mud King filed its bankruptcy petition. On May 31, 2013, Mud King filed its Motion to Estimate NOV's Claim. NOV filed its Proof of Claim [Claim no.14] on August 5, 2013.

## g. National's security measures for its OEM drawings

Mike Kubinski, a senior manager in NOV's Global Manufacturing Assets, testified that he was first employed by National in 1979. Kubinski testified that at that time all drawings were kept in a secure blueprint storage room in locked metal cabinets to which only certain employees had access. The employees in charge of the locked room monitored each drawing as it was removed and returned. National also stationed a security guard at the facility.

Kubinski also testified concerning NOV's physical protections at its Houston locations, including its Bammel facility. Security guards are stationed at NOV's Bammel facility, where all entrants are required to sign the receptionist's log, including visiting NOV employees from other facilities. Each employee at the facility has an electronic key fob in order to open the locked doors. NOV's FM-529 facility is surrounded by a fence, and entrants must pass through security. Entrants must also sign the receptionist's log and wear identification badges throughout their visit.

NOV now stores and organizes its drawings electronically with a program called Teamcenter. Only NOV employees in manufacturing, inspection, and repair and buyer planners have access to drawings through Teamcenter. Each authorized employee is assigned a unique password to access the system and each employee's access to drawings is logged. This log record allows NOV to learn which employees have accessed its drawings.

In addition, NOV and its predecessors mark drawings with confidentiality "stamps" or "blocks." The Continental EMSCO, IDECO, and Oilwell OEM drawings contain similar stamps.

NOV requires its employees to safeguard the confidentiality of the Company's internal, proprietary information. NOV employees must sign a confidentiality agreement. As a NOV employee, Arredondo signed such an agreement. Arredondo testified that she actually never read the confidentiality statement she signed when hired at NOV. Another person explained the agreement to her. NOV required Arredondo to review the company code of conduct annually. Arredondo testified she knew what she did was wrong.

NOV uses outside vendor machine shops to fabricate parts such as those at issue in this case. In order to do so, NOV provides its vendors with copies of its OEM drawings. NOV requires its vendors to execute confidentiality agreements to protect

14

the secrecy of NOV's drawings.

Arredondo was assigned approximately 120 of NOV's authorized vendors. (Doc. 214 pp. 28 & 100; NOV Ex. 101) Approximately 10 to 15 times per day, Arredondo would send drawings to NOV's vendors. (Doc. 214 pp.100 & 109) Routinely, Arredondo would access drawings and discuss drawing dimensions with her assigned vendors by telephone. (Doc. 214 p.110) Her password enabled Arredondo to access all of the NOV drawings at issue from her office computer at any time, day or night, including weekends. (Doc. 214 pp. 56-57, 70; Doc. 219 pp.108-109) Whenever her password would not permit access to a specific engineering drawing contained on the database, she would simply request the drawing from her supervisor or from an NOV engineer. They would then send her a copy of the restricted drawing. (Doc. 219 pp.113-114)[8]

In addition to Arredondo, NOV employs seven other buyer planners at Arredondo's location, each responsible for purchasing parts and sending drawings to groups of 120 different vendors. (Doc. 214 p.112) In other words, in Arredondo's office alone, OEM mud pump drawings were being sent to outside third parties 80-120 times per day across 960 different vendors.

---

[8] Arredondo did not need special permission from a supervisor in order to access any drawings at issue in this case.

15

The Court finds that Teamcenter is a document distribution program, not an electronic security system. Teamcenter does not prevent NOV employees' improper access or improper distribution of drawings such as those in this case. NOV does not use Teamcenter to know which drawings are sent to which vendors. Similarly, NOV does not retrieve its drawings from vendors that are no longer authorized to manufacture NOV parts. Further, NOV does not protect itself by routinely monitoring employee access to the drawings. The only way NOV discovered Arredondo's theft was through the anonymous letter.

NOV witness, Ken Tisdel, a computer forensics and corporate computer security expert, testified that NOV's security policies for its drawings exceed industry standards and that NOV's policies are in the "top tier" of companies in the oil and gas industry in Houston. The Court questions Tisdel's objectivity and credibility as a witness because of his trial testimony and demeanor. Moreover, after the events involving Mud King and Arredondo, Tisdel testified that his company was employed to supply enhanced security measures to NOV.

### h. NOV's predecessors' protection of trade secrets

NOV, then known as "National," began making mud pumps in 1967. (Doc. 213 p.123) Since its inception, NOV has acquired or merged with numerous companies including the four OEM brands of mud pumps at issue, now made by NOV's

authorized vendors.

One company NOV acquired was IDECO. Mr. Kenneth Kondo, currently a NOV manager, testified regarding IDECO's confidentiality practices for its drawings while he was employed at IDECO 1975 to 1988. Kondo started at the Dresser IDECO[9] Beaumont facility working with the "draw works" section.[10] Mud pumps were also manufactured at this facility. (Doc. 214 p.43). Kondo's knowledge about mud pumps was derived from his need to understand how the mud pump engines needed to be calibrated to operate the drums.

All Dresser IDECO drawings for all products were kept in the same location in the plant. Kondo described the care with which drawings were checked in or out of a locked room with limited accessibility. Employees were required to sign confidentiality agreements; vendors manufacturing the IDECO parts had the same requirement. In addition, the drawings themselves had notations that they were "confidential/proprietary and could not be utilized or sent out without approval..." (Doc. 214 p.47) In order to obtain a drawing for reference, Kondo himself would request the specific drawing in writing from a "drawing person", who would pull the

---

[9]Dresser IDECO, through a joint venture with Ingersoll Rand, created IRI which was the actual entity purchased by NOV.

[10]"Draw works" denotes the drum which is the hoisting rig for the drilling operation.

drawing, copy it, and deliver it to Kondo. Later, Kondo would return the drawing copy to the "drawing person" who would check the drawing back in to the locked room.

At IDECO only the engineering group and the sales purchasing group had access to drawings. The sales group would send the drawings to outside vendors in order to obtain quotes for the manufacture of the part. (Doc. 214 p.83) Kondo was unable to testify whether these drawings sent by the sales group were ever retrieved from outside vendors.

Subsequently, in 1996-1997 Kondo worked for Continental EMSCO for approximately three years. In 2000 EMSCO merged with NOV. (Doc. 214 p.53) While Kondo was employed at Continental EMSCO at the Houston facility at South Santa Fe, hard copy original drawings were kept in a room in the basement. Any duplicates were kept in a separate room in another part of the facility. A drawing person, responsible for the drawings, would check the drawings in and out. (Doc. 214 p.60)

When e-mail became available at Continental EMSCO, company policy prohibited sending drawings by email without approval of the engineering manager himself or one of the project engineering managers. In addition, Continental EMSCO used policies similar to those at IDECO to protect the drawings, e.g. confidentiality

agreements for the employees and vendors and confidentiality labels on the drawings themselves.

