

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED**
**01/30/2015**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MUD KING PRODUCTS, INC. | § | CASE NO. 13-32101-H5-11 |
| | § | |

**ORDER ON ATTORNEYS FEES OF NATIONAL OILWELL VARCO, L.P.**

## I. Ruling

Before the Court is the Application of National Oilwell Varco, L.P. (NOV) for Award of Statutory Fees (Doc. 269). NOV seeks statutory fees and investigation costs incurred from September 20, 2012 through October 31, 2013. NOV asserts it incurred $l,197,529.50 but seeks an award of $898,147.12. NOV has already paid the law firm of Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing (AZA) its total fees of $2,209,112 for 8,076 hours. After a hearing and consideration of testimony and other evidence, the Court grants NOV reasonable attorneys fees for litigation of its TTLA claim in the amount of $320,893. Since NOV failed to submit evidence of its court costs, the Court denies its request for general litigation expenses of $323,951.43.

This Court has jurisdiction over this matter under 28 U.S.C. § 157 and §

1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

## II. Background

NOV's application relates to this Court's hearing on Debtor's Motion to Estimate Claim of National Oilwell Varco, L.P. for Purposes of Allowance, Distribution and Voting Pursuant to 11 U.S.C. § 502(c) (Doc. 46) and Debtor's Objection to Claim #14 filed by National Oilwell Varco, L.P. (Doc. 137). This Court estimated NOV's misappropriation of trade secrets damage claim at $74,434.95 and $1,000 in statutory damages under the Texas Theft Liability Act (TTLA), plus attorneys fees and court costs (Memorandum Opinion and Order, Doc. 304). Therefore, NOV is the prevailing party under the TTLA and is entitled to an award of reasonable and necessary attorneys fees and court costs. *See* Tex. Civ. Prac. & Rem. Code § 134.005(b) ("Each person who prevails in a suit under [the Texas Theft Liability Act] shall be awarded court costs and reasonable and necessary attorney's fees.")

The Court bifurcated NOV's claims for attorneys fees and court costs. After the trial on the merits of debtor's motion to estimate NOV's claim, AZA filed NOV's statutory fee request on November 27, 2013. (Doc. 269). Mud King objected to the fees. (Doc. 273).

2

The Court held  an evidentiary hearing to consider NOV's claims for attorneys fees and court costs under the TTLA. To prove reasonable and necessary attorneys fees and court costs, NOV offered the testimony of John Zavitsanos of the law firm of Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing. (AZA) and AZA's redacted invoices. (NOV Ex. 32, 33, and 34).[1]

NOV also offered NOV Ex. 1-B, which is a spreadsheet created by AZA for the attorneys fee hearing. Mud King objected to NOV Ex. 1-B as hearsay under Rule 802 and as inadmissible under the business records exception, Rule 803(6). Mud King also objected that NOV Ex. 1-B failed to qualify as a summary under Fed. R. Evid. 1006. The Court sustained these objections and declined to admit NOV Ex. 1-B.

### III. Applicable Law

"State law controls both the award of and the reasonableness of fees

---

[1]Toward the conclusion of the hearing on NOV's attorneys fees and costs, counsel for NOV expressed concern  in connection with his questioning of a witness, Suzanne Johnson, as to which of Mud King's exhibits had been admitted into the evidentiary record.  The Court ruled that upon review of the transcript of the proceedings, the Court would determine which of Mud King's exhibits had been admitted. The transcript reveals and the Court finds that Mud King Ex. 11 is the only Mud King exhibit admitted into the evidentiary record at the hearing on NOV's attorneys fees and costs. The transcript further shows that NOV's counsel questioned Suzanne Johnson about an exhibit that was not offered or admitted, Mud King Ex. 4, page 6.  The Court finds that inasmuch as no objection was raised to Suzanne Johnson's testimony concerning the exhibit, that testimony remains part of the evidentiary record.

awarded where state law supplies the rule of decision." *Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002). As Tex. Civ. Prac. & Rem. Code § 134.003 provides the rule of decision, Texas law controls.

Under Texas law, factors to be considered by the Court to determine reasonable and necessary fees include: (1) the time and labor required, novelty and difficulty of the questions involved, and skill required to properly perform the legal service; (2) the likelihood the lawyer's acceptance of the particular employment will preclude other employment; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (citing Tex. Disciplinary R. Prof. Conduct 1.04, *reprinted in* Tex. Gov't Code, tit. 2, subtit. G app. (State Bar Rules, art. X, § 9)).

## IV. NOV's Application

### a. Amount sought

NOV has already paid AZA "one hundred percent" of its total fees of $2,209,112 for 8,076 hours of work. These hours are shown in NOV Ex. 32, 33, and 34. NOV asserts AZA spent 3,377.9 hours prosecuting NOV's TTLA claim resulting in attorneys fees totaling $1,197,529.50.

NOV explains the sums sought:

> In summary, AZA performed approximately 3377.9 hours of work at an effective rate of $354.52/hour related to the TTLA claim for a total of $1,197,524. AZA has adjusted the total amount by deducting twenty-five per cent of the fees to account for other non-recoverable claims, and is seeking an award of $898,143 for fees related to the TTLA claim.
> . . . .
> The amount NOV seeks to recover for expenses is calculated by multiplying the total amount of recoverable expenses (those which conform to the guidelines found in General-Order 2001-2) by seventy-five per cent to reflect a deduction for services incurred that were not related to the trade secret misappropriation or the CFAA claim, or related to claims against defendants other than Mud King.
> . . . .
> Despite the foregoing, NOV has applied a 25% discount to the total fees sought to account for any failure to segregate out fees and expenses that may have been related to unrecoverable claims."

(Doc. 269 p.3, p.5n.3, and  p.7).

NOV now seeks a total of $898,147.12 in attorneys fees and litigation costs of $323,951.43 as an additional claim against debtor.[2]

**b. Work performed**

NOV asserts AZA performed the following work in prosecuting its TTLA claim: (1) investigated facts and interviewed witnesses, (2) obtained a temporary restraining order and preliminary injunction, (3) obtained discovery, orders compelling production, and took numerous depositions, (4) reviewed thousands of electronic pages of documents, drawings, correspondence and spreadsheets, (5) prepared for trial and prepared witnesses to testify regarding highly technical drawings, (6) prepared expert witnesses on damages and forensic data retrieval, (7)  prepared briefs on the measure of damages and on drawing adverse inferences, and (8) prepared post-trial briefs on the reliability of expert witness testimony and in support of NOV's proposed findings of fact and conclusions of law.

