**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN.  ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **MUD KING PRODUCTS, INC.** | § | **CASE NO.  13-32101-H5-11** |
| | § | |
| | § | |
| **DEBTOR** | § | **Chapter 11** |

**SECOND AMENDED**
**[PROPOSED] DISCLOSURE STATEMENT UNDER**
**11 U.S.C. § 1125 AND BANKRUPTCY RULE 3016 IN**
**SUPPORT OF PLAN OF REORGANIZATION OF DEBTOR**

**THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF THE DEBTOR ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE.  THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE DEBTOR'S PLAN OF REORGANIZATION.  ALL CREDITORS ARE URGED TO READ THE DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY.**

**ON _____, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE.  SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND ATTACHED AS EXHIBIT A, IS BEING SOUGHT FROM CREDITORS WHOSE CLAIMS AGAINST THE DEBTOR ARE IMPAIRED UNDER THE PLAN OF REORGANIZATION.  CREDITORS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION ARE URGED TO VOTE IN FAVOR OF THE PLAN AND TO RETURN THE BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT 2UPON COMPLETION IN THE ENVELOPE ADDRESSED TO HOOVER SLOVACEK LLP., ATTENTION: EDWARD L. ROTHBERG, 5051 WESTHEIMER, SUITE 1200, HOUSTON, TEXAS 77056, NOT LATER THAN _____, AT _:_._ _____.M. HOUSTON TIME.**

# DISCLOSURE STATEMENT

**Mud King Products, Inc.**, debtor and debtor-in-possession herein (the "Debtor" or "Mud King"), submits this Second Amended Disclosure Statement ("Disclosure Statement") under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 in Support of Plan of Reorganization to all of its known Creditors.

## I.      INTRODUCTORY STATEMENT

Debtor submits this Disclosure Statement Under 11 U.S.C. § 1125 in support of its First Amended Chapter 11 Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") in connection with its solicitation of acceptances of the First Amended Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code filed by the Debtor (the "Plan"). A copy of the Plan is attached as Exhibit A for your review. All terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

The Debtor filed a petition under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division, on April 5, 2013 and has retained Edward L. Rothberg and Hoover Slovacek LLP as its current bankruptcy counsel. The Debtor has prepared this Disclosure Statement to disclose that information which, in its opinion, is material, important, and necessary to an evaluation of the Plan. Pursuant to the terms of the United States Bankruptcy Code, this Disclosure Statement must be presented to and approved by the Bankruptcy Court. Such approval is that required by statute and does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby.

The material herein contained is intended solely for the use of known creditors and interest holders of the Debtor, and may not be relied upon for any purpose other than a determination by them of how to vote on the Plan. As to Contested Matters, Adversary Proceedings and other actions or threatened actions, this disclosure statement shall not constitute or be construed as an admission of any fact or liability, stipulation or waiver, but rather as a statement made in settlement negotiations under Rule 408 of the Federal Rules of Evidence. This disclosure statement shall not be admissible in any non-bankruptcy proceeding nor shall it be construed as to be advice on the tax, securities or other legal effects of the plan as to the holders of claims against or equity interests in the Debtor.

To ensure compliance with Treasury department circular 230, each holder of a claim or interest is hereby notified that: (a) any discussion of U.S. Federal Tax issues in this disclosure statement is not intended or written to be relied upon, and cannot be relied upon, by any holder for the purpose of avoiding penalties that may be imposed upon a holder under the Tax Code; (b) such discussion is included hereby by the Debtor in connection with the promotion or marketing (within the meaning of Circular 230) by the Debtor of the transactions or matters addressed herein; and (c) each holder should seek advice based upon its particular circumstances from an independent tax advisor.

851186-00004 MMH 3/11/2015 00945261.DOC 1

Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible instruments or are digests of other instruments.  While the Debtor has made every effort to retain the meaning of such other instruments or the portions transposed, it urges that any reliance on the contents of such other instruments should depend on a thorough review of the instruments themselves.

No representations concerning the Debtor or the Plan are authorized other than those that are set forth in this Disclosure Statement.  Any representations or inducements made by any person to secure your vote which are other than those contained herein should not be relied upon, and such representations or inducements should be reported to counsel for the Debtor who shall deliver such information to the Bankruptcy Court.  Finally, all terms not otherwise defined in this Disclosure Statement shall have the meanings assigned to them under the Plan.

Creditors should read this Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made, except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code.  No other party has been authorized to utilize any information concerning the Debtor or its affairs, other than the information contained in this Disclosure Statement, to solicit votes on the Plan.  Creditors and holders of equity interest should not rely on any information relating to the Debtor, other than that contained in this Disclosure Statement and the exhibits attached hereto.

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE ATTACHMENTS, NO REPRESENTATIONS CONCERNING THE DEBTOR, THE ASSETS, THE PAST OPERATIONS OF THE DEBTOR, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.  ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.**

**EXCEPT AS SPECIFICALLY NOTED, THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTOR IS NOT ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. THE FACTUAL INFORMATION REGARDING THE DEBTOR, INCLUDING THE ASSETS AND LIABILITIES OF THE DEBTOR, HAS BEEN DERIVED FROM NUMEROUS SOURCES, INCLUDING, BUT NOT LIMITED TO, DEBTOR'S BOOKS AND RECORDS, SCHEDULES AND DOCUMENTS SPECIFICALLY IDENTIFIED HEREIN.**

**THE DEBTOR ALSO COMPILED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT FROM RECORDS AVAILABLE TO IT, INCLUDING, BUT NOT LIMITED TO, PLEADINGS AND REPORTS ON FILE WITH THE BANKRUPTCY COURT, LOAN AGREEMENTS AND BUSINESS RECORDS.**

**THE APPROVAL BY THE BANKRUPTCY COURT OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE**

851186-00004 MMH 3/11/2015 00945261.DOC 1

BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

NEITHER THE DEBTOR NOR COUNSEL FOR THE DEBTOR CAN WARRANT NOR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACIES.  NEITHER THE DEBTOR NOR ITS COUNSEL HAS VERIFIED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, ALTHOUGH THEY DO NOT HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.

IF THE REQUISITE VOTE IS ACHIEVED FOR EACH CLASS OF IMPAIRED CLAIMS, THE PLAN IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN), WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

## II.    VOTING PROCEDURES

Any creditor of the Debtor whose claim is IMPAIRED under the Plan is entitled to vote, if either (1) the claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent or unliquidated, or (2) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings, *provided, however*, any claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon motion by the creditor.  Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.  In addition, a creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Holders of impaired claims who are entitled to vote and fail to do so will not be counted as either accepting or rejecting the Plan.  Nevertheless, if the requisite vote is achieved for your class of impaired claims, you will be bound by the terms of the Plan.

A ballot to be used for voting to accept or reject the Plan is enclosed with this Disclosure Statement and mailed to creditors entitled to vote.  A creditor must (1) carefully review the ballot and the instructions thereon, (2) execute the ballot, and (3) return it to the address indicated thereon by the deadline to enable the ballot to be considered for voting proposes.

**THE DEADLINE FOR RETURNING YOUR BALLOT
IS _____.M. CENTRAL TIME ON _____, 2015**

(THE "VOTING DEADLINE").

After completion of the ballot, creditors should return the executed ballot in the self-addressed envelope to:

**MUD KING PRODUCTS, INC.**
**c/o EDWARD L. ROTHBERG/KATHY MAYLE**
**HOOVER SLOVACEK LLP**
**5051 WESTHEIMER, SUITE 1200**
**HOUSTON, TX  77056**

**VOTING INFORMATION AND INSTRUCTION FOR COMPLETING THE BALLOT:**

**FOR YOUR VOTE TO BE COUNTED YOU MUST COMPLETE THE BALLOT, INDICATE ACCEPTANCE OR REJECTION OF THE PLAN IN THE BOXES INDICATED ON THE BALLOT AND SIGN AND RETURN THE BALLOT TO THE ADDRESS SET FORTH ON THE PRE-ADDRESSED ENVELOPE.  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.**

**IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS UNDER THE PLAN, YOU MAY RECEIVE MORE THAN ONE BALLOT.  EACH BALLOT YOU RECEIVE VOTES ONLY YOUR CLAIMS FOR THAT CLASS.  PLEASE COMPLETE AND RETURN EACH BALLOT YOU RECEIVE.  YOU MUST VOTE ALL OF YOUR CLAIMS WITHIN A SINGE CLASS UNDER THE PLAN TO EITHER ACCEPT OR REJECT THE PLAN.  ACCORDINGLY, A BALLOT (OR MULTIPLE BALLOTS WITH RESPECT TO MULTIPLE CLAIMS WITHIN A SINGLE CLASS) THAT PARTIALLY REJECTS AND PARTIALLY ACCEPTS THE PLAN WILL NOT BE COUNTED.**

**THE BALLOT IS FOR VOTING PURPOSES ONLY AND DOES NOT CONSTITUTE AND SHALL NOT BE DEEMED A PROOF OF CLAIM OR INTEREST OR AN ASSERTION OF A CLAIM.**

III.    <u>IMPAIRMENT OF CLAIMS</u>

A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interest of that class are modified under a plan.  Modification for purposes of determining impairment however, does not include curing defaults and reinstating maturity or cash payment in full.  Classes of claims or interests that are not "impaired" under a plan are conclusively presumed to have accepted the plan and are thus not entitled to vote.  Classes of claims or interests receiving no distribution under a plan are conclusively presumed to have rejected the plan and thus are not entitled to vote.  Acceptances of the Plan are being solicited only from those persons who hold claims in an impaired class entitled to receive a distribution under the Plan.