During his Continental EMSCO employment, Kondo worked directly with mud pumps as a project manager. Continental EMSCO had just begun to use Auto-Cad, a program for electronic drawing instead of the previous "board pencil drawings." (Doc. 214 p.60) Consequently the Auto-Cad electronic drawings were made by the designer or the drafter at their individual desks with a server tied to those personal computer units. Drawings were then available on that data system within the engineering department.

While Kondo was at either IDECO or Continental EMSCO, the OEM drawings of other unaffiliated OEM companies were not available to Kondo. (Doc. 214 p.63) Kondo testified he was never aware of NOV OEM drawings being available to the public. When Continental EMSCO merged with NOV, the OEM drawings were transferred to NOV with great care and attention to their security. Kondo was unable to testify about any company practice at Continental EMSCO to retrieve the drawings once they were sent to outside vendors.

Kondo testified that Dresser IDECO's Beaumont facility required vendor confidentiality agreements throughout his employment from 1975 to 1988. Similarly, during his employment with Continental EMSCO, it protected the confidentiality of

drawings that went to vendors by requiring vendors to sign confidentiality agreements. Before employees could meet with a vendor or discuss any technical issues with a vendor at IDECO, the vendors had to have a confidentiality agreement in place. Similar procedures were in place at Continental EMSCO.

While Kondo worked at IDECO and its successor IRI from 1975 to 1988, he did not have access to the OEM drawings belonging to IDECO's competitors National, Oilwell, and Continental EMSCO, and, to his knowledge, those drawings were not publicly available. This Court finds Kubinski and Kondo are highly credible witnesses regarding events for which they have personal knowledge.

After NOV acquired these entities and their brands, NOV protected the OEM drawings in the same manner as it did the National OEM drawings. Kubinski testified that NOV would not have merged with Oilwell or acquired Continental EMSCO and IDECO had their OEM drawings been publically available. Their technology and trade-secrets were the reason National merged with Oilwell and acquired Continental EMSCO and IDECO.

### i. NOV Security measures for drawings sent to China

Kubinski testified NOV has manufactured mud pump parts in China through two endeavors: (1) previously through a joint venture with the Chinese company Langzhou; and (2) and currently through a vendor relationship with Campex.

Kubinski explained that with Langzhou a confidentiality agreement was not necessary because NOV owned sixty percent of Langzhou.  NOV stationed NOV employees in Langzhou's management and part of these employees' responsibilities was to safeguard the NOV drawings.

Now NOV has a contract and confidentiality agreement with Campex. Campex is NOV's buying arm for products from the Quinzhou facility in China, where certain mud pump parts are machined for NOV. In addition, all NOV OEM drawings sent to Chinese entities by NOV are labeled "confidential."

Quinzhou has the NOV drawings for all mud pumps NOV has manufactured in China, including all drawings at issue in this case. Kubinski testified that while NOV has no confidentiality agreement with Quinzhou, NOV does have a confidentiality agreement with Campex, its buyer. Kubinsky stated a confidentiality agreement was not necessary with Quinzhou because Campex owned some portion of Quinzhou. (Doc. 213 pp.163-170)

## II. CONCLUSIONS OF LAW

### a. Claim estimation and claim objection

The purpose of claims estimation is to avoid any undue delay in administering the estate. 11 U.S.C. § 502(c)  Claims estimation "is a procedural device that is to be used when adjudication and liquidation of a claim would take an unreasonably long

time to allow courts to quickly and flexibly estimate the amount of an as yet to be liquidated claim." *In re Stone &Webster, Inc.*, 279 B.R. 748, 810 (Bankr. D. Del. 2002).

Debtor objects to NOV's claim, filed for an unknown amount. Debtor scheduled NOV's claim as disputed, unliquidated, and contingent. NOV must prove its claim by a preponderance of the evidence. Fed. R. Bankr. P. Rule 3003(c)(2).

## b. Trade Secret Misappropriation

To succeed on a claim for misappropriation of trade secrets under Texas law, a plaintiff must demonstrate that the trade secret: (1) exists; (2) was acquired by breach of a confidential relationship or discovered through improper means; and (3) was used without authorization from the plaintiff. *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013).

### 1. Existence of trade secrets

A trade secret "is any formula, pattern, device, or compilation of information used in one's business, and which gives an opportunity to obtain an advantage over competitors who do not know or use it." Id. Texas courts weigh six factors in the context of the surrounding circumstances to determine whether a trade secret exists: (1) the extent to which the information is known outside of plaintiff's business; (2) the extent of the measures taken to guard the secrecy of the information; (3) the extent

to which it is known by employees and others involved in plaintiff's business; (4) the value of the information to plaintiff and its competitors; (5) the amount of effort or money expended by plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. 716 F.3d at 875 (citing *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).

## A. Measures taken to guard the secrecy of the information

Many of the drawings of mud pumps parts at issue were developed in the 1960s and 1970s prior to NOV's acquisition of the companies that developed the original drawings. The questions for this Court are whether NOV has demonstrated that (1) it used confidentiality practices to protect the information which it originated and (2) whether the acquired or merged companies, Continental EMSCO, and IDECO, and PEPCO[11] used confidentiality practices to protect the secrecy of their own information prior to becoming part of NOV.

### 1. Armco/ National confidentiality policies.

The drawings containing the parts design information date from the 1960s and 1970s. NOV relies on a memo dated April 1, 1974, from the General Manager of Oilfield & Industrial Equipment, of the Machinery and Equipment Division of

---

[11] NOV seeks only injunctive relief regarding the PEPCO drawings it found on Mud King computers. Consequently, whether an injunction should cover the PEPCO drawings is a question for the district court.

ARMCO, Robert E. Harris, which states:

> As we seek new sources through licensing arrangements and/or buyout arrangements for our manufactured products, it is becoming increasingly necessary for us to make available to such third parties our manufacturing drawings and other confidential items. We try to cover the confidential and proprietary nature of these documents by our licensing agreement and by a special agreement with the given third party. However, we have been advised by Middletown Legal that it is in order, and in the nature of a "must" for us to mark every document "CONFIDENTIAL". Would you please make this part of your procedure when preparing such documents to routinely mark them confidential so that we can avoid having them slip out of our control and cause some weakness in our effort to retain all rights to our products.

NOV Ex. 501

Consequently, the policy of placing confidentiality stamps on each ARMCO/National related company began some time after April 1, 1974. However, there is no evidence regarding confidentiality policies followed by Continental EMSCO, IDECO, or PEPCO from the creation of their mud pump parts in the 1960s or 1970s for at least the first decade of their existence. Coupled with the problems noted previously by the Court that NOV does not monitor access to its drawings by employees, such as Arredondo, to determine compliance with its confidentiality policies. NOV does not know what part design information is sent to which vendors. NOV does not retrieve design information from either current or previous vendors. The Court finds that NOV has failed to prove that its confidentiality measures are

sufficient to guard the secrecy of its parts design information.