---

[2] NOV's application for award of attorneys fees includes time for prosecution of both NOV's TTLA claim (3,377.9 hours) and its CFAA claim (3,014.8 hours). NOV's application was filed before the Court limited NOV's recovery to its  TTLA claim.

NOV's fee request also identifies the different work AZA performed in prosecuting its CFAA claim: (1) interviewing and collecting data from NOV witnesses, (2) collecting and examining sixteen terabytes of data from Mud King's electronic devices, (3) reviewing this data for NOV OEM drawings, (4) comparing Mud King-branded drawings against NOV OEM drawings to determine which Mud King-branded drawings were copied from NOV OEM drawings, and (5) documenting the investigation in detailed spreadsheets. Thus, the work AZA spent prosecuting NOV's CFAA claim differs from the work it performed prosecuting NOV's TTLA claim. (Doc. 269 p. 3-4).

Further, the fee request explains that NOV hired LCG Discovery Experts, whose employees include Ken Tisdel and Scott Speer, to perform work in prosecution of NOV's CFAA claim as opposed to prosecution of NOV's TTLA claim, including: (1) imaging and analyzing Mud King's computers and devices, (2) maintaining a chain of custody of physical evidence, (3) recovering NOV drawings from the imaged computers, (4) exporting data copied from Mud King's computers to Relativity for review by AZA staff attorneys, and (5) coordinating with Mud King's forensic experts.

## c. Lodestar method

NOV seeks recovery of its attorneys fees calculated by the lodestar method. Under the lodestar method, there must be evidence indicating the time spent on the specific tasks for which attorneys fees may be recovered. *Long v. Griffin*, 442 S.W.3d 253 (Tex. 2014).

## d. Texas Supreme Court's criticism of the lodestar method in fee-shifting cases

In considering the lodestar method of calculation, in *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762 (Tex. 2012) the Texas Supreme Court held:

> The lodestar method aims to provide a relatively objective measure of attorney's fees. *Gonzales,* 72 S.W.3d at 412. It has been criticized, however, for providing a financial incentive for counsel to expend excessive time in unjustified work and for creating a disincentive to early settlement. *Gen. Motors Corp. v. Bloyed*, 916 S.W.2d 949, 960 (Tex.1996) (citing *Court Awarded Attorney Fees*, 108 F.R.D. 237, 246–49 (3d Cir. Task Force 1985)). To avoid these pitfalls, a trial court should obtain sufficient information to make a meaningful evaluation of the application for attorney's fees. Charges for duplicative, excessive, or inadequately documented work should be excluded. *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir.1993). A meaningful review of the hours claimed is particularly important because the usual incentive to charge only reasonable attorney's fees is absent when fees are paid by the opposing party. As the U.S. Supreme Court has observed:
>
> > Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are

8

> excessive, redundant, or otherwise unnecessary, just as
> a lawyer in private practice ethically is obligated to
> exclude such hours from his fee submission. "In the
> private sector, 'billing judgment' is an important
> component in fee setting. It is no less important here.
> Hours that are not properly billed to one's client also
> are not properly billed to one's adversary pursuant to
> statutory authority."

*Hensley*, 461 U.S. at 434, 103 S.Ct. 1933 (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C.Cir.1980) (en banc)). While Texas courts have not routinely required billing records or other documentary evidence to substantiate a claim for attorney's fees, the requirement has merit in contested cases under the lodestar approach.

The starting point for determining a lodestar fee award is the number of hours "reasonably expended on the litigation." *Id.* at 433, 103 S.Ct. 1933. The party applying for the award bears the burden of proof. *Id.* at 437, 103 S.Ct. 1933. That proof should include the basic facts underlying the lodestar, which are: (1) the nature of the work, (2) who performed the services and their rate, (3) approximately when the services were performed, and (4) the number of hours worked. An attorney could, of course, testify to these details, but in all but the simplest cases, the attorney would probably have to refer to some type of record or documentation to provide this information. Thus, when there is an expectation that the lodestar method will be used to calculate fees, attorneys should document their time much as they would for their own clients, that is, contemporaneous billing records or other documentation recorded reasonably close to the time when the work is performed.

In this case, neither attorney indicated how the 890 hours they spent in the aggregate were devoted to any particular task or category of

tasks. Neither attorney presented time records or other documentary evidence. Nor did they testify based on their recollection of such records. The attorneys instead based their time estimates on generalities such as the amount of discovery in the case, the number of pleadings filed, the number of witnesses questioned, and the length of the trial. While all this is relevant, it provides none of the specificity needed for the trial court to make a meaningful lodestar determination. The court could not discern from the evidence how many hours each of the tasks required and whether that time was reasonable. Without at least some indication of the time spent on various parts of the case, a court has little basis upon which to conduct a meaningful review of the fee award.

Moreover, if multiple attorneys or other legal professionals are involved in a case, the fee application should indicate which attorney performed a particular task or category of tasks. The application here did not provide this information. For instance, the fee application details a list of thirty-seven pleadings and states that they were prepared or reviewed by either Gonzalez or Dominguez. The two attorneys, however, bill at different rates. Without specifying who performed a task, the information is incomplete. Such uncertainty diminishes the objectivity that the lodestar method aims to provide.

Olivas's attorneys also utilized legal assistants in this litigation and were awarded $6,500 for their services ($65 per hour for 100 hours of work). While both attorneys stated in their affidavits that "[l]egal assistant time was necessarily expended in the prosecution of [the] case," no evidence was offered to describe the tasks their legal assistants performed, who performed these services, or their qualifications. When obtaining payment for work done by paralegals or legal assistants, Texas courts have required more information, such as:

10

(1) [T]he qualifications of the legal assistant to perform substantive legal work; (2) that the legal assistant performed substantive legal work under the direction and supervision of an attorney; (3) the nature of the legal work performed; (4) the legal assistant's hourly rate; and (5) the number of hours expended by the legal assistant.