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a plan, **unless**, with respect to each claim or interest of such class, the plan:

1.      Leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

2.      Notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of its claim or interest after the occurrence of a default:

> (a)    Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

> (b)    Reinstates the maturity of such claim or interest as it existed before the default;

> (c)    Compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

> (d)    Does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or interest; or

3.      Provides that, on the Effective Date the holder of such claim or interest receives, on account of such claim or interest, cash, equal to:

> (a)    With respect to a claim, the allowed amount of such claim; or

> (b)    With respect to an interest, if applicable, the greater of:

>> (i)   Any applicable fixed liquidation preference; or

>> (ii)  Any fixed preference at which the Debtor, under the terms of the security, may redeem the security.

4.      In Article 4 of the Plan, the Debtor has identified the impaired classes of creditors under the Plan.  In the event there are questions regarding whether a person is in an impaired class, the person should assume that his or her claim is impaired and vote.  If the claim is determined to be impaired, the vote will be considered by the Bankruptcy Court.  The Class 3, 5, 6, and 7 holders of claims and the Class 8 interest holders of the Debtor are impaired under the Plan.

**IMPAIRED CREDITORS ANTICIPATED TO RECEIVE A DISTRIBUTION UNDER THE PLAN ARE BEING SOLICITED TO VOTE.    IF YOU HOLD AN**

851186-00004 MMH 3/11/2015 00945261.DOC 1

ADMINISTRATIVE CLAIM OR UNIMPAIRED CLAIM, THE DEBTOR IS NOT SEEKING YOUR VOTE.

## IV.    NATURE AND HISTORY OF BUSINESS

### A.  Source of Information and Accounting Method

The Debtor's books are maintained under the supervision of Nigel Brassington, a director of the Debtor and Erich Mundinger, a vice president of the Debtor.  Accounting is on the accrual basis.  The historical financial information contained in this disclosure statement as well as the bankruptcy schedules and statement of affairs was derived from the Debtor's books and records. **THE DEBTOR'S BOOKS HAVE NOT BEEN AUDITED BY AN INDEPENDENT PUBLIC ACCOUNTANT OTHER THAN AS DESCRIBED HEREIN. NO ABSOLUTE REPRESENTATION IS MADE AS TO THE ACCURACY OF THE DEBTOR'S RECORDS.   HOWEVER, THE DEBTOR HAS ATTEMPTED TO ACCURATELY REFLECT ITS BUSINESS OPERATIONS.**

### B.    General Information

#### 1.    History of The Debtor

Mud King is a Houston, Texas based oilfield services company operating at 15211 Woodham Dr[1].  Mud King's core business is selling replacement pump parts for mud pumps. Mud King has been in business since about 2000 and is owned by Nigel Brassington and Djoni Handoyo Layanto.  Mud King also sells its products internationally pursuant to various agency agreements with other companies.  Mud King currently has thirty-five (35) full-time employees.

A mud pump is a large reciprocating pump used to circulate drilling fluid, also known as mud, on a drilling rig. Mud King's replacement pump parts are not high-tech, but are based on old designs, some of which are over thirty years old.  Mud King offers a full range of replacement parts for most 500HP and Up Triplex pumps.  Mud King operates in a competitive marketplace and there are several dozens of manufacturers and dealers who have been selling the same parts as Mud King for many years.

#### 2.    Source of Financial Difficulties
##### a. *NOV Litigation*

Prior to the initiation of the NOV Litigation described below, Mud King was profitable and had no significant financial issues.  On or about September 21, 2012, National Oilwell Varco ("NOV") initiated a lawsuit in Harris County District Court against Mud King and various other defendants for misappropriation of trade secret and related actions.  On or about October 19, 2012, this litigation was removed to the Federal District court in Houston, where it remains pending, in the case styled as *National Oilwell Varco v. Mud King Products, L.L.C. et al,* Case No. 4:12-cv-03120, in the United States District Court for the Southern District of Texas, Houston Division ("NOV Litigation").  Mud King denied the allegations in the NOV Litigation.

---

[1] The Debtor operates at this location pursuant to a lease agreement with CJC Investments General Partners, LLC, an entity which is owned by Nigel Brassington.

The NOV Litigation remains pending and has been stayed due to the bankruptcy filing.

The replacement mud pump parts at issue in this case correspond to various original equipment manufacturer ("OEM") pumps originally manufactured by NOV. NOV does not allege that any of these pumps or pump parts are protected by any registered patent or trademark. Nor do they constitute secret or new technology. In fact, most of the pumps were designed decades ago.

There is nothing illegal or wrong about selling aftermarket, OEM-equivalent parts. Numerous companies (including at least one eventually purchased by NOV[2]) sell aftermarket, NOV-equivalent pump parts across Texas, the United States, and abroad. Mud King is one such company, and it legally sold the NOV-equivalent pump parts at issue for many years prior to any alleged wrongdoing.

NOV alleged that it learned in August 2012 that one of its employees was providing NOV drawings of mud pump component parts to a Mud King employee. Because Mud King had already been selling these same parts for over a decade and such parts had been widely produced by manufacturers other than NOV, it is not clear whether any benefit could be derived from such drawings. NOV's employee was allegedly paid $900 for the drawings. NOV filed the NOV Litigation seeking, among other things, a temporary restraining order. Mud King attended mediation with NOV which resulted in an Unopposed Temporary Injunction Order requiring that Mud King not use NOV's drawings and fully protecting NOV's interests ("TI"). The NOV Litigation was subsequently removed to Federal District Court where Judge Nancy Atlas adopted the TI, which continues in full force and effect as the Second Amended Unopposed Preliminary Injunction Order (Document #87 in the NOV Litigation).

Importantly, the TI as entered by the state court and as affirmed by Judge Atlas focuses on Mud King's use of the drawings and does not prohibit Mud King from continuing its established business with regard to the mud pump parts. Judge Atlas recognized that Mud King had sold and distributed such parts for years, along with other distributors and manufacturers. Thus, preserving NOV's status quo prior to the time the drawings were obtained by Mud King does NOT necessitate a blanket prohibition on the sale or manufacture of such common parts.

The state court permitted NOV full, unlimited access to all computers on Mud King's premises. NOV obtained a full and complete forensic image of all of Mud King's computers, including access to all drawings and to all financial books and records (as well as other business records) as they are kept in the ordinary course of business.

Despite the entry of the TI and Preliminary Injunction, unfettered access to Mud King's books and records, along with production of over 20,000 pages of documents, NOV claimed that significant discovery was still required which would delay a trial on the merits for at least two

---

[2] NOV states in its Amended Complaint that it purchased PEP, Inc. in 1997. Prior to the purchase, PEP, Inc. was in the business of selling aftermarket pump parts for NOV's pumps.

more years.  This litigation is nothing more than a huge multinational company with an unlimited "war chest" using oppressive litigation tactics to crush a much smaller company.   When NOV initiated its lawsuit against Mud King, three defendants were named, Mud King and two of its employees (including one officer).  Subsequently, NOV amended its complaint several times to add eight more defendants, including five additional Mud King employees and certain manufacturers who transact business with Mud King.  This maneuver by NOV wreaked havoc on Mud King - 20% of Mud King's thirty-five (35) employees are defendants in the NOV Litigation.

NOV is a multinational corporation that has grown through a series of more than 300 acquisitions in the last 15 years.   NOV is currently the third largest oil field service company on the Forbes Fortune 500 list with gross revenues in 2012 of $14.6 billion.  NOV manufactures land-based and offshore oil drilling rigs, as well as all the major mechanical components for such rigs. The company also performs a number of services for the oil industry such as well and pipeline inspections and is one of the market leaders in supply chain management. NOV designs, manufactures and sells equipment and components used in oil and gas drilling, including mud pumps and replacement pump parts.

As a result of the NOV Litigation and related negative publicity, Mud King's sales have been negatively impacted.  Additionally, as of the Petition Date, the Debtor had expended more than $400,000 in legal fees and expenses related to the NOV Litigation, averaging $60,000 per month.

Thus, with declining sales and escalating legal costs, Mud King was faced with a dire situation.   Although the company still earned a profit, the significant downward trend in revenue, coupled with the tremendous litigation costs and uncertainty associated with the NOV Litigation, painted a very bleak forecast for the company.   Absent relief from this situation, the going concern value of the company was at risk.  Although Mud King denies the allegations asserted by NOV and does not believe that NOV holds any valid claims against the company, it elected to file a Chapter 11 bankruptcy in order "stop the bleeding" associated with litigation by estimating the value of any claim which NOV may hold and treating the same in a plan of reorganization.  This procedure allows Mud King to determine the extent of any liability to NOV, if any, in a relatively expeditious manner and get back to running its business.