### B. Extent to which the information is known outside of NOV

During Kubinski's time at NOV in the 1980s, NOV did not have access to the OEM drawings of NOV's then-competitors, IDECO, Continental EMSCO, and Oilwell. To his knowledge, the IDECO, Continental EMSCO, and Oilwell OEM drawings were not publicly available.

Mud King argues that NOV's parts specifications contained in NOV's drawings are publically available. Mud King relies on the testimony of Larry Murray, a co owner of a machine shop in Odessa, Texas named SMC, both defendants in the civil action.[12]

NOV alleges that Larry Murray violated its trade secrets by emailing copies of NOV drawings to Brassington during the time period from June 30, 2011 to September 20, 2011. NOV also alleges that, since SMC was an authorized vendor, Murray violated the NOV/SMC confidentiality agreement by sending its drawings to Mud King.

The NOV/SMC Secrecy Agreement reads:

---

[12] The deposition of Larry Murray was admitted by agreement of the parties at the hearing. The exhibits to the deposition are emails between Brassington and Murray, the attached drawings, and the NOV/SMC Secrecy Agreement. All references to exhibit numbers in this section of the opinion are to the exhibits attached to the Murray deposition.

## NATIONAL OIL WELL

### SECRECY AGREEMENT

National Oilwell (NOW) possesses certain valuable, proprietary, technical and/or economic
information in the field of  <u>Oilfield Equipment Manufacturing</u>

_____

_____(SAID FIELD).
_____SMC_____   (CONFIDANT) is desirous of acquiring
such NOW information for _____(SAID
PURPOSE).

In consideration of the following numbered conditions, NOW is willing to disclose to the authorized representatives of CONFIDANT, certain of such information sufficient in NOW's opinion to enable CONFIDANT to carry our SAID PURPOSE.

1.   "CONFIDENTIAL INFORMATION" means all information is SAID FIELD supplied to CONFIDANT by or on behalf of NOW, either written, verbal or another form, except such information which:

   a.   prior to CONFIDANT's receipt thereof: (i) was generally publicly available; or (ii) was in CONFIDANT's possession, from a source other than NOW; or

   b.   Subsequent to CONFIDANT's receipt thereof; (I) becomes publicly available without the fault of CONFIDANT; or (ii) is acquired by CONFIDANT from a third party, free of any restrictions as to its disclosure.

Ex. 10 to Murray Deposition

NOV has produced no copy of this agreement signed by anyone representing

NOV, raising a question of the enforcability of the contract. However, assuming the

agreement is binding and in effect, SMC is only limited  to  dissemination or use of

NOV drawings obtained from NOV.  Disclosure of NOV drawings obtained by Murray from another source would not violate this agreement and would not be a misapplication of NOV's trade secrets.

Larry Murray testified that in the operation of SMC he routinely sent and received parts drawings, including OEM drawings, to and from other aftermarket companies, including Mud King.  Murray testified he never charged money for sending drawings.  NOV contends Murray took money from Brassington for drawings. After reviewing all exhibits and Murray's testimony, the Court concludes NOV's claim is without merit.

Murray  testified that each drawing he forwarded to Mud King was received by him or SMC from a source other than NOV.  For example, NOV alleges Murray sent Ex. 5, a drawing of a F-1000 Pump Crosshead No. D –00 Continental Emsco Company to Brassington on June 30, 2011, 9:46 PM.  NOV alleges Ex. 5 was an NOV trade secret and covered by the NOV/SMC secrecy agreement. Murray testified that Brassington asked him by email for a drawing of the F1000 Pump Crosshead and Murray responded he did not have that drawing.

However, there was another long time machine shop in Odessa, known as Texas Flange, owned by Vernon Williams.  When Vernon Williams was visiting SMC, Murray asked Williams if he had such a drawing. Murray testified Williams

responded "No, I'm not sure I do, but I might be able to help you." Murray continued: "I give him my card, and I just figured that somebody would fax over a drawing; but he didn't. It showed up in my e-mail from somebody I didn't even know. And I saved the drawing and deleted the e-mail and that's how I got that drawing." (Murray Dep. p.84) This Court credits Murray's testimony that he received Murray Deposition Exhibit 5 from a third party and not from NOV. Consequently, regarding Ex. 5, Murray did not violate the NOV/SMC Secrecy agreement or NOV's trade secrets. The Court finds Ex. 5 may not be included in the NOV proof of claim as a basis for damages.

The next Murray transaction allegedly violating NOV's trade secrets occurred on July 8, 2011, when Brassington asked Murray if he had drawings for 8 different parts. (Murray Dep. Ex. 8A) Murray sent Brassington 4 drawings in response: SMC Inc. drawing 10-15 39-8, a Gardener Denver 8Zll pump sleve P/N 80M3, a Gardner Denver PZll pump oil stop head p/n 200 pzlo51, and 200 PZL 189 p/n crosshead pzl0.pz11 steel tubing drawing (1015-400) drawings. NOV offered no evidence that these drawings implicate NOV trade secrets.

Lastly, NOV alleges that on September 20, 2011, Murray violated the NOV/SMC Secrecy Agreement and NOV's trade secrets by sending Brassington

a F1600 Threaded Plug Retainer via email attachment. This drawing has an IDECO logo and a confidentiality stamp. Murray testified he also received this drawing from Vernon Williams. (Murray Dep. p. 191) NOV offered no evidence to the contrary. Consequently, this Court finds that the drawings Larry Murray sent to Brassington on September 20, 2011, did not violate the NOV/SMC secrecy agreement, were not NOV trade secrets, and did not come to SMC or Murray from NOV.

Nevertheless, except for the Murray/Brassington emails, there is no evidence that the remaining drawings found in Mud King's possession were publicly available. Further, the fact that Mud King employee, Rubiano, paid someone inside NOV to steal NOV's OEM drawings indicates that Rubianio and, therefore, Mud King could not otherwise obtain NOV's drawings and specifications from the public domain.

## C. Extent to which the information is known by NOV employees and others involved in NOV's business

NOV uses outside vendors to manufacture its mud pump parts. NOV requires its third party vendors to enter into confidentiality agreements. NOV requires its employees to sign confidentiality agreements and to annually

participate in an online code of conduct course.

In the Bass case only four employees within the company had access to the information. Conversely, thousands of NOV employees have access to the mud pump parts information, but Texas law requires that the context of the information be considered. Mud King argues that NOV cannot maintain the confidentiality of its drawings because it has many employees and many outside vendors producing its parts.

The Court agrees that NOV's business plan using third-party vendors may well make it more vulnerable to public dissemination of its trade secrets. However, NOV has followed the same business plan for a number of years and there is no evidence supporting Mud King's argument that the number of NOV's employees or vendors inherently prevents NOV from maintaining confidentiality.

### D. Value of the information, effort expended by plaintiff developing the information, and difficulty by which the information could be acquired by others

Kubinski's testimony and NOV's records from the early 1970s show the significant efforts NOV undertook in testing and experimentation to design and optimize its products. The first National mud pump, the 10P, took over 4,000

hours of engineering time to create. In comparison, the subsequent models took 8,000 hours to compare.