*All Seasons Window and Door Mfg., Inc. v. Red Dot Corp.*, 181 S.W.3d 490, 504 (Tex.App.-Texarkana 2005, no pet.) (quoting *Multi–Moto Corp. v. ITT Commercial Fin. Corp.*, 806 S.W.2d 560, 570 (Tex.App.-Dallas 1990, writ denied)). Paralegal fees have been denied absent such proof. *Moody v. EMC Servs., Inc.*, 828 S.W.2d 237, 248 (Tex.App.-Houston [14th Dist.] 1992, writ denied).

*El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762-763 (Tex. 2012)

## e. Inadequacy of AZA's contemporaneous billing records

John Zavitsanos testified that for the first few months of this case, from September 2012 to January 2013, AZA block billed its time.[3] In 2013, NOV switched to require itemized task bills. (Doc. 361 p 35).

Zavitsanos testified that when AZA began to prepare NOV's request for attorneys fees, he recognized that AZA's invoices, NOV Ex. 32,  33, and 34, still did not provide the detailed descriptions of the tasks sufficient to support NOV's statutory fee request. Zavitsanos described AZA's creation of NOV Ex.

---

[3] A block-billed invoice shows all tasks performed by each timekeeper each day, rather than showing the amount of time each timekeeper spent on each task.

1-B as follows:

> So when the time came to submit our fee application to this Court
> under the TTLA and under the CFAA statute, our team -- primarily
> [Monica Uddin] . . . went through, and took our bills, and put on a
> spreadsheet that we're seeing here on 1-B all of the tasks as
> segregated by claim. So this one, 1-B, for example, would be all of
> the tasks for TTLA. Now, if you compare this printout, 1-B, with
> . . . [NOV Ex. 32, Ex. 33, and Ex. 34] I think there's actually more
> detail in 1-B than there is in those fee statements. And the reason
> that is, is because in instances where . . . the description was
> inadequate, we . . . had people go back . . . to look at e-mails, . . .
> briefs, . . . drafts of briefs, . . . when they logged in onto the
> database that we had for these . . . terabytes of documents, so that
> we could . . . give a more fulsome description of what it is that
> they're doing . . .

> This . . . was a monstrous effort to put this together, because we
> wanted this to be as detailed as possible. So we went to all of the
> individual timekeepers . . . for those entries . . . where there was
> block billing . . . or where the itemized billing was insufficient, we
> asked them to go back and to give us a little more detail . . .

(Doc. 361 p. 37–39).

Zavitsanos testified that AZA's invoices, the only routine business records
it maintains of its timekeepers' hours expended and tasks performed, do not
describe "what it is that they're doing." (NOV Ex. 32, 33, and 34).

**f. The qualifications and experience of AZA's timekeepers**

Zavitsanos testified concerning the qualifications of AZA's timekeepers. NOV Ex. 32, 33, and 34 include time for the following timekeepers: (1) Andrea Caswell, (2) Andrew Elkhoury, (3) Anne Ellis, (4) Tiffany Joudi, (5) Kelly Leiker, (6) Sasha Meyer, (7) Adam Milasincic, (8) David Monroe, (9) Ariadne Montare, (10) Ana Ortiz, (11) Karen Peck, (12) Lynette Peter, (13) Michelle Rivers, (14) Jane Robinson, (15) Kinan Romman, (16) Timothy Shelby, (17) Staff Attorney DA, (18) Staff Attorney BH, (19) Staff Attorney WM, (20) Staff Attorney KY, (21) Amanda Singleton, (22) Karen Smith, (23) Valerie Stefka, (24) Monica Uddin, (25) Sophie Williams, and (26) John Zavitsanos.  AZA's invoices include the time spent, hourly rates and total fees billed by all of these timekeepers in a chart that concludes each invoice with the heading "Attorney Summary."

1. AZA Attorneys

John Zavitsanos is an attorney licensed in Texas on November 6, 1987. Zavitsanos' hourly rate is $625. Zavitsanos is the "de facto managing partner and the founder" of AZA. Zavitsanos is Chambers recognized, AV rated by

Martindale-Hubbell, on the Best Lawyers List, and has been recognized by the American Board of Trial Advocates at the advocate level. Zavitsanos is a Texas Super Lawyer and has been repeatedly voted as one of the top 100 in the State of Texas for all categories, not just litigation. Zavitsanos has been a Best Lawyers in America for ten years and is board certified at civil trial law by the Texas Board of Legal Specialization and by the National Board of Trial Advocacy. Zavitsanos testified that he was the lead lawyer on the case overseeing the rest of the AZA team.

Timothy Shelby was licensed in Texas on November 6, 2002. Shelby's hourly rate is $475.  Shelby was the day-to-day lead lawyer on this case. Shelby is a partner at AZA. Shelby graduated from Harvard Law School. Shelby worked at Baker Botts before he was hired by AZA. Shelby is a Texas Super Lawyer, is in the Best Lawyers in America, and was a Rising Star. Shelby has tried a number of cases.

Monica Uddin was licensed in Texas on November 5, 2010. Uddin's hourly rate is $310. Uddin graduated from the University of Chicago Law School. AZA hired Uddin directly out of school in 2010. Uddin has tried at least

four cases to verdict, of which two were as first chair and two were as second chair. Three of Uddin's trials were jury trials. Uddin has been a Rising Star at least twice.

Ariadne Montare was originally licensed in New York in 1995 and was licensed in Texas in 2005. Montare's hourly rate is $450. Montare graduated from Columbia Law School. Montare was the primary interface between AZA and NOV's bankruptcy counsel.

Tiffany Joudi graduated from South Texas College of Law in 2008 and was licensed in Texas on November 7, 2008. Joudi's hourly rate hourly rate is $350.

Karen Peck graduated from Yale Law School  in 1988, and was licensed in Texas on November 10, 1988. Karen Peck's hourly rate is $450. As to her work for NOV, Zavitsanos testified, "I can't for the life of me remember what exactly she did on this case." (Doc. 362 p. 21).