On May 31, 2013, the Debtor filed a Motion to Estimate NOV's Claim (Docket #46). Subsequently, NOV filed an objection to this motion.  On August 5, 2013, NOV filed a Proof of Claim ("NOV Proof of Claim") in this case in an unknown amount, alleging damages related to theft of trade secret.  On August 29, 2013, Debtor also filed an Objection to the NOV's Proof of Claim (Docket #137).   Beginning October 1, 2013, the Court conducted a full evidentiary hearing on both the Motion to Estimate NOV's Claim and the Objection to NOV Proof of Claim. On July 17, 2014, the Court entered an order estimating NOV's claim at $74,434.95, with prejudgment and post judgment interest, plus additional damages of $1,000 under the TTLA ("NOV Liability Claim"), plus its attorneys fees and costs (Docket #304).  NOV subsequently filed a brief, pursuant to the Court's order, alleging prejudgment interest at a rate of 5%, totaling $6,860.42 through the July 17, 2014.   The Debtor did not object to NOV's calculation of prejudgment interest.   NOV also alleged its entitlement to post judgment interest until paid.

NOV has appealed this order and Mud King has cross appealed. Subsequently, on January 30, 2015, the Court determined that NOV would be allowed attorneys' fees in the amount of $320,893.00 related to the NOV Liability Claim ("NOV Attorneys Fee Claim") NOV has appealed this order and Mud King has cross appealed.

As more fully set forth below, Mud King's reorganization plan provides for payment in full of all secured and unsecured creditors.

### 3.   Financial Situation as of Petition Date

Excluding its' unsecured trade obligations, Mud King's secured indebtedness consists of claims totaling approximately $16,500, owed to Ford with respect to a vehicle used in Debtor's business.  Mud King has no other secured debt.  Mud King also has trade obligations of approximately $3.1 million, including $46,368 owed to affiliate MK Pumps.  These obligations are owed to approximately twenty-six (26) trade creditors who have provided various goods and services to Mud King.  Most of Mud King's trade creditors commonly provide such goods and services to this industry.  Additionally, as discussed more fully herein, the Court has estimated NOV's unsecured claim at $74,434.95, with prejudgment and postjudgment  interest, plus damages of $1,000 under the TTLA, plus allowed attorneys' fees and costs determined to be $320,893.00     Additionally, four (4) employees hold contingent, unliquidated indemnification claims against Mud King related to the NOV Litigation.

### 4.   Ownership and Management

Djoni Handoyo and Nigel Brassington are the owners and directors of Mud King.  Both Handoyo and Brassington have extensive experience in the oil and gas industry.  Erich Mundinger, a financial consultant, has been employed as a vice president to assist with financial reporting and bankruptcy case oversight.  Mud King's daily operations are managed by Lee Wilson.  Mr. Wilson has been employed by Mud King since 2009.

### 5.   Significant Events During Bankruptcy
#### a. *Voluntary Petition filing*

On April 5, 2013, Mud King filed this voluntary reorganization case ("Petition Date") under Chapter 11 of the Bankruptcy Code and was assigned Case No. 13-32101-H5-11 in the United States Bankruptcy Court for the Southern District of Texas.

#### b. *Administration*

Shortly after the filing of the petition, the Debtor filed:

*Application to Employ Hoover Slovacek LLP as counsel for the Debtor*:  This pleading was filed on April 9, 2013 and an order authorizing this employment was entered on June 3, 2013.

*Emergency Motion for Authority to Remit Federal Income Tax Deposit to Internal Revenue Service*:  By this motion, the Debtor requested that it be permitted to remit a federal tax deposit to the Internal Revenue Service in connection with its 2013 federal payroll tax obligations.  An order authorizing payment of this deposit was entered on April 15. 2013.

*Application to Employ Special Litigation Counsel:* By this pleading, the Debtor sought to employ Muskat, Martinez & Mahony LLP as special litigation counsel to assist with the NOV Litigation.  An order authorizing this employment was entered by the Court on May 14, 2013.

*Motion for Entry of Agreed Order:*  This pleading was filed by Ford Motor Credit, in agreement with the Debtor, on May 8, 2013, seeking to approve regular monthly contractual payments to Ford by the Debtor in connection with a pickup truck used in the Debtor's operations.  An order approving this agreement was entered on May 14, 2013.

*Motion to Estimate Claim of NOV:*  On May 31, 2013, the Debtor filed this motion seeking to have the Court estimate any claim of NOV at $0.00.  NOV objected to this motion.  As discussed more fully in the NOV Litigation section above Article IV(2)(a), beginning October 1, 2013, the Court conducted a consolidated full evidentiary hearing on this motion and the Objection to NOV Claim.     The Court subsequently determined that NOV shall be allowed a claim in the amount of $74,434.95, with prejudgment and postjudgment interest, plus damages of $1,000 under the TTLA, plus allowed attorneys' fees and costs determined to be $320,893.00.  NOV has appealed these orders and Mud King has cross appealed.  The appeals are pending in the United States District Court, Southern District of Texas.

*Objection to Proof of Claim filed by NOV*: On August 5, 2013, NOV filed a Proof of Claim ("NOV Proof of Claim") in this case in an unknown amount, alleging damages related to theft of trade secret.  On August 29, 2013, Debtor also filed an Objection to the NOV's Proof of Claim (Docket #137).  As discussed more fully in the NOV Litigation section above Article IV(2)(a), beginning October 1, 2013, the Court conducted a consolidated full evidentiary hearing on this motion and the Objection to NOV Claim.   The Court subsequently determined that NOV shall be allowed a claim in the amount of $74,434.95, with prejudgment and postjudgment interest, plus damages of $1,000 under the TTLA, plus allowed attorneys' fees and costs determined to be $320,893.00.   NOV has appealed these orders and Mud King has cross appealed.  The appeals are pending in the United States District Court, Southern District of Texas.

*Motion to Dismiss Case or Appoint Chapter 11 Trustee:*  On June 21, 2013, NOV filed this motion seeking to have the Debtor's Chapter 11 bankruptcy case dismissed or, alternatively, appoint a Chapter 11 trustee.  On October 1, 2013, after a full evidentiary hearing, the Court denied the motion.  An order denying the motion was entered on October 3, 2013.

*Motion for Relief from Stay:*  On August 20, 2013, NOV filed this motion seeking to terminate the automatic stay in order to proceed with the NOV Litigation.   On October 1, 2013, after a full evidentiary hearing, the Court denied the motion.  An order denying the motion was entered on October 3, 2013.

*Application to Employ Special Regulatory Counsel:* By this pleading, the Debtor sought to employ Ladner & Associates as special counsel to assist assisting with various international trade and regulatory compliance requirements.   An order authorizing this employment was entered by the Court on July 10, 2013.

*Motion to Extend Deadline to Assume or Reject Leases of Real Property:*  This pleading was filed by the Debtor seeking to extend the deadline to assume or reject its leases of nonresidential real property.   On June 29, 2013, the Court entered an order extending the Debtor's deadline to assume or reject its lease with Lee Toombs, Liza Toombs, and Ann Toombs, Successor Trustees of Ethel and Edgar Toombs, Jr. Trust until September 30, 2013 and until November 1, 2013 to assume or reject its lease with CJC Investments General Partners, LLC.  The Debtor's lease with Lee Toombs, Liza Toombs, and Ann Toombs, Successor Trustees of Ethel and Edgar Toombs, Jr. Trust expired by its terms on September 30, 2013.

*Emergency Motion for Approval of Agreed Stipulation Between Mud King Products, Inc. and CJC Investments:*  On October 23, 2013, the Debtor filed this motion seeking approval of its agreement with CJC Investments General Partners, LLC, the landlord at its current operating facility, to extend the deadline to assume or reject the Debtor's lease of nonresidential real property through the Effective Date of a confirmed Chapter 11 Plan.  An order approving this agreement was entered on October 24, 2013.

*Motions to Extend Debtor's Exclusive Period to Confirm a Plan:* On July 1, 2014, the Debtor filed its Plan of Reorganization and related disclosure statement, during its exclusive period to file the same (Docket #301 and #302, respectively).    Due to the litigation involving the claims alleged by NOV and the potential impact on a plan, the Debtor's exclusive period confirm a plan has been extended several times pending a ruling by the Court with respect to the allowance of NOV's claim and subsequent ruling.  A hearing on approval of the Disclosure Statement is scheduled for March 9, 2015 and once approved, the deadline for the Debtor to solicit and obtain acceptance of its plan has been extended through April 23, 2015.

### c. *Case Management Going Forward*

1.   PLAN NEGOTIATIONS

The Debtor has an exclusive period within which it may propose a plan of reorganization and is proposing the Plan within that period.