As evidence of the ease of acquiring NOV's parts information, Mud King points to the aftermarket for mud pump parts and companies such as SMC. Larry Murray has worked at SMC, his family's business in Odessa, Texas, for forty-three years, manufacturing and supplying oil field equipment, including mud pumps. Larry Murray explained he obtained tolerances necessary to build aftermarket parts from many places. In his testimony he describes part of this process:

> Q. Can you explain that?
> A. Yeah, I can explain that to you. It's currently available in – in lots of places. Say, one thing like on the FB1600, I have a parts book that's on there that gives rebuild data for your fluid ends with all the sizes and everything on the inside it would take if you wore one out and sent it to a shop and had it rebuilt. It was published information that was in the book. There's also information as far as fits, how tight your bearings ought to be on – on crankshafts and stuff like that. You know, you can get your sizes off the bearing or out of the bearing books so you know what your sizes are and you know how tight it ought to be. Service manuals for drawworks, all the service manuals– I've got a manual right there that you can get from National that has got – for the various drawworks, its' got all your sizes, fits, and stuff on shafts and stuff on it there. It may not have your sizes exactly on it, but it does give you running fits, how tight it ought to be; and then some of the matching parts, you can flip over the grid and get some information off of it, too.

Q. Let me ask you: In order to get all of this– this information, do you have to sign some supersecret disclosure letter?

A. No, you do not.

Q. All right. A confidentiality agreement?

A. No.

Q. It's just out there for the general public?

A. It's just --it's just rebuild data for anybody that's rebuilding stuff.

Q. Now, based on this information, can you reliably, 100 percent of the time, build an aftermarket part that's going to fit and work properly with an OEM part?

A. We've done it successfully for many years.

Larry Murray Deposition pp.190-191.

Conversely, NOV relies on the testimony of Kenneth Trahan, an entrepreneur and machinery expert, who testified that NOV's drawings could not be easily duplicated by others and that its parts would be very costly to reverse engineer. Trahan testified that no one could simply inspect and measure a given NOV OEM part and then create an exact replica, because the parts are manufactured using specified "dimensional tolerances" that direct how close the machinist must make the dimensional specifications for each respective part (e.g. + or - .001 inch of 5.00 feet).

The conflicting testimony of Murray and Trahan reflects the difference between the two distinct markets for mud pump parts--the OEM market vs the

aftermarket. Each has different degrees of product quality and cost appropriate to the requirements of diverse mud pump parts purchasers.

A legal mud pump parts aftermarket obviously exists as illustrated by NOV's own Mission Group and SMC's over forty years of aftermarket parts business. Moreover, the Court notes all NOV vendor confidentiality agreements admitted in evidence permit the vendor to use NOV drawings which are public or come legally from third parties. (NOV Ex. 179-198)  Such language of limitation in its vendor agreements convinces this Court that NOV recognizes that some of its drawings may well be in the public domain and NOV cannot reasonably expect to limit its vendors' use of such NOV's drawings in their manufacture of aftermarket mud pump parts.

Nevertheless, any aftermarket parts supplier which could acquire and use NOV's OEM drawings would greatly enhance the quality of its own aftermarket parts. The Court finds that NOV's efforts to develop the drawings of its mud pump parts represent a substantial investment in time and money.

The Court finds that NOV has borne its burden to prove that the information in the drawings taken by Mud King is not known outside of NOV's business. For those reasons, the Court concludes that the information contained

in NOV's drawings at issue, with the exception of the Murray/Bassington email attachments, constitute trade secrets.

## 2. Acquired by improper means

The Court finds that Arredondo's admitted theft of the drawings in exchange for payment constitutes Mud King's acquisition of the drawings by improper means.[13]

## 3. Use of trade secret without authorization

"Use" includes "marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . ." *General Universal Systems, Inc. v. HAL, Inc.*, 500 F.3d 444, 451 (5th Cir. 2007). It is undisputed that debtor sold some parts it manufactured with the aid of NOV's trade secrets without NOV's authorization. The Court finds that NOV has borne its burden to prove that the information contained in the drawings stolen by Arredondo for the benefit of Mud King were trade secrets and that Mud King misappropriated that

---

[13] The only evidence the monies paid to Arredondo came from Mud King was the testimony of Sarah Clugy whose testimony was vague and inconclusive. The Court finds she is neither a competent, nor credible witness.

information.

## c. Conversion

Conversion is the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights. *General Universal System*, 500 F.3d 444 at 450. In Texas, conversion claims are limited to the wrongful exercise of dominion and control over tangible, physical objects. *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex.1971)) "The gist of a conversion is not the acquisition of the property by the wrongoer [sic], but the wrongful deprivation of a person of property which he is entitled to possess." *Branham v. Prewitt*, 636 S.W.2d 507, 510 (Tex. Civ. App— San Antonio 1982, writ ref'd n.r.e.) (citing *Ligon v. E. F. Hutton & Co.*, 428 S.W.2d 434 (Tex.Civ.App–Dallas *1978*, writ ref'd n.r.e.).

Allegations involving intellectual property rights are outside the scope of Texas law of conversion. *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003). "Texas law has never recognized a cause of action for conversion of intangible property except in cases where an underlying intangible right has been merged into a document and that document has been converted." *Express*

*One Int'l v. Steinbeck*, 53 S.W.3d 895, 901 (Tex.App.— Dallas 2001, no pet.);
*Rehak Creative Services, Inc. v. Witt*, 404 S.W.3d 716 (Tex. App.—Houston [14
Dist.] 2013, review denied); cf. *Genesco Sports Enterprise, Inc. v. White*, 2011
WL 6593415 (N.D.Tex. Oct 27, 2011).

In *Real Estate Innovations, Inc. v. Houston Ass'n of Realtors, Inc.*, 422
Fed.Appx. 344, 350 (5th Cir. 2011), cert. denied,— U.S.— ,132 S.Ct. 249,181
L.Ed.2d 143(2011), the Court noted: "In Texas, conversion claims are limited
to the wrongful exercise of dominion and control over tangible, physical objects.
*See Carson*, 344 F.3d at 456 (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d
444, 447 (Tex.1971)). Allegations involving intellectual property rights are
outside the scope of Texas conversion law. *Id.*"

The Court concludes that NOV has not proven its cause of action for
conversion to the extent that it seeks to recover for Mud King's use of the
intangible information which constitutes its trade secrets. More importantly, to
the extent NOV seeks recovery for the paper copies themselves, it has not
proven conversion by Mud King because NOV was never deprived of
possession of the information or its own ability to possess the data.

### d. Texas Theft Liability Act

In the alternative, NOV seeks recovery for the same actions of Mud King under the Texas Theft Liability Act ("TTLA") which provides a civil remedy for damages sustained by the victim of a theft, including reasonable and necessary attorneys fees. Tex. Civ. Prac. & Rem. Code § 134.003(a)("A person who commits theft is liable for the damages resulting from the theft.")