Adam Milasincic graduated from Virginia Law School and was licensed in Texas on November 4, 2011. Milasincic's hourly rate is $295.

Kinan Romman was licensed in Texas on November 2, 2007. Kinan

Romman's hourly rate is $390. Romman was in the top two percent at the University of Houston Law School. Romman was an associate at Fulbright and Jaworski before AZA hired him. Zavitsanos testified that Romman was the primary worker on this case early on, but is currently an in-house lawyer with the Exxon Corporation. Zavitsanos testified that at the beginning of the case, Romman had a lot of discretion and interviewed dozens of people and selected the four "staff attorneys" AZA hired to search the terabytes of data it obtained from Mud King Products, Inc.'s computers.

Beth Harper, identified on NOV Ex. 32, 33, and 34 as Staff Attorney BH, was licensed in 1987. Deola Ali, identified as Staff Attorney DA, was licensed in 2010. Kim Yi, identified as Staff Attorney KY, was licensed in 1996. William McKinley, identified as Staff Attorney WM, was licensed in 2011. Zavitsanos testified that the staff attorneys did not do any legal research or come up with any strategic considerations. Zavitsanos explained that the supervising attorney gave the staff attorneys a set of parameters and they searched for documents. Zavitsanos stated that searching documents was "the only reason we used them; otherwise they would not be on the bill . . . [and] they were all looking at the

16

same stuff . . ." (Doc. 362, p. 22-24).

###### 2. AZA legal assistants

A request for attorneys fees that includes work performed by legal assistants must identify the person performing the task and the class of professional, attorney or paralegal, who performed the work. *Gill Sav. Ass'n v. International Supply Co.*, 759 S.W.2d 697, 705 (Tex. App.–Dallas 1988). Although AZA's invoices describe all of its timekeepers as attorneys, Zavitsanos clarified that some timekeeprs were paralegals or other support staff. Paralegal work can be recovered as attorneys fees only if the work is legal rather than clerical. *Vela v. City of Houston*, 276 F.3d 659, 681 (5th Cir. 2001) (applying Texas law). Proof must include more than the attorney's testimony that the legal assistant performed the work under the attorney's direction. *Clary Corp. v. Smith,* 949 S.W.2d 452, 469–470 (Tex. App.–Fort Worth 1997). Proof must explain how the legal assistant is "qualified to participate in document production, or even that she was qualified at all." *Id.* at 469. When obtaining payment for work done by paralegals or legal assistants, proof must include "(1) the qualifications of the legal assistant to perform substantive legal work; (2)

that the legal assistant performed substantive legal work under the direction and supervision of an attorney; (3) the nature of the legal work performed; (4) the legal assistant's hourly rate; and (5) the number of hours expended by the legal assistant.*" El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 764 (Tex. 2012).

Zavitsanos testified that Lynette Peter has been his legal assistant for 15 years and has attended at least 50 trials. Her hourly rate is $190.00. There is no evidence concerning Peter's education. Zavitsanos explained, "historically [Peter] typically does first drafts of Motions to Compel." Although Zavitsanos stated that Peter prepared first drafts on motions and pleadings in the case, on cross-examination he could not specify which documents she had prepared in this case.  (Doc. 362 p. 34-35).

Karen Smith is a paralegal who is junior to Peter. Smith's hourly rate is $175.00. There is no evidence concerning Smith's education, training or experience. Zavitsanos testified that Smith is "very, very good." Zavitsanos testified that Smith "looked for documents" and "was Mr. Shelby's legal assistant and also worked for Mr. Romman." (Doc. 362 p.26). Zavitsanos testified, "the paralegals . . . definitely would do the work that a paralegal would

do and I guess a lawyer would do if you were in a much smaller office, and so -- for example, organizing exhibits – ." (Doc. 362 p. 28). Zavitsanos also testified that the paralegals worked "with witnesses on substantive factual issues and . . . draft[ed] discovery and correspondence." *Id*.

### 3. AZA's paralegals in training

Zavitsanos identified Amanda Singleton, David Monroe and Valerie Stefka, as "paralegal clerks," "really like a junior paralegal...kind of paralegals in training."(Doc. 362 p. 26).  He explained that the paralegals in training "tend to train under the other legal assistants" and "typically get the assignments from the legal assistants." *Id*.  Zavitsanos stated David Monroe and Valerie Stefka graduated with honors from their respective colleges. Zavitsanos did not testify about Amanda Singleton's education, training or experience. Amanda Singleton's rate is billed at both $125.00 and $85 on AZA's invoices. David Monroe's hourly rate is $125. Valerie Stefka's hourly rate is $75. In response to the question of whether AZA's paralegals and paralegal clerks performed "work that a lawyer would do," Zavitsanos testified, "I don't know about the paralegal clerks."

### 4. AZA's other personnel

Zavitsanos testified that Ann Ellis's hourly rate is incorrectly shown at $295, and should be shown as $180. Zavitsanos did not identify whether Ellis is an attorney or paralegal. He did not testify about Ellis' education, training, or experience. Zavitsanos said, "I don't remember exactly what she did, that would be reflected on the bill, but it was obviously a fairly discrete task because there's only 7.1 hours." (Doc. 362 p. 26).

Zavitsanos stated that the fees requested include time billed by Scott Herndon although his time does not appear on NOV Ex. 32, 33, and 34. Scott Herndon is not an attorney. Zavitsanos testified, "Herndon performed some document review and a little bit of research." Herndon charged AZA for his time at $110 per hour and is considered an expense by AZA.

## g. Zavitsanos' explanation for AZA's higher than typical number of hours

The Court finds that Zavitsanos failed to testify regarding the specific work actually performed by AZA time keepers. However, he did testify AZA's 3,377.9 hours claimed regarding NOV's TTLA claim are higher than those spent in a typical trade secrets case. Zavitsanos explained that the reason the hours

incurred in this case were higher than those in a typical trade secrets case was because "of all of the -- all the trade-secret cases that I handled -- and there have been a lot, too many to count them -- I cannot recall a case ever where the discovery process was as obstinate and as difficult as this case." (Doc. 361 p. 86).