2.   ASSUMPTION AND REJECTION

The bankruptcy law allows the Debtor to assume or reject any pending lease agreements or executory contracts that exist on the date of the order for relief.   Additionally, the law provides that the Debtor can assign its interest in lease agreements and executory contracts provided they cure all defaults and provide adequate assurance that the assignee will comply with the terms of the lease or contract.  Executory contract and lease assumption and rejection are treated in the Plan.  Any contract or lease not specifically assumed in the Plan, or by prior court order, is deemed rejected.  The Debtor's lease with Lee Toombs, Liza Toombs, and Ann Toombs, Successor Trustees of Ethel and Edgar Toombs, Jr. Trust expired by its terms on September 30, 2013.

3. CREDITORS COMMITTEE

The United States Trustee is responsible for soliciting a committee of creditors holding unsecured claims pursuant to 11 U.S.C. §1102(a)(1) and sought to solicit a committee in this case.  On May 7, 2013, the US Trustee filed a notice of inability to appoint a committee.  No committee has been appointed or formed in this case.

851186-00004 MMH 3/11/2015 00945261.DOC 1

### C.    Operations During Bankruptcy

Mud King has operated its business affairs as Debtor-in-Possession since the entry of an order for relief under Chapter 11, but has not made any extraordinary disposition or acquisition of assets since that date.

### D.    The Debtor's Assets and Their Value

As of the filing date Debtor's principal assets consisted of cash, security deposits, accounts, receivable, inventory, advances & notes receivable, and office equipment & furnishings, vehicles, machinery & equipment.

Following is a table summarizing the value of these assets reflected on the schedules as of the Petition Date and values obtained since that date:

| | |
|---|---|
| Cash | $1,256,876.42 |
| Security Deposits | $40,446.58 |
| Accounts Receivable | $ 5,127,357.33 |
| Employee Advances | $11,894.03 |
| Inventory (Cost Basis) | $11,009,901.89 |
| Office Equipment, Furnishings and Supplies, Vehicles, Machinery, Equipment, Leasehold Improvements (Net Book Value) | $740,957.20 |
| Prepaid Expenses | $1,469,090.84 |
| Counter Claims Against NOV | unknown |
| **TOTAL** | **$19,656,524.29** |

### 1.    Accounts Receivable

Mud King has continued to collect and create accounts receivable since the filing of the petition under Chapter 11.  As of the end of January 2015, accounts receivables were approximately $ 4,979,539.49[3], and cash was $4,894,434.69.

### 2.    Office Equipment & Furnishings of the Debtor

The Debtor has various computers, servers, printers and scanners, a copier, file cabinets and other various office furnishings valued collectively at $59,910. A detailed listing of these assets is attached to Debtor's Schedule "B".  The scheduled valuation of each of the assets listed in Schedule B is the net book value (i.e. cost less depreciation) derived from Debtor's books and

---

[3] Subsequent to the Petition Date, the Debtor established an AR Reserve of $1,247,710 for certain aged accounts receivable.  This reserve is reflected in the Amended April 2013 operating report filed by the Debtor on June 26, 2013. The reserve was increased in July 2014 to $1,583,265.93 and is included in the January 2015 operating report MOR-5.

records.  The office equipment and furnishings are in good condition and are maintained well from the perspective of preventive maintenance.

### 3.   Machinery & Equipment

The Debtor has machinery and equipment that is utilized in its operations valued at $168,521. A detailed listing of these assets is attached to Debtor's Schedule "B".  The scheduled valuation of each of the assets listed in Schedule B is the net book value (i.e. cost less depreciation) derived from Debtor's books and records.  The machinery and equipment is in good condition and is maintained well from the perspective of preventive maintenance.

### 4.   Leasehold Improvements

The Debtor's books and records also reflect leasehold improvements with an aggregate value of $408,905.   A detailed listing of these assets is attached to Debtor's Schedule "B".  The scheduled valuation of each of the assets listed in Schedule B is the net book value (i.e. cost less depreciation) derived from Debtor's books and records.  The leasehold improvements are in good condition and are maintained well from the perspective of preventive maintenance.

### 5.   Vehicles

The Debtor has automobiles and trucks that are utilized in its operations which are collectively valued at $104,000.   A detailed listing of these assets is attached to Debtor's Schedule "B".  The scheduled valuation of each of the assets listed in Schedule B is the net book value (i.e. cost less depreciation) derived from Debtor's books and records.  These assets are in good condition and are maintained well from the perspective of preventive maintenance.

### 6.   Prepaid Expenses

The Debtor's books and records reflect prepaid expenses totaling $1,469,090.84.  These prepaid expenses related to 2013 federal tax deposits and prepaid insurance of the Debtor.  A detailed listing of these assets is listed in Debtor's Schedule "B".

**E.**   **Liabilities**.  An analysis of claims is attached hereto as Exhibit B.  Following is a brief summary:

1. Pre-Petition Claims
   **a.** *Priority Claims (Class 1):* Scheduled Claims were $241,595 related to taxes federal payroll and income tax deposits[4] for 2013 and 2013 ad valorem property taxes.  The Texas State Comptroller of Public Accounts has filed a priority claim in the amount of $18,721.  The Debtor is unaware of the existence of any other priority claims.

   **b.** *Secured Claims (Class 2)*:  Ford Motor Credit holds a secured claim in the amount of $16,438.33 in connection with its 2011 Ford Pickup Truck.  The Debtor is unaware of the existence of any other secured claims.

---

[4] On April 15, 2013, the Court authorized the Debtor to remit prepetition federal tax deposits to the appropriate taxing authorities.  These tax deposits have been made.

**c.** *General Unsecured Claims (Class 3, Class 4, Class 5 and Class 6):* The scheduled unsecured claims were $3,093,183.08, including the claim of affiliate MK Pumps in the amount of $46,367.74.    As more fully described in Article IV(2)(a), the Court has determined that NOV shall be allowed an unsecured claim in the amount of $74,434.95, with prejudgment and postjudgment interest, plus damages of $1,000 under the TTLA, plus allowed attorneys' fees and costs determined to be $320,893.00.  Mud King reserves the right to object to claims filed in excess of the schedule amounts as shown on the Claims Analysis.

**d.** *Employee Indemnity Claims (Class 7):* The Debtor scheduled various contingent, unliquidated indemnification claims owed to certain employees related to the NOV Litigation. The amount of these claims, if any, is unknown.

**e.** *Allowed Equity Interests* (*Class 8*): unknown.

**F.  Administrative Claims**
   The Debtor's January 2015 Monthly Operating Report shows that there approximately $1,310,275.10 in post-petition liabilities owed which will be paid in the ordinary course of business. No further administrative expenses are known other than accrued, unpaid professional fees. Counsel for the Debtor estimates that additional fees and expenses related to its services, along with those of other professionals employed in this case should not collectively exceed more than an additional $120,000.00.  In summary, the Debtor has sufficient funds to satisfy ordinary course post-petition payables and attorneys' fees.  Based on the foregoing, the Debtor believes that it will have sufficient funds to pay all administrative expense claims which will come due on the Effective Date.

**V.    DESCRIPTION OF PLAN**

**SUMMARY OF THE PLAN OF REORGANIZATION**

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.  THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE**

TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### A.  Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders.  Upon the filing of a petition for relief under Chapter 11, Section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 Case.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The Plan should be read carefully and independently of this Disclosure Statement.  The following analysis of the Plan is intended to provide a context for understanding the remainder of this Disclosure Statement and to assist in an understanding of the Plan and the proposed treatment of the Creditors.

The Debtor expects to implement its plan and continue in its business restructuring which should provide growth and full compliance with the plan.  The Debtor has a strong core business and intends to reorganize around that business, which, together with certain other operational improvements, is expected to be the basis for a viable reorganization plan.

The terms of the Debtor's Plan are based upon, among other things, the Debtor's assessment of its ability to achieve the goals of its business plan, make the distributions contemplated under the Plan, and pay its continuing obligations in the ordinary course of business.  Under the Plan, Claims against and Interests in the Debtor are divided into Classes according to their relative seniority and other criteria.

A copy of the Plan is attached as Exhibit A.  Generally, if the Plan is confirmed by the Bankruptcy Court and consummated, (1) Administrative Claims will be paid in cash in full;

(2) Priority Claims will be paid in full in cash when due; (3) Allowed Claims of Ad Valorem taxing authorities shall be paid when due; (4) Allowed Secured Claim of Ford Motor Credit will be paid pursuant to its contractual terms; (5) Allowed Claims of $50,000 or less will be paid in cash in full; (6) Allowed Claims of NOV shall be in full within five (5) days from the Effective Date, with the Allowed NOV Liability Claim paid with interest at the rate of 5% per annum; (7) Allowed Claims of Dezhou and Oilman shall be paid in full, without interest, in equal monthly installments, over a period of eighteen (18) months; (8) Allowed Claims of Petroquipt shall be paid in full, without interest, in equal monthly installments, over a period of thirty-six (36) months; and (9) Allowed Employee Indemnification Claims, if any, shall be paid in full in cash when matured.