Under the TTLA, "theft" means unlawfully appropriating property or unlawfully obtaining services as described by Texas Penal Code §§31.03, 31.04, 31.05, 31.06, 31.07, 31.11, 31.12, 31.13, or 31.14. Tex. Penal Code § 134.002 (Vernon's 2012.) Texas Penal Code § 31.05 pertains to the theft of trade secrets and provides:

(a) For purposes of this section:

(1)"Article" means any object, material, device, or substance or any copy thereof, including a writing, recording, drawing, sample, specimen, prototype, model, photograph, microorganism, blueprint, or map.

(2) "Copy" means a facsimile, replica, photograph, or other reproduction of an article or a note, drawing, or sketch made of or from an article.

(3)"Representing" means describing, depicting, containing, constituting, reflecting, or recording.

(4)"Trade secret" means the whole or any part of any scientific or

technical information, design, process, procedure, formula, or improvement that has value and that the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes.

(b) A person commits an offense if, without the owner's effective consent, he knowingly:

(1) steals a trade secret;[14]

(2) makes a copy of an article representing a trade secret; or

(3) communicates or transmits a trade secret.

(c) An offense under this section is a felony of the third degree.

Tex. Penal Code § 31.05.

The TTLA provides for recovery of damages for theft of trade secrets as follows:

§ 134.005. Recovery
(a) In a suit under this chapter, a person who has sustained damages resulting from theft may recover:

(1) under Section 134.003(a), from a person who commits theft, the amount of actual damages found by the trier of fact and, in addition to actual damages, damages awarded by the trier of fact in a sum not to exceed $1,000;

. . . .

(b) Each person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees.

---

[14] "Steal" means to acquire property or service by theft. Tex. Penal Code § 31.01(7).

Tex. Civ. Prac. & Rem. Code § 134.005.

"With respect to theft of trade secrets, a plaintiff may establish a claim by showing: (1) without the plaintiff's consent; (2) the defendant knowingly steals the plaintiff's trade secret, makes a copy of an article representing the trade secret, or communicates or transmits a trade secret; and (3) the plaintiff sustains damages as a result of the theft. See Tex. Penal Code § 31.05 (Vernon 2011) (providing the first two elements); Tex. Civ. Prac. & Rem. Code § 134.005(a) (providing the third element)." *In re TXCO Resources, Inc.*, 475 B.R. 781, 833 (Bankr.W.D.Tex. 2012). "A person who sustains damages resulting from the unlawful appropriation of property addressed by Penal Code § 31.05 may recover actual damages as well as additional damages not to exceed $1,000. . . [and] under section 134.005, . . . be awarded court costs and reasonable and necessary attorney's fees." *IBP, Inc. v. Klumpe*, 101 S.W.3d 461 (Tex. App.— Amarillo 2001) (review denied); Tex. Civ. Prac. & Rem. Code § 134.005.

NOV has established ownership of its trade secrets which Mud King unlawfully appropriated without NOV's consent by paying Ms. Arredondo to copy and print the drawings from NOV's server. Obtaining unauthorized copies of a plaintiff's trade secret is theft under the Texas Penal Code. Tex. Penal

Code §31.05(a)(2) and (b)(2); *but see Southwestern Energy Production Co. v. Berry-Helfand*, 411 S.W.3d 581, 600-01 (Tex. App.—Tyler 2013)(pet. filed) As a consequence of Mud King's actions in copying NOV's trade secrets, NOV is entitled to recover its actual damages, costs, and reasonable attorneys fees. *TXCO*, 475 B.R. at 834.

### e. Computer Fraud and Abuse Act ("CFAA")

In its third amended complaint, NOV alleges that Mud King, Brassington, and Rubiano, knowingly, intentionally, and with intent to defraud, accessed or caused access to NOV's computers and servers without authorization, or in excess of their authorized access and by means of such conduct damaged the integrity of NOV's data and furthered a fraud in obtaining valuable confidential and proprietary NOV information, leading to losses and damages in excess of over $5,000 within a one-year period in violation of 18 U.S.C. § 1030(a)(2)(C), (a)(4), and (a)(5)(C). NOV alleges without dispute its computers are protected computers involved in interstate commerce and under 18 U.S.C. §1030(g), Mud King, Brassington, and Rubiano are liable for compensatory damages and losses to NOV including costs exceeding $5,000, that NOV alleges it incurred investigating Arredondo's computer intrusion to determine the nature and extent

of defendants' unauthorized and improper access into NOV's computers and

servers. NOV further alleges it is entitled to the value of the confidential and

proprietary information taken by Mud King.

NOV contends Mud King violated 18 U.S.C. § 1030(a)(2)(C), (a)(4), and

(a)(5)(C). Those sections provide:

> (a) Whoever-
>
> . . . .
>
> (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains--
>
> . . . .
>
> (C) information from any protected computer;
>
> . . . .
>
> (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;
>
> (5) . . . (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

18 U.S.C. § 1030(a)(2)(C), (a)(4), and (a)(5)(C).

The CFAA, a criminal statute, provides a civil cause of action for damages

for some, but not all violations of the CFAA. *Fiber Systems Int'l., Inc. v.*

*Roehrs*, 470 F.3d 1150, 1156 (5th Cir. 2006). The CFAA provides for a civil

cause of action at 18 U.S.C. §1030(g), as follows:

> (g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

18 U.S.C. §1030(g).

Thus, to obtain compensatory damages in a civil action against a violator of the CFAA, NOV must prove that it suffered "damage or loss by reason of a violation of [the CFAA]." *Id.* In addition, to bring a cause of action under §1030(g), the violative conduct must involve one of the factors itemized in §1030(c)(4)(A)(I). *See Fiber Systems Int'l., Inc. v. Roehrs*, 470 F.3d 1150, 1157-1158 (5th Cir. 2006). NOV alleges that the debtor's conduct at issue violates §1030(c)(4)(A)(i)(I) and involves a "loss to 1 or more persons during

any 1-year period . . . aggregating at least $5,000 in value." *See*
§1030(c)(4)(A)(i)(I).

Both "damage" and "loss" are defined terms under the CFAA. The term
"damage" means any impairment to the integrity or availability of data, a
program, a system, or information." 18 U.S.C. §1030 (e)(8). NOV has shown
its drawings were accessed from its computer database and printed or emailed,
but NOV has not shown that its computer system or database was impaired in
any way.