Zavitsanos' similarly justified his $751,275 fee in *Sentinel Integrity Solutions, Inc. v. Mistras Group, Inc.*, 414 S.W.3d 911, 922–923 (Tex. App.–Houston [1st Dist.] 2013):

> Regarding the work performed in this particular case, Zavitsanos testified that the number of "emergency matters that Sentinel requested" early on in the case required intensive work that prevented firm employees from working on other matters. Zavitsanos also stated that discovery in this case was "very, very challenging." He outlined the usual course of discovery in a case of this complexity, including written discovery, depositions, and forensic computer experts, and he stated,
>
> And all of that was done here; but it was done repeatedly, repeatedly, repeatedly, repeatedly. I mean, I cannot recall—I have been doing this almost 25 years. I cannot recall a case where we have had to get—we have had to file so many motions to get basic information out of the other side as much as this case.

*Id.*

Zavitsanos testified AZA wanted the deposition of a Mud King corporate

representative to provide "meaningful guidance" to help "pare down the ocean of information" AZA received when NOV imaged Debtor's computer. (Doc. 361 p. 86). AZA's discovery requests were "designed to help narrow that search because this is not our first rodeo," and that the discovery requested was "the type of information that we would normally seek to help us narrow the list of what we're going to be looking for. And we never got the benefit of that and so it was almost like shooting darts in a darkroom." (Doc. 361 p. 92). Zavitsanos testified that had AZA had "basic information" from a corporate representative, then AZA could come up with better, more defined search terms so that we could do targeted searches. AZA "literally spent hundreds and hundreds and hundreds and thousands of dollars going through . . . [Mud King's] database almost rudderless because of the wholesale refusal on their part to comply with discovery." (Doc. 361 p. 90).

AZA's inability to obtain debtor's employees' help to narrow its computer search stems from NOV and AZA's involvement of the FBI from the start of NOV's investigation into the theft of its drawings. Threatened with the possibility of criminal prosecution, the Mud King's employees invoked their

Fifth Amendment right to remain silent, rather than risk incriminating themselves.

While AZA's invoices clearly show hundreds of hours searching the Realitivity data base created from imaging debtor's computer system, NOV's application allocates these hours to NOV's claim under the CFAA. (Doc. 269 p. 14). According to NOV's application, the 3,377.9 hours NOV seeks for pursuing the TTLA does not include the hundreds of hours spent searching the Reality database. (Doc. 269 p. 4).

Zavitsanos testified that debtor's bankruptcy filing accelerated trial of NOV's lawsuit and the discovery process and that the time to prepare the case for trial was compressed.[4] Zavitsanos explained "we had to do what normally would take . . . say aggressively six to eight months. So we had to do six to eight months' worth of discovery in one week [and] . . . we would not have the benefit of any follow on discovery or follow-up -- follow up on issues or getting the benefit of guidance from the Court in the event that there was a disagreement

_____

[4]The Court notes that the claim estimation hearing actually occurred on October 2013, a month later than the date originally scheduled for NOV's state trial, September 17, 2013.

23

between the parties on a certain discovery issue. So we had to essentially work up the case and get ready for trial at the same time on a case with hundreds of blueprints and terabytes of information. It was almost undoable." (Doc. 361 p.101-103).

Zavitsanos testified that AZA had "an extraordinary number of people" working on average 12 to 14 hours or more every day. (Doc. 361 p. 104). In preparation for trial, AZA attorneys retained experts, worked with them, culled down the exhibit list, had multiple conferences with the opposing side, prepared witnesses, and took depositions. Zavitsanos concluded, "I do not believe most firms could have done that. I think it took an extraordinary amount of skill to be able to pull out the information that we pulled off of these computers without the benefit of the preliminary discovery and matching these items up. Yes, it took an exceptional amount of skill." (Doc. 361 p. 105-106).

### h. Billing judgment

In presenting a request for fees, billing judgment should be evident from the attorneys' invoices offered in support of the request and "charges for duplicative, excessive, or inadequately documented work should be excluded."

*El Apple I, Ltd.* 370 S.W. 3d 757 at 762; *cf. Walker v. U.S. Dep't. of Hous. and Urban Dev.*, 99 F.3d 761, 769 (5th Cir. 1996) (Analyzing the exercise of billing judgment in a request for fees under 42 U.S.C. § 1988(b), the Fifth Circuit held that billing judgment is not demonstrated by plaintiffs in "not charging for (1) computer-assisted legal research or long-distance calls; (2) inadequately documented time; (3) time spent on issues on which they did not prevail; or (4) time spent 'researching and investigating issues that ultimately' were not pursued," because "plaintiffs do not have the right to bill for inadequately documented time or for time on issues on which they do not prevail" and "[p]laintiffs cannot have prevailed on issues they did not pursue.")

Zavitsanos testified he exercised billing judgment because "it is not uncommon for either Mr. Shelby or I to adjust . . . time down [and] . . . write off time that we don't think in our judgment should be passed along to the client, for time entries of "some of our younger folks who are not as efficient as they should be." Zavitsanos testified the extent of AZA's exercise of billing judgment can not be quantified because AZA does not maintain any record of time written off. (Doc. 361 p. 74).

Zavitsanos testified that AZA "exercised billing judgment, and we went through, based on our years of experience -- and, again, you [Monica Uddin] did the

initial task, but then you relayed that to Mr. Shelby, and then I looked at it. So we have three sets of eyes going through this. And we carved out -- and this was not a long period of time, by the way. It was a -- it was in the minority period of time, but we went through and we carved out those tasks that we thought were related to the TTLA claim."

Zavitsanos testified about fees identified as "fees not sought, billing judgment," as follows:

> So these are -- these are fees that we are not seeking in  this case for one of many reasons. Either they do not relate to the TTLA claim in any way, or principally do not relate to the TTLA claim, or the definition was -- was very vague and we cannot find any support for it, and it very well could have related to the TTLA claim, but -- try as we could -- we could  not identify that, so we did not include it; or instances where perhaps somebody looking from the outside, because the definition was cryptic and we cannot back it up, even though it seemed to relate to the TTLA claim, because there was not more meat on the bone, if you will, we just thought it was not appropriate to include it.