Total distributions shall not exceed the amount of any Allowed Claim, with interest.  The Effective Date of the Plan is the date on which the Confirmation Order becomes a Final Order.

## B. Administrative Expenses and Priority Tax Claims and Timing of Payment

The Holders of Administrative Expense Claims against the estate and Tax Claims are treated as generally described below.

Payment of Administrative Claims.  Each Holder of an unpaid Allowed Administrative Claim shall be paid in Cash in full on the later of thirty (30) days after the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless the Holder of such Claim agrees to a different treatment.

Payment of Post-Petition-Tax Administrative Expense Claims.  Each Holder of an unpaid Allowed Administrative Claim for post-petition taxes shall be paid in Cash in full on the later of the statutory due date under applicable law or within five (5) days after the Effective Date, unless the Holder of such Claim agrees to a different treatment.

Payment of Non-Tax Priority Claims.  Each Holder of an unpaid Allowed Non-Tax Priority Claim shall be paid in Cash in full on the later of thirty (30) days after the Effective Date or the date such Claim becomes an Allowed Non-Tax Priority Claim, unless the Holder of such Claim agrees to a different treatment.

Payment of Unsecured Priority Tax Claims.  Allowed Priority Tax Claims shall be paid in Cash in full in Cash on the later of when due, thirty (30) days after the Effective Date or the date such Claim becomes an Allowed Unsecured Priority Claim, unless the Holder of such Claim agrees to a different treatment.

Payment to Professionals.  All payments to professionals for actual, necessary services and costs advanced in behalf of the bankruptcy up until the Confirmation Date shall be pursuant to Bankruptcy Court order and subject to the restrictions of 11 U.S.C. §330. Professional fees incurred for services rendered and costs advanced subsequent to the Effective Date shall be the liability of the Reorganized Mud King Products, Inc.

Payment of United States Trustee Fees Incurred Prior to Confirmation.  All fees incurred pursuant to 28 U.S.C. §1930(a)(6) for time periods prior to entry of Order Confirming Plan shall be paid by the Debtor on or before the Effective Date.

Payment of United States Trustee Fees Subsequent to Confirmation. The Reorganized Debtor shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. §1930(a)(6) entry of Order Confirming Plan. After confirmation, the Reorganized Debtor shall file with the Bankruptcy Court and serve on the United States Trustee a monthly financial report for each month (or portion thereof) the case remains open in a format prescribed by the United States Trustee and provided to Mud King by the United States Trustee.

### C. Classes of Secured and Unsecured Claims and Treatment of Interests

The Classes of Claims against and Interests in the Debtor created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are generally described below:

### Class 1.  Allowed Secured Claim of Taxing Authorities.

Class 1 consists of the Allowed Secured Claims of Ad Valorem taxing authorities for the year 2013 secured by a lien on the assets of the Debtor.  The Class 1 claims are unimpaired.

Treatment.  Allowed Secured Class 1 Claims shall be paid by the Reorganized Debtor when due.  The Allowed Secured Class 1 Claims Holders shall retain their liens until such time as they are paid in full.

### Class 2.  Allowed Secured Claims of Ford Motor Credit

Class 2 consists of the Allowed Secured Claims of Ford Motor Credit secured by a lien on a 2011 Ford F-150 Truck (VIN ending B09271).   The Class 2 Claim is unimpaired.

Treatment.   The Allowed Class 2 Claim shall be paid in accordance with the contractual terms and provisions of its agreement.  Ford Motor Credit shall retain its lien, security interests and rights as provided under its pre-Filing Date loan documents and/or applicable law.

### Class 3.  Allowed General Unsecured Claims of $50,000 or Less

Class 3 consists of the Allowed Unsecured Claims of $50,000 or Less. The Class 3 Claims are impaired.

Treatment:  The Holders of Allowed Unsecured Class 3 Claims shall be paid 100% of their Allowed Claim, without interest, on the later of thirty (30) days after the Effective Date or the date such Claims become Allowed Claims.  If a creditor with an allowed claim in excess of $50,000 wishes to have their claim

851186-00004 MMH 3/11/2015 00945261.DOC 1

treated as a Class 3 claim and paid accordingly, then the creditor will make that election on the ballot when voting, and the Allowed Claim will be limited to $50,000.

**Class 4.  Allowed General Unsecured Claims of NOV.**

Class 4a consists of Allowed General Unsecured NOV Liability Claim.   The Class 4a claim is unimpaired.

> Treatment.  Allowed Class 4a Claim shall be paid in full within five (5) days of the Effective Date and shall include prejudgment and post interest at the rate of 5% per annum until paid.   Prejudgment interest to be paid through July 17, 2014 totals $6,860.42.  Post judgment interest will be calculated from July 18, 2014 through the date paid.

Class 4b consists of Allowed General Unsecured NOV Attorneys Fee Claim.   The Class 4a claim is unimpaired.

> Treatment.  Allowed Class 4a Claim shall be paid in full within five (5) days of the Effective Date.

**Class 5. Allowed Claims of Dezhou & Oilman.**

Class 5 consists of Allowed Claims of Dezhou and Oilman.  The Class 5 Claims are impaired.

> Treatment.  The Holders of Allowed Unsecured Class 5 Claims shall be paid in full, without interest, in equal monthly installments, beginning sixty (60) days following the Effective Date and continuing on the same day of each succeeding month for a period of eighteen (18) months. The Debtor shall be allowed to offset any amounts owed by Class 5 claimants against the Allowed Claim.

**Class 6. Allowed Claims of Petroquipt.**

> Class 6 consists of Allowed Claim of Petroquipt.  The Class 6 Claim is impaired.

> Treatment.  The Holders of Allowed Unsecured Class 6 Claims shall be paid in full, without interest, in equal monthly installments, beginning sixty (60) days following the Effective Date and continuing on the same day of each succeeding month for a period of thirty-six (36) months.  The Debtor shall be allowed to offset any amounts owed by Class 6 claimants against the Allowed Claim.

**Class 7.  Allowed Claims of Employees for Indemnification of NOV Litigation.**

Class 7 consists of Allowed Claims of Employees for Indemnification of NOV Litigation. The Class 7 Claims are impaired.

851186-00004 MMH 3/11/2015 00945261.DOC 1

<u>Treatment</u>.  The Holders of Allowed Unsecured Class 7 Claims shall be paid 100% of the Allowed Claim, without interest, after the Effective Date, if and when they mature.

**Class 8.  Allowed Interests of Equity Holders.**

Class 8 consists of the Allowed Equity Interests in Mud King Products, Inc.  The Class 8 Interests are impaired.

<u>Treatment</u>.  The Holders of Class 8 Equity Interests shall retain the Equity Interests held on the date of the filing of the bankruptcy case, with the prohibition of payment of dividends until Classes 1, 2, 3, 4, 5, 6 and 7 are paid as provided for in the Plan.

**D.    Means of Execution of Plan**
**1.**  <u>Vesting of Property of the Estate in Reorganized Debtor</u>. On the Effective Date of the Plan, all property of the Debtor and of its Estate shall vest in the Reorganized Debtor free and clear of liens, claims and encumbrances, except as otherwise provided by the terms of the Plan.

**2.**  <u>Continuation of Business Operations</u>.  From and after the Effective Date of the Plan, the Reorganized Debtor shall be authorized to continue its normal business operations. Reorganized Debtor shall enter into such transactions as it deems advisable, free of any restriction or limitation imposed under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan.  Cash flow from the operations shall be used to fund payments required by the Plan.

**3.**  <u>Source of funds for Payments due on the Effective Date</u>.  Current cash flow derived from operations will be used to pay Allowed Claims as required by the Plan.

**4.**  <u>Directors and Officers of Reorganized Debtor</u>.  The Directors and Officers of the Debtor are authorized to continue as Directors and Officers of the Reorganized Debtor from and after the Effective Date of the Plan.

**5.**  <u>Disbursing Agent</u>.  Reorganized Debtor shall act as the Disbursing Agent.  If Reorganized Mud King chooses not to act as the Disbursing Agent, then it shall designate a substitute.

**E. Administrative Claims Bar Date.**  Any holder of an Administrative Claim against the Debtor, except for expenses incurred in the ordinary course of operating the Debtor's business and Claims of governmental units as provided in 11 USC Section 503(b)(1)(D), shall file proof of such Claim or application for payment of such Administrative Claim on or within sixty (60) days after the Confirmation Date, with actual service upon counsel for the Debtor or such Holder's Administrative Claim will be forever barred and extinguished and such Holder shall, with respect to any such Administrative Claim be entitled to no distribution and no further notices.  To the extent, if any, post-petition taxes are due to the Comptroller on or before the

851186-00004 MMH 3/11/2015 00945261.DOC 1

Effective Date, they shall be paid in full on the Effective Date in accordance with § 1129(a)(9)(A). To the extent, if any, post-petition taxes have been incurred by Debtor but are not yet due as of the Effective Date, those taxes shall be paid when due under and in accordance with state law.