In *New South Equipment Mats, LLC v. Keener*, No. 3 13cv162TSL-JMR,
2013 WL 5946371 at *7 (S.D. Miss. 2013) the court held:

> In construing the term "damage," courts have consistently held that
> "damage" refers to "the destruction, corruption, or deletion of electronic
> files, the physical destruction of a hard drive, or any 'diminution in the
> completeness or usability of the data on a computer system.' " See
> *TriTeq Lock & Sec. LLC v. Innovative Secured Solutions, LLC*, Civ.
> Action No. 10-CV-1304, 2012 WL 394229, at *6 (N.D. Ill. Feb. 1,
> 2012) (citing); *Condux Intern. Inc. v. Haugum*, No. 08–4824 ADM/JSM,
> 2008 WL 5244818, at *7 (D. Minn. Dec. 15, 2008) (relying on the
> definition of "integrity" ("wholeness" or "soundness") to conclude that
> the CFAA's definition of damage requires "some diminution in the
> completeness or useability of data or information on a computer
> system"). "[T]he mere copying of electronic information from a
> computer system is not enough to satisfy the CFAA's damage
> requirement." Compare *Farmers Ins. Exch. v. Auto Club Group, No.
> 11C1332*, 2011 WL 4888889, at *4 (N.D. Ill. Oct. 13, 2011). See also
> *Landmark Credit Union v. Doberstein*, 746 F.Supp.2d 990, 993–94

(E.D. Wis.2010) ("[S]eemingly every court in this circuit that has interpreted the meaning of the word 'damage' in the CFAA has held that damage does not encompass harm from the mere disclosure of information and the CFAA is not intended to expansively apply to all cases where a trade secret has been misappropriated by use of a computer") (internal quotations omitted).

NOV failed to prove any impairment to the integrity or availability of its data, its program, its system, or its information. Consequently, the Court finds that NOV has failed to prove "damage" under the CFAA.

Under the CFAA, "loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. §1030 (e)(11). NOV contends that it has proven "loss" under the CFAA because it hired the law firm that represents it in the instant litigation, referred to as AZA, to conduct a damage assessment and to restore the data to its condition prior to the CFAA violation. NOV urges that "loss" is shown by AZA interviews and collection of data from NOV witnesses, collection and examination of over sixteen terabytes of data from Mud King electronic devices. Thereafter, NOV had its attorneys review this data for NOV OEM drawings, compare Mud King-branded drawings against NOV OEM drawings to determine which Mud King-

branded drawings had been copied from NOV OEM drawings, and document its investigation in detailed spreadsheets.

In addition, NOV argues "loss" is shown by its hiring LCG Discovery Experts to conduct a damage assessment, to restore data to its condition prior to the CFAA violation, consisting of imaging and analyzing NOV's computers, imaging and analyzing Mud King's computers and devices, collecting physical evidence and maintaining a chain of custody, recovering NOV drawings from the imaged computers, exporting data from copies of Mud King's computers to Relativity for review by staff attorneys, imaging, analyzing and exporting data from individual defendants' computers and devices, and coordinating with Mud King's experts. (See NOV Application for Statutory Fees, Doc. 269)

Kevin Tisdel, is the principal and co-founder for LCG Discovery Experts, an electronic discovery company that handles computer forensics and litigation support related to electronic discovery and computer forensics. Tisdel testified that the AZA law firm called LCG to assist in an electronic discovery matter to conduct some imaging on a Saturday morning. (Doc. 226 pp. 5, 7-8.) Tisdel testified, "Our team went out to Mud King's building and met with counsel from AZA and counsel from Mr. Muskat's firm as well. We stood by until certain devices were made available upon the court order. There were a series of laptop computers, desktop computers,

cell phones, external hard drives, some servers. All those items needed to be imaged, and so we began an imaging process to forensically image, which is just making a forensic copy of each one of the hard drives associated with those devices." *Id.* Tisdel testified that in this case, his company assisted AZA in electronic discovery. *Id.* at 27.[15]

Fees paid to an expert to assist in litigation do not fall within the CFAA's definition of "loss." *Brooks v. AM Resorts, LLC*, 954 F. Supp.2d 331(E.D. Pa. 2013) (citing *Mintel Int'l Group, Ltd. v. Neergheen*, No. 08-CV-3939, 2010 WL 145786, at *10 (N.D.Ill. Jan. 12, 2010) (holding that fees paid to a computer expert to assist the plaintiff in litigation against alleged violator, but not for the purpose of assessing computer damage, were not "losses" under the CFAA); *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.*, 616 F.Supp.2d 805, 812 (N.D. Ill.2009).)

This Court finds that Tisdel and his firm were hired by NOV's counsel to assist in discovery and that Tisdel conducted no investigation or assessment of NOV's computer system. The expert's fees incurred in analyzing data that NOV's law firm obtained from Mud King's computer system are not a "loss" under the CFAA.

---

[15]The Court questions Tisdel's objectivity and credibility as a witness because of his trial testimony and demeanor. Moreover, after the events involving Mud King and Arredondo, Tisdel testified that his company was employed to supply enhanced security measures to NOV.

NOV also asserts that the fees of the AZA attorneys and contract workers constitute a CFAA loss. Nevertheless, NOV has failed to demonstrate that AZA lawyers or employees of Relativity helped NOV repair any interruption of its service or impairment of its data. The Court concludes that NOV has failed to prove "loss," an essential element to a cause of action under the CFAA. Consequently, the Court finds that NOV's proof of claim includes no claim for damages under the CFAA.

## F. Conspiracy

NOV alleges that the Mud King defendants civilly conspired to violate the CPRC, which incorporates the TTLA, to misappropriate trade secrets, and to convert NOV's property. Simply put, under Texas law, "employers are vicariously liable for the torts of employees that are "committed in the course and scope of their employment." *Medina v. Herrera*, 927 S.W.2d 597, 601 (Tex. 1996); *see also* Restatement (Third) of Agency § 7.07(1). An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. *Id.* § 7.07(2)." *see Bohnsack v. Varco*, L.P. 668 F.3d 262, 273-274 (5th Cir. 2012). This Court finds that the evidence is sufficient to show that Mud King's employees committed torts which were within the course and scope of their employment and subject to the employer's control. To the

extent necessary, the Court also finds that Mud King through its employees conspired to violate the TTLA and to misappropriate NOV's trade-secrets.

## G. Unjust enrichment

NOV seeks recovery of damages under a claim of unjust enrichment. In Texas "Unjust enrichment is not a proper remedy merely because it 'might appear expedient or generally fair that some recompense be afforded for an unfortunate loss' to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 42 (Tex. 1992).

Unjust enrichment is a theory of recovery which adds nothing to NOV's substantive causes of action. *Walker v. Cotter Properties, Inc.,* 181 S.W.3d 895, 900 (Tex. App.— Dallas, 2006, no pet.). Additionally, the availability of an adequate legal remedy may render equitable claims such as unjust enrichment unavailable. *R.M. Dudley Const. Co, Inc. v. Dawson*, 258 S.W.3d 694, 704 (Tex. App.—Waco, 2008)(pet. denied); *see Best Buy Co. v. Barrera*, 248 S.W.3d 160, 161 n. 1 (Tex. 2007) (citing and quoting *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 770 (Tex. 2005) ("Like other equitable claims and defenses, an adequate legal remedy may render equitable claims of unjust enrichment and equitable defenses of voluntary-payment unavailable.")). The Court finds that under the facts of this case

NOV has adequate legal remedies and NOV may not claim unjust enrichment as a basis for damages in its proof of claim.