(Doc. 361 p. 46-47).

Zavitsanos testified that, although AZA identified approximately 1,700 hours expended on NOV's behalf that in his billing judgment were excluded from NOV's request for fees from debtor, AZA nevertheless billed those hours to NOV and NOV paid AZA for those hours in full. Given Zavitsanos' lack of specificity about hours excluded from AZA's invoices, and the lack of any documentary evidence that AZA

26

excluded any hours from its invoices, the Court finds there is no evidence AZA exercised any billing judgment for its hours.

## IV. Calculation of the Lodestar

The Court's first task is to calculate the lodestar by multiplying the hours each timekeeper reasonably expended on NOV's TTLA claim by that timekeeper's hourly rate. Thus, the Court must determine which of the 8,076 hours spent by AZA, shown in NOV Ex. 32, 33, and 34, represent the reasonable and necessary attorneys fees NOV incurred prosecuting its TTLA claim against Mud King Products, Inc.

### a. Multiple claims and multiple defendants

AZA's invoices show the total hours AZA timekeepers spent investigating, preparing, and prosecuting all NOV's claims against Debtor and all other defendants from September 20, 2012, through October 31, 2013. Thus, the hours shown in NOV Ex. 32, 33, and 34 include all AZA's time spent in prosecution of NOV's lawsuit filed in the 165th Judicial District Court of Harris County, Texas, Cause No. 2012-55427; all hours spent after defendants removed the case to federal district court, now pending before Judge Nancy F. Atlas as Case No. 4:12-cv-03120; and, after debtor filed bankruptcy, all hours spent representing NOV before this Court.

NOV's original state court petition names three defendants, Mud King

Products, Inc., Nigel Brassington, and Freddy Rubiano. NOV's Third Amended Complaint pending in federal district court and the basis of its proof of claim, names twelve defendants: (1) Mud King Products, Inc., (2) Nigel Brassington, (3) Freddy Rubiano, (4) Donald R. Humiston, (5) Oilman Group Co., Ltd. a/k/a Oilman Group, Ltd., (6) Wellhead Solutions, Inc., (7) Dezhou L & A Petroleum Machinery Co., Ltd., (8) Gary Clayton, (9) Sean Cougot, (10) Martin Rodriguez, (11) S.M.C., Inc., and (12) Larry D. Murray.

When a plaintiff seeks to charge a defendant with its attorneys fees, the plaintiff must prove "that the fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1 (Tex. 1991). In cases with multiple defendants, to recover its attorneys fees, the plaintiff must segregate the fees owed by each defendant so that "defendants are not charged fees for which they are not responsible." *Id.* (Requiring segregation of attorneys fees owed by settling defendants from those owed by remaining defendants at trial).

Similarly, NOV's original state court petition alleges: (1) misappropriation of trade secrets, (2) conversion, (3) computer fraud and abuse, (4) theft under chapter 134 of the Texas Civil Practice & Remedies Code, and (5) conspiracy. In addition,

the original petition seeks a constructive trust, temporary restraining order, a temporary injunction, and a permanent injunction.

NOV's Third Amended Complaint alleges: (1) misappropriation of trade secrets, (2) conversion, (3) Computer Fraud and Abuse Act, (4) theft – chapter 134 of the Texas Civil Practice & Remedies Code, (5) conspiracy (Mud King Defendants and Dezhou), (6) conspiracy (Mud King Defendants, Oilman, and Wellhead), (7) conspiracy (Mud King Defendants Vis-à-vis Arredondo), (8) aiding and abetting (Mud King Defendants Vis-à-vis Arredondo), (9) unjust enrichment, (10) conspiracy (Mud King Defendants and SMC Defendants), and (11) breach of contract (SMC). In addition, the Third Amended Complaint seeks a TRO, preliminary injunction and permanent injunction. Consequently, the original state court petition listed all allegations necessary to prosecute NOV's TTLA claim. The Court includes no work related to complaint amendments in the lodestar calculation.

Where fees are recoverable, the prevailing party must prove the fees necessary for the litigation of that claim. "[A] prevailing party must segregate recoverable from unrecoverable attorney's fees in all cases." *Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007). *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 311 (Tex. 2006). "Accordingly, we reaffirm the rule that if any attorney's fees relate solely to a claim

for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id*. at 313–14.

NOV Ex. 32, 33, and 34 include time spent in prosecution of NOV's claims against defendants other than debtor. Therefore, the Court's calculation of the lodestar excludes such time.

## b. Exclusion of clerical timekeepers

NOV failed to prove the following timekeepers are qualified by education, training, or experience to perform legal, rather than clerical, work: Andrea Caswell, Andrew Elkhoury, Ann Ellis, Kelly Leiker, Sasha Meyer, Ana Ortiz, Michelle Rivers, Jane Langdell Robinson, Amanda Singleton and Sophie Williams. Accordingly, the Court's calculation of the lodestar excludes their time.

## c. Exclusion of time spent obtaining equitable relief and in identifying other potential defendants

Zavitsanos testified that at the beginning of this case, NOV's primary goal was to determine who had possession of its blueprints in order to obtain injunctive relief to prevent them from using NOV's blueprints. Zavitsanos testified,"[W]hen we first filed the case, the immediate concern was getting a restraining order and an injunction

30

and preventing this from getting on further and finding out where this information went." (Doc. 361 p. 88). Hence, the initial days of the case were directed to prosecution of injunctive relief against debtor and other defendants and investigation of potential defendants as they were identified in Relativity searches.

Since damages, not injunctive relief, is the remedy available under the TTLA, AZA's time spent seeking equitable relief is not eligible for the lodestar calculation. *See* Tex. Civ. Prac. & Rem. Code § 134.005 (a person who has sustained damages resulting from theft may recover the amount of actual damages and damages awarded by the trier of fact in a sum not to exceed $1,000); *cf.* Tex. Civ. Prac. & Rem. Code § 134A.003 (injunctive relief available under the Uniform Texas Trade Secrets Act). Accordingly, to calculate the lodestar, the Court discounted or excluded time spent in (1) obtaining and amending NOV's temporary restraining orders and preliminary injunctions against other defendants and (2) obtaining and amending NOV's temporary restraining orders and preliminary injunctions against Mud King Products, Inc.