     **F. Unsecured Claims Bar Date.** The bar date for all parties to file a proof of claim, except for claims related to rejection of an executory contract or lease, has elapsed. The deadline for filing a proof of claim for unsecured claims (other than a claim for damages stemming from the rejection of an executory contract or lease) was August 5, 2013.

     **G. Rejection Damage Claim Bar Date.** An Unsecured Claim arising from the rejection of an executory contract or unexpired lease must be filed no later than twenty (20) days after the Effective Date of the Plan.

     **H. Summary of Financial Projections.** Attached hereto as Exhibit C are financial projections prepared by management. These projections include the monthly forecast for the balance of 2015 and annual forecasts for 2016 and 2017. The statements include projected cash flow forecasts and assumptions based upon Debtor's continued operations at the consolidated facility that maximize revenue while reducing historical costs. The projections are conservative and establish that the Reorganized Debtor will be able to make the payments provided for in the Plan from existing cash and revenue from operations.

## VI. OTHER PROVISIONS OF PLAN

     **A. Assumption and Rejection of Executory Contracts.**
     The Debtor will reject all Executory Contracts except for those previously assumed by Court Order or those listed on Exhibit A to the Plan. Any Claims arising from rejection of an executory contract or lease must be filed on or before twenty (20) days from the Effective Date. Otherwise, such Claims are forever barred and will not be entitled to share in any distribution under the Plan. Any Allowed Claims arising from rejection of Executory Contracts, if timely filed and allowed, will be paid as a Class 3 General Unsecured Claims.

     **B. Disbursing Agent.**
     The Reorganized Debtor shall act as the Disbursing Agent or shall designate a party to act as Disbursing Agent.

     **C. Conditions to Confirmation.**
     Confirmation of the Plan shall not occur and the Bankruptcy Court shall not enter the Confirmation Order unless (a) all of the requirements of the Bankruptcy Code for confirmation of the Plan with respect to the Debtor shall have been satisfied. In addition, confirmation shall not occur, the Plan shall be null and void and of no force and effect, and the Plan shall be deemed withdrawn unless the Court shall have entered all orders (which may be orders included within the Confirmation Order) required to implement the Plan.

     **D. Waiver and Nonfulfillment of Conditions to Confirmation.**
     Nonfulfillment of any condition to confirmation of the Plan may be waived only by the Debtor. In the event that the Debtor determines that the conditions to the Plan's confirmation

which it may waive cannot be satisfied and should not, in its discretion, be waived, the Debtor may propose a new plan, may modify this Plan as permitted by law, or may request other appropriate relief.

### E. **Confirmation Order Provisions for Pre-Effective Date Actions.**

The Confirmation Order shall empower and authorize the Debtor to take or cause to be taken, prior to the Effective Date, all actions which are necessary to enable it to implement the provisions of the Plan and satisfy all other conditions precedent to the effectiveness of the Plan.

### F. **Conditions to the Effective Date.**

The following are conditions precedent to the effectiveness of the Plan (i) the Plan is confirmed and the Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order (ii) Debtor does not withdraw the Plan at any time prior to the Effective Date; and (iii) the Debtor shall have sufficient cash on hand to make the payments and distributions required under the Plan.

### G. **Binding Effect.**

As provided for in Section 1141(d) of the Bankruptcy Code, the provisions of the Plan shall bind the Debtor, any entity acquiring property under the Plan and any Creditor, Interest Holder, or shareholder of the Debtor, whether or not the Claim or Interest of such Creditor or Interest Holder is impaired under the Plan and whether or not such Creditor or Interest Holder has accepted the Plan.  After confirmation, the property dealt with by the Plan shall be free and clear of all Claims and Interests of Creditors and Interest Holders, except to the extent as provided for in the Plan as the case may be.   The Confirmation Order shall contain an appropriate provision to effectuate the terms of paragraph 13.1 of the Plan.

### H. **Satisfaction of Claims and Interests.**

Holders of Claims and Interests shall receive the distributions provided for in the Plan, if any, in full settlement and satisfaction of all such Claims, and any interest accrued thereon, and all such Interests.

### I. **Special Provision for Treatment of NOV Liability Claim and NOV Attorneys' Fees Claim**.  The NOV Liability Claim and NOV Attorneys' Fees Claim are being appealed.  The Reorganized Debtor will make distributions on this claims as provided in Article 4 herein. However, if the amount in either estimation order is reduced is reduced on appeal, then NOV shall return the difference in the amount paid and the reduced amount of the claim to the Reorganized Debtor.

### J. **Discharge.**

Pursuant to Section 1141(d) of the Bankruptcy Code, upon the Effective Date, the Debtor shall be discharged from any debt that arose before the date of such confirmation, and any debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a proof of the Claim based on such debt is filed or deemed filed under Section 501 of this title; such Claim is allowed under Section 502 of this title; or the Holder of such Claim has accepted the Plan.

**K. <u>Injunction.</u>**

The Confirmation Order shall include a permanent injunction prohibiting the collection of Claims in any manner other than as provided for in the Plan.  All Holders of Claims shall be prohibited from asserting against the Debtor or any of its assets or properties, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not such Holder filed a proof of Claim.  Such prohibition shall apply whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code; or (c) the Holder of a Claim based upon such debt has accepted the Plan.

**L. <u>Preservation of Setoff Rights.</u>**

In the event that the Debtor has a Claim of any nature whatsoever against the Holders of Claims, the Debtor may, but is not required to setoff against the Claim (and any payments or other distributions to be made in respect of such Claim hereunder), subject to the provisions of Section 553 of the Bankruptcy Code.  Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor of any Claim that the Debtor has against the Holder of Claims.  Neither this provision nor the injunctive provision of the Confirmation Order shall impair the existence of any right of setoff or recoupment that may be held by a Creditor herein; provided that the exercise of such right shall not be permitted unless the Creditor provides the Debtor with written notice of the intent to effect such setoff or recoupment.  If the Debtor or the Disbursing Agent, as applicable, objects in writing within twenty (20) business days following the receipt of such notice, such exercise shall only be allowed upon order of the Bankruptcy Court.  In the absence of timely objection, the Creditor may implement the proposed setoff or recoupment against the Claim held by the Bankruptcy Estate.

**M. <u>Releases.</u>**

On the Effective Date and pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, the Debtor, and to the maximum extent provided by law, its agents release and forever discharge all claims, including acts taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into or any other act taken or entitled to be taken in connection with the Plan or this case against the following, whether known or unknown:

Nigel Brassington, Djoni Handoyo Layanto, Erich Mundinger, MK Pumps, their employees, agents, affiliates attorneys and representatives ("Insider Released Parties"), in connection with any and all claims and causes of action arising on or before the Confirmation Date that may be asserted by or on behalf of the Debtor or the Bankruptcy Estate and/or on account of the Debtor's Case.

The release of these Insider Released Parties shall be conditioned upon the occurrence of the Effective Date.  Neither the releases contemplated by Article 13.7 of the Plan, nor any other provisions of the Plan, shall release claims against non-debtor third parties, including but not limited to claims asserted by NOV against non-debtor third parties.

851186-00004 MMH 3/11/2015 00945261.DOC 1

The Debtor's Professionals will be released from any and all claims and liabilities other than gross negligence and willful misconduct or except as otherwise provided under the Professional Code of Responsibility.

**N. Lawsuits.**

On the Effective Date, all lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of Claims against the Debtor except proof of Claims and/or objections thereto pending in the Bankruptcy Court shall be dismissed as to the Debtor.  Such dismissal shall be with prejudice to the assertion of such Claims in any manner other than as prescribed by the Plan.  All parties to any such action shall be enjoined by the Bankruptcy Court by the Confirmation Order from taking any action to impede the immediate and unconditional dismissal of such actions.  All lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of a claim(s) by the Debtor or any entity proceeding in the name of or for the benefit of the Debtor against a person shall remain in place only with respect to the claim(s) asserted by the Debtor or such other entity, and shall become property of the Debtor to prosecute, settle or dismiss as it sees fit.

**O. Insurance.**

Confirmation and consummation of the Plan shall have no effect on insurance policies of the Debtor in which the Debtor or any of the Debtor's representatives or agents is or was the insured party; the Debtor shall continue as the insured party under any such policies without the need of further documentation other than the Plan and entry of the Confirmation Order.  Each insurance company is prohibited from denying, refusing, altering or delaying coverage on any basis regarding or related to the Debtor's bankruptcy, the Plan or any provision within the Plan.

**P. Objections to Claims.**

The Debtor or the Disbursing Agent shall, on and after the Effective Date, have the right to make and file objections to Claims, including Administrative Expense.  Unless otherwise ordered by the Bankruptcy Court, all objections to Claims that are the subject of proofs of claim or requests for payment filed with the Bankruptcy Court shall be filed and served upon the holder of the Claim as to which the objection is made no event later than one hundred twenty (120) days after the Effective Date.

**Q. Prosecution of Objections.**

On and after the Effective Date, except as the Bankruptcy Court may otherwise order, the filing, litigation, settlement or withdrawal of all objections to Claim and Reserved Avoidance Actions may be made by the Reorganized Debtor and/or Disbursing Agent.