## I. Damages

### a. Misappropriation of trade secrets.

In an action for trade secret misappropriation, the plaintiff may recover actual damages based on either the value of what has been lost by the plaintiff or the value of what has been gained by the defendant. *Univ. Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 535–36 (5th Cir.1974) (applying Georgia law which bases its law of trade secrets on the Restatement of Torts

§ 757 as does Texas law). In *Carbo Ceramics v. Keefe*, 166 Fed. Appx. 713, 723 (5th Cir. 2006), the Court discussed the available measurements of damages:

> The value of what has been lost by the plaintiff is usually measured by lost profits. *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 89–90 (Tex.1973); *Elcor Chem. Corp. v. Agri–Sul, Inc.*, 494 S.W.2d 204, 214 (Tex. App.—Dallas 1973, writ ref'd n.r.e.)
> ...
> The value of what the defendant has gained as a result of the misappropriation can be measured by a number of methods. First, the plaintiff can seek damages measured by the defendant's actual profits resulting from the use or disclosure of the trade secret (unjust enrichment). *Elcor Chem. Corp.*, 494 S.W.2d at 214; *University Computing*, 504 F.2d at 536 (defendant's profits may be appropriate measure of damages when defendant used trade secrets to improve manufactured items sold for profit). Second, the plaintiff can seek damages measured by the value that a reasonably prudent investor would have paid for the trade secret. *Precision Plating & Metal*

*Finishing Inc. v. Martin Marietta Corp.*, 435 F.2d 1262, 1263–64 (5th Cir.1970). Third, the plaintiff can seek damages measured         by the costs saved by the defendant. *University Computing*, 504 F.2d at 538–39. This is typically shown through saved development costs. See, e.g., *Bourns, Inc. v. Raychem    Corp.*, 331 F.3d 704, 709–10 (9th Cir.2003) (affirming award of $9 million, measured by three years' saved time at a "burn rate" of $3 million per year).

Finally, the plaintiff can seek damages measured by a "reasonable royalty." *Elcor Chem.    Corp.*, 494 S.W.2d at 214; *Metallurgical Indus., Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir.1986); *University Computing*, 504 F.2d at 536–39. The royalty is calculated based on what a willing buyer and seller would settle on as the value of the trade secret. *Metallurgical Indus.*, 790 F.2d at 1208; *University Computing*, 504 F.2d at 539.

*Carbo Ceramics, Inc. v. Keefe* 166 Fed. Appx.714,722-724, 2006 WL 197340, (5th Cir. 2006).

There is no clear legal precedent in Texas law for computing damages where a competitor wrongly acquires a trade secret, but continues to sell its own parts without use of that trade secret. Mud King has operated for ten years historically selling at least 81 of the aftermarket mud pump parts at issue. Mud King continued to sell the same 81 parts unchanged after it possessed the NOV drawings. While Mud King did use 23 of the NOV drawings to improve some of its own corresponding parts, Mud King only sold 15 of the 17 parts it altered using NOV's drawings.

Because Mud King records show, either by email or downloading, the NOV drawings for the 81 parts, NOV argues Mud King "used" the 81 parts, even if there

was no change to the Mud King part. Consequently, NOV contends Mud King should forfeit all its profits from the 81 unchanged parts.

NOV does not rely on either the value of its drawings to its own business or on any lost profits to prove its damages. Instead, NOV seeks: (1) disgorgement of actual profits from the 15 altered parts Mud King sold in the alleged amount of $74,434.95; (2) disgorgement of all profits Mud King earned from its 81 unaltered parts sold by Mud King without use of any NOV drawings in the alleged amount of $283,859.96; and (3) damages of $4,001,546.90, reflecting the hypothetical costs to Mud King, according to NOV's experts, of creating 204 new drawings by reverse engineering the corresponding 204 NOV parts.

As support for its multiple recoveries, NOV cites the seminal case of *Univ. Computing Co. vs. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974). However, NOV misconstrues Judge Tuttle's opinion for the court. The defendant in *Univ. Computing* failed in marketing the misappropriated devices and had no profits to disgorge. *Id* at 528-29. Where there was no evidence of any sales lost by the plaintiff or gained by the defendant due to the misappropriation, the Fifth Circuit held it was proper for the district court to instruct the jury that in arriving at the proper damages it should consider the development costs incurred by the plaintiff. The court found that the ultimate measure to be applied was the "reasonable royalty" measure,

made up in part of plaintiff's development costs and which required calculation of what the parties would have agreed to hypothetically as a fair price for licensing the devices.

Both NOV and Mud King experts rely on and accept the same Mud King accounting numbers for its revenues and costs. (Doc. 226 p. 90) With the use of 23 NOV drawings, Mud King created 27 parts and of those 27 parts Mud King actually sold only 15 different parts associated with 17 of the 23 drawings. (MK Ex. 50, 105 & 146A, Doc. 46 tab 1, NOV Ex. 611-13)

Mud King's evidence reflects gross profits from the 15 different parts it sold from January 31, 2011 to September 24, 2012. For that period, Mud King shows it earned gross profits of $131, 094.28. (MK Ex 105, NOV Ex. 277)

Despite using Mud King's own revenue numbers, NOV's expert, Dennis Arnie, testified that Mud King instead earned $74,439.95 in actual profits on the same 15 parts. (NOV Ex. 614, tab 12) Arnie rejected the Mud King January 31, 2011 starting date, because it "was too long of a damage period...You could capture too much in profits in your disgorgement model." (Doc. 266 p. 91) Instead of using profit figures from January 31, 2011, Arnie used a shorter period, based on what Arnie described as different scenarios e.g. whether Arnie

found an email in Mud King's files which mentioned the particular part, or whether Mud King's hard drive showed a part was downloaded (but not changed) on a specific date. Arnie then allowed ten days for a transmission of data. *Id.* at 93-96  This Court accepts Arnie's method of dating Mud King's profits from the 15 parts actually sold from dates derived from Mud King's computers and emails. Consequently, the Court finds that Mud King's actual profits from sales of the 15 parts it sold after alteration using NOV's drawings was $74,439.95.

Arnie uses the same methodology to calculate Mud King profits from 81 Mud King parts sold, even though Mud King never used the NOV drawings to make changes to the 81 parts.  NOV seeks all profits from the 81 parts Mud King sold during the time Mud King possessed the NOV drawings, in the alleged amount of $283,859.96.

Even assuming NOV should be awarded $283,859.96 in profits for Mud King's unchanged parts, NOV regards that sum as insufficient. Consequently, NOV also seeks to add  hypothetical development costs of over $4 million for the 204 parts drawings, most of which relate to parts Mud King never sold. This Court heard lengthy evidence at the estimation hearing regarding reverse

engineering and extensive testimony of NOV's experts.  However, NOV offers no legal authority for its entitlement to more recovery than Mud King's net profits for parts it sold with the use of NOV's drawings, much less multiple recoveries.