**d. Exclusion of excessive, redundant, inadequately described, or time otherwise unrelated to prosecution of NOV's TTLA claim**

Zavitsanos testified that if "they couldn't figure out what they meant by

31

'assist with exhibits,' then we did not approve." Therefore, to calculate the lodestar, the Court excludes time entries shown in NOV Ex. 32, 33, and 34 that begin with the verb "assist" when the nature of the assistance is not apparent from the remaining entry. Moreover, mindful of the Texas Supreme Court's admonition in *El Apple I, Ltd. v. Olivas*, that while it is intended to be an objective measure of attorneys fees, the lodestar method provides "a financial incentive for counsel to expend excessive time in unjustified work," the Court has, in calculating the lodestar, discounted or excluded time spent that is excessive, redundant, or otherwise unnecessary to prosecution of NOV's TTLA claim.

AZA's invoices are block billed, vague, and uninformative. AZA's invoices contain duplicate entries and excessive time. As an example:

Uddin, Menien

| Date | Description | Hours |
|---|---|---|
| 10/1/2013 | Trial preparation. Preparation included: coordination of Annie testimony and demonstratives with Okin and Adams for Motion to Dismiss; review of revisions to Mud King exhibit list; coordination of draft deposition transcripts for witnesses who need to review them; review of recently-taken deposition exhibit against exhibit list; review potential draft interrogatory amendment with Tim Shelby and incorporate Tim Shelby revisions; and brief research on impact of federal government shutdown on bankruptcy trial. | 3.70 |
| | Prepare for and participate in court-ordered meet-and-confer regarding objections to exhibit lists, witness list, and procedure for trial. | 1.70 |
| | Trial preparation. Preparation included: marking hand-produced exhibits in Relativity to review of recently-taken deposition exhibit against exhibit list; service of newly-added and revised exhibits; conference with staff about pre-trial assignments and logistics; review of two hand-over Lucas reports; draft update to trial team regarding _____ from meet-and-confer including exclusion of experts, proposed stipulations of possession and use of certain drawings, and order of presentation of evidence; coordination of witness prep during trial; acceptance of service of trial subpoenas for NOV witnesses; search for Mud King's electronic copy of exhibits; correspondence to opposing counsel regarding same and regarding missing documents from document production; attention to filing of corrected exhibit list; begin preparation of John Zavitsanos for Lee Wilson cross-examination; and email to trial team regarding | 5.40 |
| | Prepare for and travel to and from pre-trial conference with Judge Brown to discuss exhibit and witness objections, and procedure for presentation of evidence at trial. | 1.90 |
| | Trial preparation. Preparation included: revising LCG exhibit to include scrubbed native spreadsheet; preparation of demonstratives for Motion to Estimate; preparation of demonstratives for Motion to Dismiss; team meeting for upcoming tasks; witness order discussions; continued requests for receipt of electronic versions of Mud King exhibits; continued revision of NOV exhibits; and preparing materials and timeline for Tim Shelby opening statement. | 7.40 |
| 10/1/2013 | Travel to and from trial and presentation of NOV's Motion to Dismiss Mud King's Bankruptcy Filing and NOV's Motion to Lift Automatic Stay. | 6.20 |
| 10/2/2013 | Trial preparation. Preparation included: prepare materials and timeline for Tim Shelby opening statement and Nigel Brassington cross-examination; revision and service of exhibits as-needed; and arrange for service of hard copies of revised exhibits; and revision of master matrix. | 4.30 |
| | Trial preparation. Preparation included: revision of material needed for Tim Shelby opening statement; prepare responses to exhibit objections. | 1.40 |
| | Travel to and from trial and presentation of NOV's Motion to Dismiss Mud King's Bankruptcy Filing and NOV's Motion to Lift Automatic Stay. | 6.20 |
| | Trial preparation. Preparation included: strategy meetings regarding recession of attorney for Lillian Arredondo; preparation of Brad Ortego for direct examination; and draft of Brad Ortego direct examination. | 4.70 |
| 10/2/2013 | Trial preparation. Preparation included: review of Brad Ortego deposition | 4.30 |

In sum AZA's timekeeper billed 20.6 hours on September 30, 26.3 hours on October 1, and 22.8 hours on October 2. AZA included a duplicative entry for October 2.

Moreover, at least one entry appears to be in error. On October 10, 2013, the timekeeper described her work as "Defeat Daubert challenge, Present Dennis Arnie for examination. Defeat Daubert challenge." (NOV Ex. 44 Bates Stamp No.010746). There was no *Daubert* challenge to Arnie's expertise.

AZA failed to review such duplicative entries and overbilling. Due to the excessive hours billed and vague descriptions of her work throughout the Mud King case, the Court only awarded trial time for this timekeeper's actual participation in court with regard to specific witnesses.

Accordingly, in calculating the lodestar, the Court has discounted or excluded time spent: (1) drafting and serving NOV's amended complaints because NOV's original petition alleges its TTLA claim against Debtor and the amended complaints add defendants and modify NOV's request for injunctive relief; (2) preparing for and meeting with the FBI because the threat of criminal prosecution stymied prosecution of NOV's TTLA claim against Debtor by

causing most fact witnesses to invoke the Fifth Amendment and remain silent rather than risk incriminating themselves; (3) obtaining service on the "Chinese defendants;" (4) obtaining a default judgment against Wellhead Group; (5) investigating the "PEP" drawings because the Court found that Debtor is not liable to NOV for its possession of those drawings; (6) drafting and prosecuting NOV's unsuccessful motion for relief from stay against Debtor and other defendants; (7) drafting and prosecuting NOV's motion to dismiss because NOV's fee application states that NOV has excluded such time from its request for fees under the TTLA; (8) responding to motions filed by other defendants, such as motions to dismiss; (9) providing case updates to NOV's in-house lawyers; (10) discussing the case with counsel for other defendants, as NOV has failed to show that any of such time is related to prosecution of its TTLA claim against Debtor; (11) on NOV's motion to strike the answers of other defendants; and (12) on clerical or administrative work, rather than legal work, such as setting up and conducting relativity searches and processing invoices from third parties.

In addition, the Court excludes time entries: (1) so redacted that

insufficient information remains to assess the reasonableness or necessity of the hours claimed; (2) with vague or terse  description, such as time described as "trial preparation;" (3) describing the work performed as "attention to," because thinking about a subject without a description of the reason for the attention or the result of the attention is not the performance of legal work; (4) describing work performed as "review" without describing the reason for or the action taken as a result of the review; (5) by Ariadne Montare communicating on June 18, 2013 with "bank's counsel" about a "Chevy Tahoe" (NOV Ex.32 Bates Stamp No. 010726); and (6) by the four staff attorneys because NOV's fee request explains that AZA hired them to perform work in connection with

NOV's CFAA claim. The Court finds that from September 20, 2012 to October 31, 2013, the AZA timekeepers' hours spent and hourly rates reasonably and necessarily spent in prosecution of NOV's TTLA claim against Debtor are shown in the chart below:

| Hours Allowed | Total Fee Allowed | Timekeeper | Rate |
|---|---|---|---|
| 319.50 | $151,762.50 | Shelby, Timothy | 475 |
| 123.10 | $38,161.00 | Uddin, Monica | 310 |
| 29.10 | $18,187.50 | Zavitsanos, John | 625 |
| 3.30 | $1,485.00 | Peck, Karen | 450 |
| 75.80 | $34,110.00 | Montare, Ariadne | 450 |
| 94.00 | $32,900.00 | Joudi, Tiffany | 350 |
| 200.50 | $38,095.00 | Peter, Lynette | 190 |
| 26.80 | $4,422.00 | Smith, Karen | 165 |
| 6.00 | $1,770.00 | Milasincic,Adam | 295 |

Based on the foregoing, the Court calculates the lodestar for prosecution of NOV's TTLA claim against debtor totals $ 320, 893.

37

## V. Other *Anderson* Factors

### a. The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer

The Court finds that for the months of September and October 2012 and September and October 2013, some of the AZA lawyers representing NOV in this case were precluded from other employment.

### b. The fee customarily charged in the locality for similar legal services

The Court finds that the fees charged by AZA attorneys are within the range of fees charged by other attorneys in the locality of Houston, Texas.

### c. The amount involved and the results obtained

At the hearing on the motion to estimate, NOV claimed damages of over $6 million. The Court held NOV failed to carry its burden to prove Debtor's liability for (1) conversion, (2) unjust enrichment, (3) violating the Computer Fraud and Abuse Act (CFAA), and (4) exemplary damages. NOV, as prevailing party, is entitled to an award of reasonable and necessary attorneys fees and court costs under the TTLA. *See* Tex. Civ. Prac. & Rem. Code § 134.005(b) ("Each person who prevails in a suit under [the Texas Theft Liability Act] shall

be awarded court costs and reasonable and necessary attorney's fees.")

The Court estimated NOV's claim and reduced it to $74,434.95, in actual damages, plus $1,000 in statutory damages. In its application, NOV requests attorneys fees of approximately twelve times its damage award.  Such a request is excessive.

**d. The time limitations imposed by the client or by the circumstances**

The Court finds that the circumstances of this case imposed time limitations on some AZA attorneys for approximately four months of the thirteen months at issue.

**e. The nature and length of the professional relationship with the client**

Zavitsanos testified that AZA attorneys have represented NOV previously.

**f. The experience, reputation, and ability of the lawyer or lawyers performing the services**

The Court credits Zavitsanos' testimony regarding the qualifications and experience of AZA's attorneys.

**g. Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered**

The Court credits Zavitsanos' testimony that NOV paid 100% of AZA's

invoices.

## VI. Non-Taxable Expenses Cannot be Recovered Under the TTLA

NOV seeks to recover its out-of-pocket expenses and court costs incurred in this case. NOV's application states that expenses and costs "billed to AZA's account for NOV during the Application Period total $431,935.24. NOV is seeking an award for expenses of $323,951.43. The amount that NOV seeks is calculated by multiplying the total amount of recoverable expenses (those which conform to the guidelines found in General Order 2001-2) by seventy-five percent to reflect a deduction for services incurred that were not related to the trade secret misappropriation or the CFAA claim, or related to claims against defendants other than Mud King."

General litigation expenses are not recoverable as attorneys fees to the prevailing party under Tex. Civ. Prac. & Rem. Code § 134.005. *Int'l. Paper Co. v. Frame*, 67 Fed. Appx. 251, 2003 WL 21195497, *6–7 (5th Cir. 2003) (citing *Shenandoah Assoc. v. J & K Prop., Inc.*, 741 S.W.2d 470, 487 (Tex. App.1987)) (Vacating the district court's award of attorneys fees of $982,813.00 and costs of $414,875.20, the Fifth Circuit held that an award of attorneys fees to the prevailing

party under the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code § 134.005, may not include an award of litigation expenses that, although they may be customarily billed to a client, are not properly recoverable as court costs, because "[t]he plaintiff has not provided any authority under Texas law for including these litigation expenses as part of its attorneys' fees award, and we have found none."); *cf. Kimberly-Clark Corp. v. Factory Mut. Ins. Co.*, Not Reported in F. Supp. 2d, 2008 WL 1958998 (N.D. Tex. 2008) (Holding that "the non-taxable costs requested by Plaintiff will not be awarded," because Texas law does not support the award of non-taxable costs under Tex. Civ. Prac. & Rem. Code § 38.001.)

The TTLA does not award general litigation expenses to the prevailing party. NOV and AZA declined to identify NOV's taxable court costs. Therefore, the Court denies NOV's request for an award of expenses in the amount of $323,951.43.

## VII. Conclusion

Based on the foregoing, it is

**ORDERED** NOV is allowed a claim for its reasonable and necessary attorneys fees incurred as the prevailing party under the TTLA in the amount of $320,893. It is further

**ORDERED** NOV's request for an award of $323,951.43 for general litigation expenses including its taxable court costs **IS DENIED.**

Signed:  January 30, 2015

Karen K. Brown
United States Bankruptcy Judge