**R. Disallowance of Claims.**

All Claims held by Persons against whom the Debtor or its Estate have asserted a Claim or Cause of Action under Sections 522(f), 522(h), 542, 543, 544, 547, 548, 549, 550, 551, 553, or 724(a) of the Bankruptcy Code, including, without limitation, the Chapter 5 Actions and the Derivative Claims, shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and holders of such Claims may not vote to accept or reject the Plan until such time as

such Claims or Causes of Action against the Person have been settled or a Final Order entered and all sums due the Debtor by that Person are turned over to the Debtor.

### S. **Disputed Claims**.

Except as otherwise provided in the Plan, no payments shall be made with respect to all or any portion of a Disputed claim unless and until any and all objections to such Disputed Claim have been determined by a Final Order.  Payments and distributions to each holder of a Disputed Claim, to the extent that the Disputed Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan.  Any payments that would have been made prior to the date on which a Disputed Claim becomes an Allowed Claim shall be made as soon as practicable after the date that the order or judgment of the Court determining such Claim to be an Allowed Claim becomes a Final Order.

For purposes of the Plan, any and all Claims that are subject to disallowance pursuant to Code §§ 502(e) and 509 shall be deemed to be disallowed as of the Confirmation Date, notwithstanding the absence of any objection thereto.

## VII.   **LIQUIDATION ANALYSIS**

### A.   **Methodology.**

The starting point in determining the amount which members of each impaired class of unsecured claims and interests would receive in a Chapter 7 case is to estimate the dollar amount that would be generated from the liquidation of the Debtor (the "Liquidation Proceeds"). The Liquidation Proceeds of the Debtor would consist of the proceeds from the sale of all of the assets of the Debtor, augmented by the cash held by the Debtor.  The present value of the distribution from the Liquidation Proceeds is then compared with the present value offered to each of the classes of unsecured claims and interests of each such class.

### B.   **Analysis.**

Attached as **Exhibit D** is a liquidation analysis (the "Liquidation Analysis").   This Liquidation Analysis indicates that Holders of Allowed General Unsecured Claims would receive a the same estimated distribution in a Chapter 7 liquidation, except in a Chapter 7 the payment would be drastically delayed, which is a far less desirable result than the result to be achieved under the Plan.  Under the Plan, all creditors are paid in full, with most creditors paid within thirty (30) days of the Effective Date.  However, as discussed below, in liquidation, these creditors would likely not receive any distribution until the assets were fully liquidated by the Chapter 7 Trustee. This process would likely take several months and possibly years before any payment would be made to creditors.

As previously discussed, Debtor's assets have a book value of approximately $18.8 million.  Of this amount, approximately $500,000 pertains to leasehold improvements which would have no value in the event of liquidation. Additionally, Debtor's most significant asset is inventory of approximately $11.5 million.  The liquidation value of this inventory would be deeply discounted and likely yield a little more than $2 million.  The $41,500 in security in

prepetition security deposits would likely be forfeited in a liquidation.  Further, in a liquidation, existing equipment, vehicles and machinery would be sold at a discounted value.  As set forth in Exhibit D, in a liquidation, these  assets have a value of at best $2.4 million.     Debtor estimates cash of $3 million.  In a liquidation, the Chapter 7 Trustee, will likely utilize the cash first to pay ongoing expenses associated with the Chapter 7 case and sale of assets, including payments to various professionals such as attorneys, brokers, auctioneers and accountants.  These fees would be paid ahead of the prepetition claims in this case.

As set forth in Exhibit D, absent confirmation of the Plan, the Chapter 11 Case would be converted to a case under Chapter 7 of the Bankruptcy Code and the assets would be liquidated for at best $7.2 million.   As stated above, Chapter 7 administrative fees and expenses, then Chapter 11 administrative expense claims would be paid ahead of all other claims.

Further, the conversion of the Case to a case under Chapter 7 would add another layer of administrative expense, including professional fees and trustee commissions that would further impair the timing and potential recovery of Allowed General Unsecured Claims.  Thus, the proposed distribution to Allowed Class 3 General Unsecured Claims and Allowed Class 4 Unsecured Claims of NOV under the Plan provides for a much faster and better return to creditors than in a liquidation.

## VIII.   RISKS POSED TO CREDITORS

The principal risk to the creditors is that the Plan will not be confirmed.   Absent confirmation of the Plan, the case would be converted to a Chapter 7 to liquidate the Debtor's assets.  Although it appears that the creditors would be paid in full, the final distribution from a Chapter 7 trustee could take several years.  The Plan is preferable because the creditors can be paid much faster.

## IX.   ALERNATIVES

Although the Disclosure Statement is intended to provide information to assist creditors in making a judgment on whether to vote for or against the Plan, and although creditors are not being offered through that vote an opportunity to express an opinion concerning alternatives to the Plan, a brief discussion of alternatives to the Plan may be useful. These alternatives include conversion to a Chapter 7 or dismissal of the proceedings.  The Debtor of course, believes the proposed Plan to be in the best interests of creditors.   The Debtor assesses the alternatives as follows:

### A.  Conversion to Chapter 7

The first alternative would be to convert the Chapter 11 case to a Chapter 7 liquidating bankruptcy to liquidate the business.  If this occurred, the Bankruptcy Court will appoint a trustee to liquidate the Debtor's assets for the benefit of its creditors.  The costs associated with a trustee would then be added to the additional tier of administrative expenses entitled to priority over general unsecured claims upon conversion.   Such administrative expenses include the Trustee's commissions, as well as fees for professionals retained by the Trustee to assist in the liquidation. The Trustee's commissions are based on disbursements to creditors.  The Trustee

receives 25% of the first $5,000, 10% of the next $45,000, 5% of the next $950,000 and 3% on all amount disbursed in excess of $1 million.

### B. Dismissal

Dismissal of the proceeding would likely result in the Debtor and the plan proponents defending debt-collection litigation and numerous new lawsuits to collect debts. The Secured Lenders would foreclose on most of the Debtor's assets likely halting operations. Under this scenario, the unsecured creditors would likely receive no payment whatsoever on their claims.

### C. No Assurance of Either

There are other possibilities which are less likely, such as a competing plan proposed by a different party. The Debtor has attempted to set forth the reasonable alternatives to the proposed Plan. However, the Debtor must caution creditors that a vote must be for or against the Plan. The vote on the Plan does not include a vote on alternatives to the Plan. There is no assurance what course the proceedings will take if the Plan fails acceptance.

## X.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A. Tax Consequences to Creditors

#### 1. GENERALLY

The tax consequence to any particular creditor may vary depending on their own circumstances and they should consult with their own tax professional for advice regarding the impact on them of their acceptance or rejection of the plan.

#### 2. UNSECURED CLAIMS

Holders of Class 3, 4, 5 and 6Unsecured Claims will receive distributions from the Debtor. These Claimholders should either be treated as (i) recognizing ordinary income in an amount equal to cash received and recognizing a loss in an amount equal to the tax basis in the Claim or (ii) recognizing a loss equal to the difference between the amount of cash received and their tax basis in their Claim.

A Claimholder's tax basis in a Claim should generally equal the amount included in income as a result of the provision of goods or services to the Debtor, except to the extent that a bad debt loss had previously been claimed. The gain or loss with respect to the Claim should be ordinary to the extent that it arose in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtor.

**DUE TO THE COMPLEX NATURE OF APPLICABLE TAX LAWS, CLAIMANTS SHOULD CONSULT WITH THEIR TAX PROFESSIONAL CONCERNING COMPLIANCE WITH AND THE AFFECT OF BOTH STATE AND FEDERAL TAX LAWS ON THEIR INTEREST BEFORE THEY CAST A BALLOT TO ACCEPT OR REJECT THE PLAN.**

**THE ACCOUNTANTS, ATTORNEYS, AND THE MANAGEMENT OF THE DEBTOR MAKE NO REPRESENTATIONS HEREIN CONCERNING THE IMPACT OF THE TAX LAW ON ANY INDIVIDUAL TREATED UNDER THE PLAN.**

851186-00004 MMH 3/11/2015 00945261.DOC 1

## XI.   PREFERENCES AND FRAUDULENT TRANSFERS

Under the Bankruptcy Code and Texas State Law, the bankruptcy estate may sue to recover assets (or their value) that were transferred by "voidable transfers", which includes assets transferred:

      (A)     in fraud of Creditors,

      (B)     in constructive fraud of Creditors – because the asset was transferred without sufficient consideration while the Debtor was insolvent,

      (C)     as a preferential transfer - a payment before bankruptcy outside the ordinary course that allows a creditor to receive more than it would receive in liquidation, or

      (D)     as an unauthorized post-bankruptcy transfer by the Debtor outside of the ordinary course.

A list of all transfers made during the applicable avoidance periods is attached to Debtor's Statement of Financial Affairs filed with the Bankruptcy Court on April 19, 2013 (Docket #19).   The Debtor does not believe that any of these transfers are voidable under Sections 550, 547, 548, 544, or similar provision of the Bankruptcy Code.   The Plan contemplates a release of all Avoidance Actions.

If the Plan is not confirmed and a liquidating trustee or Chapter 7 trustee is appointed, it is possible that the trustee's analysis will differ from that of the Debtor and that avoidance actions will be commenced against Creditors of the estate, insiders, or others.

## XII.   LITIGATION

As discussed herein, on September 21, 2012, litigation was initiated in Harris County District Court against the Mud King Products, Inc. and various other defendants for misappropriation of trade secret and related actions.   On or about October 19, 2012, this litigation was subsequently removed to the Federal District court in Houston, where it remains pending, in the case styled as *National Oilwell Varco v. Mud King Products, L.L.C. et al*, Case No. 4:12-cv-03120, in the United States District Court for the Southern District of Texas, Houston Division.   The NOV Litigation is currently stayed as to the Debtor and various employee defendants.   The Court has estimated NOV's claim against the Debtor which will paid in full as provided in Article IV of the Plan.   Otherwise, no litigation is pending or expected against the Debtor.   No claim of environmental liability has been made, and no such claims are known or expected.

## XIII.   MANAGEMENT OF THE REORGANIZED DEBTOR

### A.      Directors and Officers of the Debtor

Nigel Brassington and Djoni Handoyo Layanto are officers and directors of the Debtor. These Directors and Officers of the Debtor shall continue as the Directors and Officers of the Reorganized Debtor from and after the Effective Date of the Plan.

851186-00004 MMH 3/11/2015 00945261.DOC 1

### B.      Management Compensation

As of the Effective Date, the management of the Reorganized Debtor shall continue to receive salaries as follows: Nigel Brassington - $237,070 annually and Djoni Handoyo Layanto - $148,494 annually.   Lee Wilson will continue as operations manager at an annual salary of $110,000. Management reserves the right increase these salaries in accordance with usual and customary practices of the company.

## XIV.   ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.      Acceptance of the Plan

Confirmation of a Plan under Chapter 11 requires, among other things, that at least one class of creditors or claimants, such as the secured or unsecured creditors in this case, vote in favor of the Plan.   This vote is calculated by only counting those creditors who actually send in a ballot on time.  If two thirds in total dollar amount and a majority in number of claims actually voting in a class approve the Plan, that class of creditors is considered an accepting class.  If the vote is insufficient, the Court can still confirm the Plan, but only upon being provided additional proof regarding the ultimate fairness of the Plan to the creditors.  The Debtor believes that the unsecured creditors will support the Plan when they consider the fact that the secured and priority creditors will receive the majority of all of the assets of the Debtor in the event the reorganization is unsuccessful.

The proponent of a Plan also must meet all other applicable requirements of Section 1129(a) of the Bankruptcy code (except Section 1129(a)(8), if the proponent proposes to seek confirmation of a Plan under Section 1129(b) of the Bankruptcy Code).   These other requirements include, among other things, that the Plan comply with the applicable provisions of Title 11 and other applicable law, that the Plan be proposed in good faith, and that at least one impaired class of creditors vote to accept the Plan.  The Debtor believes that the Plan satisfies all other applicable requirements of Section 1129(a) of the Bankruptcy Code.

### B.      Confirmation without Acceptance of All Impaired Classes

The Bankruptcy Court may confirm a plan even if not all impaired classes accept the Plan.  For the Plan to be confirmed over the rejection of an impaired class, the proponent must show, among other things, that the plan does not discriminate unfairly and that the plan is fair and equitable with respect to each impaired class that has not accepted the plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class if, among other things, the plan provides:  (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain, on account of its claim, property that has a value as of the Effective Date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and interests, that the holder of any claim or interest that is junior to the claims or interest of such class will not receive or retain, on account of such junior claim or interest, any property unless the senior class is paid in full.  The Bankruptcy Court must further find that the economic terms of a plan do not unfairly discriminate as provided in Section 1129(b) of the Bankruptcy Code with respect to the particular objecting class.  Under the terms of this plan, the principals of the Debtor shall retain their interest in the Reorganized Debtor.

The retention of this interest may prevent the Debtor from seeking relief under 1129(b)(2)(B). However, if the plan is not confirmed, unsecured creditors will likely not receive any distribution in a liquidation.

### C.        Other Requirements for Confirmation

In order to obtain confirmation of the Plan, the requirements of Section 1129 of the Code must be satisfied.  These requirements include but are not limited to findings that the Plan complies with the applicable provisions of Chapter 11 of the Code, that the Debtor has complied with the applicable provisions of Chapter 11 of the Code, that the Plan has been proposed in good faith and not by any means forbidden by law, and at least one class of impaired claims has voted to accept the Plan.  The Debtor believes that the Plan satisfies all the statutory requirement of Chapter 11 of the Bankruptcy Code.

**1.**      BEST INTEREST OF CREDITORS

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each class, that each holder of a claim or interest of such class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date, that is not less than the amount that such person would receive or retain if the Debtor was, on the effective date, liquidated under Chapter 7 of the Bankruptcy Code.  As set forth above, the Debtor believes that this test will be satisfied.

**2.**      FINANCIAL FEASIBILITY

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the bankruptcy court, the bankruptcy court must determine that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.  The Debtor believes that it will be able to fulfill its obligations under the Plan.

Attached hereto as Exhibit C is the Debtor's projection demonstrating the feasibility of the Plan. Exhibit C was prepared by Debtor's management from historical data and a projection model that assumes that revenue will be produced as projected by use of the current facilities and equipment.  The Debtor believes that it is sufficient to support additional business and will continue to increase its revenues.  This pro forma indicates that the Debtor will be able to survive on a post-confirmation basis.

### D.        Cram-Down - Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Code contains provisions for confirmation of a Plan even if the Plan is not accepted by all impaired classes, provided that at least one impaired class of claims has accepted it (determined without including any acceptance by any insider holding a claim of such class).  These "cram-down" provisions, for confirmation of a Plan despite the non-acceptance of one or more impaired classes of claims or interests, are set forth in Section 1129(b) of the Bankruptcy Code.

In the event that any impaired class of claims does not accept the Plan by the requisite majority set out in the introduction, the Debtor must demonstrate to the Bankruptcy Court, with respect to each impaired class which does not accept the Plan that the Plan does not discriminate

unfairly, and is "fair and equitable" with respect to that class.  Under the Bankruptcy Code, a Plan is considered "fair and equitable" with respect to secured claims, unsecured claims or interest, as the case may be, if the following conditions are met:

(a)  <u>Secured Claims</u>.  The holders of such claims retain their liens, to the extent of the allowed amount of their secured claims, and that each holder of such a claim receive on account of such secured claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in the collateral.

(b)  <u>Unsecured Claims</u>.  Either (i) each impaired unsecured creditor receives or retains under the Plan property of a value as of the effective date of the Plan equal to the amount of its allowed claim, or (ii) the holder of any claim or interest that is junior to the claims of the dissenting class will not receive or retain any property under the Plan.

<u>Absolute Priority Rule</u>. Section 1129(b)(2)(B)(ii) controls the payment of senior and junior classes of claims or interests in the event that all of the applicable requirements of Section 1129(a), other than paragraph (8), are met with respect to a plan.  In the event that any impaired class (other than an "insider", as defined in 11 U.S.C. § 101(31)) rejects the Plan, the equity interest holders (or other interests junior to unsecured creditors) may only retain their interest in the Reorganized Debtor in return for new value infused into the Reorganized Debtor in accordance with *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 445 (1999). The assessment of the required "new value" for the equity interest holders (or other interests junior to unsecured creditors) is to be made in the event that any impaired class (that is not an "insider") rejects the Plan.

The Debtor believes that the Plan meets the "fair and equitable" test and does not discriminate unfairly with respect to secured class of creditors or interest holders.  Under the terms of this plan, the principals of the Debtor shall retain their interest in the Reorganized Debtor.  The retention of this interest may prevent the Debtor from seeking relief under 1129(b)(2)(B). Unless all impaired classes vote for the Debtor's plan, the retention of this interest will prevent the Debtor's plan from being confirmed and this case will be converted to chapter 7.

## XV.  <u>CONCLUSION</u>

The information provided in this Disclosure Statement is intended to assist you in voting on the Plan in an informed fashion.  If the Plan is confirmed, you will be bound by its terms.  Accordingly, you are urged to make such further inquiries as you may deem appropriate and then cast an informed vote on the Plan.

851186-00004 MMH 3/11/2015 00945261.DOC 1

Respectfully submitted this _11_th day of March, 2015.

MUD KING PRODUCTS, INC.

By: _____
Erich Mundinger, Vice-President

OF COUNSEL:

**HOOVER SLOVACEK LLP**
EDWARD L. ROTHBERG
State Bar No. 17313990
Email: rothberg@hooverslovacek.com
MELISSA A. HASELDEN
State Bar No. 00794778
Email: haselden@hooverslovacek.com
Galleria Tower II
5051 Westheimer, Suite 1200
Houston, Texas 77056
Telephone: 713.977.8686
Facsimile:  713.977.5395

ATTORNEYS FOR DEBTOR