This Court can find no Texas or Fifth Circuit case under Texas law that supports a plaintiff's multiple recovery of profits both affected and unaffected by the acquired trade secret as well as avoided costs.  NOV repeatedly notes that the measure of damages should be " flexible and imaginative" or that avoided costs is an allowed measure of damages. *Bohnsack v. Varco*, L.P., 668 F.3d 262, 280 (5th Cir. 2012). Neither statement is in dispute.

However, the authorities cited by NOV allow a plaintiff's recovery under only one measure of damages and no case allows development costs where defendant's profits are shown. So, for example, NOV relies on *Southwestern Energy Production Co. v. Berry-Helfand*, 411 S.W.3d 581, 609 (Tex App— Tyler 2013)(pet denied), in which the court finds: "Where profits can be proved from the trade secret's use, the defendant's actual profits are used in the calculation of damages."  Similarly, NOV cites *In re Txco*, 475 B.R. 781 (Bankr. W.D.Tx 2012), even though the court there awarded only reasonable royalty damages because all evidence of lost profits was too speculative. *Id.* 838. NOV also miscites *Bohnsack v. Varco, L.P.* 668 Fed.3d 262, 280

(5th Cir. 2012) allowing plaintiff damages measured by what a reasonably prudent investor would have paid for the device.

NOV also relies on the recent Fifth Circuit case Aspen Tech., Inc. v. M3 Technology, Inc., Nos. 12-20388, 13-20268, 2014, WL 221-691, (5th Cir. 2014) as support for its contention that by possessing the drawings, Mud King exercised a commercial use to avoid mistakes in developing its own mud pump parts or to avoid reverse engineering costs. Also, NOV contends the *Aspen* case demonstrates proof of commercial use through adverse inference from a witness' claim of Fifth Amendment privilege. *Aspen,* 2014 WL 2210691  To the contrary, *Aspen* highlights the NOV's lack of evidence in this case. *Id.*

In *Aspen* M3, the losing defendant, argued that plaintiff Aspen had failed to offer legally sufficient evidence to prove M3 actually used Aspen's trade secrets found in its possession.  In response the Court noted: " This court has recently acknowledged the even more liberal construction of the term "use" contained in the Restatement (Third) of Unfair Competition, which states that "[a]s a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant to a 'use' under this section." (*Id* at 2210697)(citations omitted).

NOV seeks damages for the 81 sold, but unchanged Mud King parts and the remainder of the 202 NOV drawings, even though Mud King never exploited NOV's trade secrets with respect to those drawings. It appears to this Court that NOV claims damages for speculative future Mud King actions that never occurred. Whether the anonymous letter and NOV's resulting injunction stopped such future acts, is a moot point, because the acquired trade secrets were useless to Mud King.

This Court finds that NOV has failed to legally justify its request for multiple damages. The Court holds that NOV is entitled to recover Mud King's net profits earned using NOV drawings of $74, 439.95.

## J. Exemplary damages

NOV seeks exemplary damages of $2,554,739.64, or 9 times what NOV alleges are Mud King's actual profits for the 81 drawings emailed or downloaded but not altered or used. Such a recovery is necessary, according to NOV, as a matter of public policy to set an example of Mud King so as to prevent misappropriations in the future.

Texas courts may award exemplary damages "only if the claimant proves by clear and convincing evidence that the harm from which the claimant seeks recovery of exemplary damages is due to: (1) fraud; (2) malice; or (3) gross negligence. Tex. Civ. Prac. Rem. Code § 41.003. In *Ware v. Paxton,* 359 S.W.2d 897, 899 (Tex.

1962) the Texas Supreme Court defined malice to be "The fact that an act is unlawful is not of itself ground for an award of exemplary or punitive damages. The act complained of not only must be unlawful but also must partake of a wanton and malicious nature, or, as sometimes stated, somewhat of a criminal or wanton nature, and an act will not be deemed malicious, and so warranting punitive damages, merely because it is unlawful or wrongful."

While this Court cannot condone Mud King's actions, NOV has failed to prove they were wanton or malicious. A wrongful act such as misappropriation of trade secrets or violation of the Texas Theft Liability Act will not suffice under Texas law. The Court finds that NOV has not borne its burden to prove by clear and convincing evidence it is entitled to exemplary damages.

## K. Attorneys' fees

The TTLA provides for an award of "additional" damages up to $1,000 as well as costs and attorney's fees. A further hearing will be conducted to determine the reasonable amount of fees due NOV under this statute. NOV will have the burden to prove it is entitled to receive reasonable attorney's fees related to the specific damages which have been allowed by this Court.

## I. PEP drawings

NOV requests that a permanent injunction be granted as to Mud King's use of NOV's PEP drawings. NOV contends the reverse-engineered PEP drawings are proprietary and confidential information belonging to NOV; Mud King improperly obtained them and has used them. NOV urges Mud King's access, use, and disclosure of NOV's PEP drawings will result in imminent harm and irreparable injury to NOV for which there is no adequate remedy at law and which is impossible to quantify in monetary damages.

NOV bought PEP (Phoenix Energy Products, Inc.) in 1997 and acquired all its drawings. (Doc. 213 pp. 115-116). Mr. Kubinski testified that the PEP patents were valuable, and that was the reason why NOV acquired PEP. *Id.*, 122:10-13. When NOV acquired PEP, it incorporated its drawings into NOV's standard confidentiality practices. *Id.* at 116:23-25.

However, NOV failed to prove that prior to its purchase of PEP, the drawings themselves were maintained as trade secrets. NOV relies solely on the negative implications it would have this Court draw from three Mud King employees who claimed their Fifth Amendment rights when asked "Did Mud King bribe a NOV employee in 2004 in order to obtain the PEP drawings." This inference is too attenuated in time and is insufficient to satisfy NOV's burden of proof to establish the information on the PEP drawings was NOV's trade secret.

## L. Prejudgment Interest.

NOV seeks prejudgment interest. Although this Court enters orders only on the debtor's motion to estimate and debtor's objection to claim, it may be appropriate to include prejudgment interest in the estimation of NOV's claim. Tex. Fin. Code Sections 304.102,304.103; see also *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.* , 962 S.W.2d 507, 529 (Tex 1998). Consequently, the Court directs NOV to file a brief on the matter by July 21, 2014 and Mud King to respond by July 25, 2014.

## II. CONCLUSION

The Court estimates NOV's misappropriation of trade secrets damage claim at $74,434.95, plus possible prejudgment interest for the misappropriation of NOV's trade secrets. NOV has also proven it is entitled to additional damages of $1,000 under the TTLA, plus its attorneys fees and costs.

A further hearing to determine attorney's fees and other costs will be held by this Court on July 31, 2014 at 9:30 am.

Signed this _17_ day of ___July___, 2014 at Houston, Texas.

KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE